**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| AMERICAN FEDERATION OF LABOR AND CONGRESS OF INDUSTRIAL ORGANIZATIONS,<br><br>　　　　Plaintiff,<br><br>v.<br><br>NATIONAL LABOR RELATIONS BOARD,<br><br>　　　　Defendant. | Civil Case No. 20-cv-00675-KBJ |

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................. ii

FACTS ...................................................................................................................................... 2

    The Right of Employees to Engage in Collective Bargaining and to Petition for an Election to Select a Representative for that Purpose ................................................................................ 3

    Regulatory History ............................................................................................................... 7

        The 2014 Election Rule ..................................................................................................... 7

        The 2017 Request for Information ................................................................................... 9

        The 2019 Election Rule ................................................................................................... 11

ARGUMENT ......................................................................................................................... 12

    PLAINTIFF IS LIKELY TO SUCCEED ON THE MERITS ................................................. 12

    I.   The Rule Is Invalid Because It Was Not Promulgated After Notice and Comment and It Does Not Fall into the Exception for Rules of Procedure ................................................. 12

        A. The Rule Places Additional Obstacles in the Path of a Party Seeking an Election and Vests Parties with a Substantive Right to a Regional Director's Opinion on the Status of Individual Employees Under the Act ................................................. 14

        B.  The Rule Substantively Alters the Critical, Campaign Period ............................. 19

        C.  The Rule Contracts the Petitioner's Substantive Right to an Eligibility List ...................................................................................................... 22

        D.  The Rule Contracts the Parties' Substantive Right to Select Election Observers ................................................................................................ 23

        E.  The Rule Deprives the Party That Wins A Representation Election of the Substantive Rights That Previously Attached to the Regional Director's Immediate Certification of the Results ................................................................. 24

        F.  The Provisions of the Rule Are Not Severable ................................................... 28

    II.  Promulgation of the Rule Was Arbitrary and Capricious as a Whole Because the Board Completely Ignored Available Evidence That Contradicts the Rationale for the Rule .. 31

    III. The Rule Is Inconsistent with the NLRA ....................................................................... 35

    PLAINTIFF WILL SUFFER IRREPARABLE HARM IF THE RULE TAKES EFFECT..... 40

    INJUNCTIVE RELIEF WOULD CAUSE NO SUBSTANTIAL HARM TO THE BOARD. 42

    THE PUBLIC INTEREST WEIGHS IN FAVOR OF PRELIMINARY RELIEF.................. 43

CONCLUSION ......................................................................................................................43

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Allegheny Ludlum Corp.*,
  333 N.L.R.B. 734 (2001), *enf'd*, 301 F.3d 167 (3d Cir. 2002)................................................24

*Allentown Mack Sales and Serv., Inc. v. NLRB*,
  522 U.S. 359 (1998)........................................................................................................31

*Allstate Insurance Co.*,
  234 N.L.R.B. 193 (1978).............................................................................................6, 26

*Amer. Hosp. Ass'n v. NLRB*,
  499 U.S. 606 (1991)........................................................................................................31

*Associated Builders & Contractors of Tex., Inc. v. NLRB*,
  2015 WL 3609116 (W.D. Tex. 2015)........................................................................9, 34

*Associated Builders & Contractors of Tex., Inc. v. NLRB*,
  826 F.3d 215 (5th Cir. 2016) .................................................................................9, 15, 20

*Barre-National, Inc.*,
  316 N.L.R.B. 877 (1995) ...................................................................................................5

*Batterton v. Marshall*,
  648 F.2d 694 (D.C. Cir. 1980) ...................................................................13, 18, 21, 27

*Boire v. Greyhound Corp.*,
  376 U.S. 473 (1964)........................................................................................................41

*Butera Finer Foods, Inc.*,
  334 N.L.R.B. 43 (2001) ...................................................................................................23

*Chamber of Commerce of U.S. v. NLRB*,
  118 F. Supp. 3d 171 (D.D.C. 2015)......................................................................9, 15, 20, 31

*Chamber of Commerce of the U.S. v. NLRB*,
  879 F. Supp. 2d 18 (D.D.C. 2012).....................................................................................7

*D'Amico v. U.S. Serv. Indus., Inc.*,
  867 F. Supp. 1075 (D.D.C. 1994) ....................................................................................43

*Davis v. PBGC*,
  571 F.3d 1288 (D.C. Cir. 2009).......................................................................................12

*Didlake, Inc.*,
  367 N.L.R.B. No. 125 (May 10, 2019) ..............................................................................6

*Embassy Suites Hotel, Inc.*,
  313 N.L.R.B. 302 (1993) .......................................................................................23

*Epsilon Elecs., Inc. v. U.S. Dept. of Treasury*,
  857 F.3d 913 (D.C. Cir. 2017) ...............................................................................29

*Excelsior Underwear, Inc.*,
  156 N.L.R.B. 1236 (1966) .......................................................................................5

*FCC v. Fox Television Stations, Inc.*,
  556 U.S. 502 (2009) (Kennedy, concurring) ..........................................................35

*Goodyear Tire & Rubber Co.*,
  138 N.L.R.B. 453 (1962) ..........................................................................................3

*Int'l Union of Elec., Radio & Mach. Workers v. NLRB*,
  426 F.2d 1243 (D.C. Cir. 1970)...............................................................................42

*Magnesium Casting Co. v. NLRB*,
  401 U.S. 137 (1971)............................................................................................4, 36

*Make the Road N.Y. v. McAleenan*,
  405 F. Supp. 3d 1 (D.D.C. 2019).............................................................................43

*MD/DC/DE Broadcasters Ass'n v. FCC*,
  236 F.3d 13 (D.C. Cir. 2001)...................................................................................29

*Mendoza v. Perez*,
  754 F.3d 1002 (D.C. Cir. 2014)...............................................................................12

*Motor Vehicle Mfrs. Ass'n of United States, Inc. v. State Farm Mut. Auto. Ins. Co.*,
  463 U.S. 29 (1983)...................................................................................................32

*Nat. Res. Def. Council v. Abraham*,
  355 F.3d 179 (2d Cir. 2004).....................................................................................12

*Nat'l Ass'n of Waterfront Emp'rs v. Solis*,
  665 F. Supp. 2d 10 (D.D.C. 2009)...........................................................................19

*New York v. U.S. Dept. of Health and Human Servs.*,
  414 F. Supp. 3d 475 (S.D.N.Y. 2019)......................................................................29

*NLRB v. CNN Am., Inc.*,
  865 F.3d 740 (D.C. Cir. 2017).................................................................................24

*NLRB v. Gissel Packing Co.*,
  395 U.S. 575 (1969)............................................................................................3, 25

*Scott ex. rel. NLRB v. Stephen Dunn & Assocs.*,
   241 F.3d 652 (9th Cir. 2001) ...........................................................42

*NLRB v. Wyman-Gordon Co.*,
   394 U.S. 759 (1969).................................................................6, 22

*NRDC v. Herrington*,
   768 F.2d 1355 (D.C. Cir. 1985).................................................32

*Overnite Transp. Co.*,
   335 N.L.R.B. 372 (2001) ..........................................................37

*Pickus v. United States. Board of Parole*,
   507 F.2d 1107 (D.C. Cir. 1974)...........................................16, 27

*Pub. Citizen v. Dep't of State*,
   276 F.3d 634 (D.C. Cir. 2002) ..................................................19

*Quest International*,
   338 N.L.R.B. 856 (2003) ...........................................................26

*Reeder v. FCC*,
   865 F.2d 1298 (D.C. Cir. 1989) ...........................................13, 18

*Sequoia Orange Co. v. Yeutter*,
   973 F.2d 752 (9th Cir. 1992) ...............................................12, 13

*Sorenson Commc'ns Inc. v. FCC*,
   755 F.3d 702 (D.C. Cir. 2014)...................................................32

*Tel. and Data Sys., Inc. v. FCC*,
   19 F.3d 42 (D.C. Cir. 1994).......................................................30

*Time Warner Cable, Inc. v. FCC*,
   729 F.3d 137 (2d Cir. 2013).......................................................28

**Statutes, Regulations, and Court Rules**

5 U.S.C. § 553......................................................................1, 12

5 U.S.C. § 706.................................................................1, 31, 35

29 U.S.C. § 102.69....................................................................37

29 U.S.C. § 153............................................................... *passim*

29 U.S.C. § 157.............................................................................3

29 U.S.C. § 159......................................................................3, 14

29 C.F.R. § 102.64 ................................................................................4, 5, 14, 15

29 C.F.R. § 102.67 ................................................................................ *passim*

29 C.F.R. § 102.69 ................................................................................23

Fed. R. App. P. 8 ................................................................................39

Fed. R. App. P. 18 ................................................................................39

Fed. R. Civ. P. 62 ................................................................................39

**Other Authorities**

AFL-CIO, Submission of the American Federation of Labor and Congress of
  Industrial Organizations in Response to Request for Information Concerning
  the Rules Governing Representation Cases (April 18, 2018),
  https://www.nlrb.gov/sites/default/files/webform/uploads/nlrb_rin_3142-
  aa12_submission_of_the_afl-cio.pdf ................................................................10

*Black's Law Dictionary* (11th ed., 2019) ................................................................39

John-Paul Ferguson, Report: Assessing the Impact of the April 2005 Amendments
  to the NLRB Representation Case Procedures (April 17, 2018),
  https://www.nlrb.gov/sites/default/files/webform/uploads/nlrb_rfi_afl-
  cio_expert_report_4-18-18.pdf. ................................................................10, 35

Miscellaneous Amendments, 26 Fed. Reg. 3,885 (May 4, 1961) ................................................................4

NLRB, Election Report for Cases Closed (Feb. 26, 2020),
  https://www.nlrb.gov/sites/default/files/attachments/basic-page/node-6857/fy-
  2019-totals.pdf ................................................................40

NLRB, NLRB Casehandling Manual – Part Two: Representation Proceedings §
  11310 (Jan. 2017) ................................................................6, 23

NLRB, Office of the General Counsel, Section 10(j) Manual (Feb. 2014) ................................................................42

NLRB Regional Director Committee, Regional Director Committee's Response
  and Comments to the NLRB's Request for Information on the Representation
  – Case Procedures (April 13, 2018),
  https://www.nlrb.gov/sites/default/files/webform/uploads/rd.comm_.2014.
  election.rule_.pdf. ................................................................10, 34

Representation – Case Procedures,
  79 Fed. Reg. 74,308 (Dec. 15, 2014) ................................................................ *passim*

Representation – Case Procedures,
  82 Fed. Reg. 58,783 (Dec. 14, 2017) ................................................................9

Representation – Case Procedures,
    84 Fed. Reg. 69,524 (Dec. 18, 2019) .............................................................................. *passim*

Representation – Case Procedures:  Election Bars; Proof of Majority Support in
    Construction Industry Collective-Bargaining Relationships,
    84 Fed. Reg. 39,930 (Aug. 12, 2019) ............................................................................. 10, 41

*Webster's II New College Dictionary* (2001) ............................................................................. 39

Plaintiff American Federation of Labor and Congress of Industrial Organizations ("AFL-CIO") submits this memorandum in support of its motion for a preliminary injunction barring implementation of a final rule issued by the National Labor Relations Board ("NLRB" or "Board"), Representation – Case Procedures, 84 Fed. Reg. 69,524 (Dec. 18, 2019) (the "2019 election rule"), currently set to take effect on April 16, 2020.

We demonstrate below that the preliminary injunction should be granted because each of the factors the court must consider weighs heavily in favor of the Plaintiff. Plaintiff is likely to succeed on the merits of its claims for three independent reasons that correspond to Counts One, Two, and Four of the Complaint.[1]

The primary ground for invalidation (Count One) is that the NLRB's 2019 election rule was adopted without notice and comment in violation of the Administrative Procedure Act (APA), 5 U.S.C. § 553. The very narrow exception to the notice-and-comment requirement for rules of agency "procedure" is not remotely applicable, because the 2019 election rule embodies agency policy and value judgments that go to the heart of the key substantive provisions of the National Labor Relations Act ("NLRA" or "Act"). The challenged rule indeed rejects prior agency policy and value judgments adopted *with* notice and comment and substitutes new policy and value judgments in their place *without* notice or comment. And regulatory actions that embody agency policy and value judgments are precisely those that require public input through notice and comment under the APA.

The second ground for invalidation (Count Two) is that the promulgation of the 2019 election rule as a whole was arbitrary, capricious, and an abuse of discretion in violation of the APA, 5 U.S.C. § 706(2)(A), because the Board expressly declined to rely on empirical evidence

---

[1] If this case proceeds to final adjudication on the merits, we will also argue that specific parts of the rule are arbitrary, capricious, and an abuse of discretion as alleged in Count Three.

1

concerning the operation of the existing rules, including information that the Board itself had requested from affected parties as well as information readily available to the Board in its own records, and because the disregarded evidence contradicts factual assertions the Board advances to justify the rule.

The third ground for invalidation (Count Four) is that certain important provisions of the rule are contrary to the text of the NLRA and thus exceed the agency's authority in violation of the APA, 5 U.S.C. § 706(2)(C).

If the Court agrees that Plaintiff is likely to succeed on its primary claim that the NLRB promulgated the 2019 election rule in violation of the APA's notice-and-comment requirement, the Court may issue an injunction without reaching Plaintiff's alternative grounds for invalidating the rule. That would require the Board to provide notice and receive comments, which, if given due consideration, would be apt to cure the substantive deficiencies in the rule.

Plaintiff also satisfies the other criteria for the grant of a preliminary injunction because implementation of the rule will cause irreparable harm to the AFL-CIO and its affiliated unions, the balance of hardships favors Plaintiff, and the public interest will be served by the injunction.

**FACTS**

The facts relevant to this motion are facts concerning the historical development of the statutory and agency law governing petitions for elections under the NLRA, including how the Board substantively changed agency law in 2014 pursuant to notice-and-comment rulemaking and how the current Board, without such rulemaking, undid those changes and went even further. A review of the historical development reveals how deeply substantive the 2019 changes are.

**The Right of Employees to Engage in Collective Bargaining and to Petition for an Election to Select a Representative for that Purpose**

The right to engage in collective bargaining is the central, substantive right created by the NLRA. Section 7 of the Act vests in employees "the right . . . to bargain collectively through representatives of their own choosing." 29 U.S.C. § 157. Employees exercise the right to engage in collective bargaining through § 9 of the Act. 29 U.S.C. § 159. Section 9 vests in employees a right to petition the NLRB to conduct an election through which they can select a representative for purposes of collective bargaining, change representatives, or demonstrate that they no longer wish to be represented. 29 U.S.C. § 159(c). Absent serious unfair labor practices that render a fair election impossible, the *only* means by which employees can compel their employer to bargain with their chosen representative is by exercising their right to petition for an election. *See NLRB v. Gissel Packing Co.*, 395 U.S. 575 (1969). Thus, a petition and subsequent election are the gates employees must pass through in order to engage in collective bargaining.

The time between the filing of a petition and an election is often marked by vigorous campaigning by employees, the union, and the employer. The Board has designated that period the "critical period" during which it attempts to maintain "laboratory conditions" and will find conduct objectionable and grounds for overturning an election that would not be unlawful outside that period. *See*, *e.g.*, *Goodyear Tire & Rubber Co.*, 138 N.L.R.B. 453 (1962). The length of the critical period, and thus the time it takes employees to obtain an election and, thereby, representation, is determined, directly and indirectly, by the NLRB rules at issue here.

In 1959, Congress amended the NLRA in order to expedite the processing of petitions for elections. Congress found that the Board itself could not process petitions for elections in a timely manner. Therefore, Congress provided:

The Board is . . . authorized to delegate to its regional directors its powers under section 159 of this title [§ 9 of the Act] to determine the unit appropriate for the

3

purpose of collective bargaining, to investigate and provide for hearings, and determine whether a question of representation exists, and to direct an election or take a secret ballot under subsection (c) or (e) of section 159 of this title and certify the results thereof, except that upon the filing of a request therefor with the Board by any interested person, the Board may review any action of a regional director delegated to him under this paragraph, but such a review shall not, unless specifically ordered by the Board, operate as a stay of any action taken by the regional director.

29 U.S.C. § 153(b). The provision was expressly intended to expedite the resolution of questions of representation. *See Magnesium Casting Co. v. NLRB*, 401 U.S. 137, 141 (1971) (Section 3(b) "'is a new provision . . . designed to expedite final disposition of cases by the Board, by turning over part of its caseload to its regional directors for final determination. . . . This authority to delegate to the regional directors is designed . . . to speed the work of the Board.'") (quoting Senator Goldwater, a member of the Conference Committee which added the provision). The Board effected the authorized delegation of authority in 1961. *See* Miscellaneous Amendments, 26 Fed. Reg. 3,885 (May 4, 1961). Thus, petitions for elections are now processed by the Board's regional directors ("RDs") subject to discretionary Board review.

Once a petition is filed, absent agreement of all parties, the RD must conduct a hearing before directing that an election take place. The sole statutory purpose of such a hearing, as § 9(c) makes clear, and as the NLRB acknowledges in the 2019 election rule, is to determine if a "question of representation exists." *See* 84 Fed. Reg. at 69,539. To that end, the NLRB's regulations (in a section not changed by the 2019 election rule) provide: "A question of representation exists if a proper petition has been filed concerning a unit appropriate for the purpose of collective bargaining or concerning a unit in which an individual or labor organization has been certified or is being currently recognized by the employer as the bargaining representative." 29 C.F.R. § 102.64(a).

4

Despite the fact that the only statutory prerequisite to obtaining a Board-supervised election is the existence of a question of representation, prior to 2014, the Board allowed parties to raise and litigate other issues at the pre-election hearing. For example, the Board permitted parties to raise and litigate a question about whether a particular individual was a covered employee under the Act rather than a manager, supervisor, confidential employee, independent contractor, or some other excluded category. *See Barre-National, Inc.*, 316 N.L.R.B. 877 (1995). The Board did not, however, require that the RD decide these issues prior to an election. *See id.* at 878 n.9. This rule was controversial because parties could raise numerous issues of this sort at the pre-election hearing thereby significantly delaying the election and thus the start of collective bargaining. Moreover, in many instances, the disputed issues were rendered moot by the election results (for example, if the eligibility of one person was in dispute and the employees voted against representation by more than one vote). As explained more fully below, in 2014, the Board amended its rules to provide that "[d]isputes concerning individuals' eligibility to vote or inclusion in an appropriate unit ordinarily need not be litigated or resolved before an election is conducted," 29 C.F.R. § 102.64(a), an amendment the 2019 election rules would displace.

If, after a hearing, the RD finds that a question of representation exists, he or she directs that an election be conducted to resolve the question. The RD sets the election date. The current regulations, which the 2019 rule would displace, provide that the RD shall schedule the election "for the earliest date practicable." 29 C.F.R. § 102.67(b).

The RD's direction of election triggers an obligation on the part of the employer to provide a list of eligible voters together with their contact information to the union or the petitioning employees. *Excelsior Underwear, Inc.*, 156 N.L.R.B. 1236 (1966). That obligation was codified in 2014 and the current rule provides that the list must be provided within two

business days of the direction of election, 29 C.F.R. § 102.67(*l*), a requirement the 2019 rule

would relax to five business days. Provision of the list is critical in many elections because,

while the employer always knows who its employees are and how to reach them, the union does

not have access to this information prior to receiving the list. As the Supreme Court explained,

"[t]he disclosure requirement furthers this objective" of a fair and free choice of bargaining

representatives "by allowing unions the right of access to employees that management already

possesses." *NLRB v. Wyman-Gordon Co*., 394 U.S. 759, 767 (1969).

　　　Parties have the right to select observers to be present as votes are cast and counted.

NLRB, NLRB Casehandling Manual – Part Two: Representation Proceedings § 11310 (Jan.

2017). The current regulations do not impose any limitations on parties' choice of observers,

although the Board had developed a detailed set of rules about the identity of observers in its

case law, which the 2019 rule would overrule.

　　　If a majority votes in favor of representation, the RD certifies the union as the

representative of the employees. Issuance of that certification is critical because it triggers the

employer's obligation to recognize and bargain with the employees' chosen representative. *See*,

*e.g.*, *Didlake, Inc*., 367 N.L.R.B. No. 125, slip op. 1 n.2 (May 10, 2019) ("the employer's duty to

bargain on request attaches with the issuance of the certification of representative"); *Allstate*

*Insurance Co.*, 234 N.L.R.B. 193 (1978).

　　　Parties have the right to file a request for review of the RD's pre- and post-election

decisions, and the Board has discretion over whether to grant review. 29 C.F.R. §§ 102.67(c) &

(d). Under the current rules, which the 2019 rule would displace, the filing of a request for

review does not stay the conduct of an election, the counting of the ballots, or the certification of

results. 29 C.F.R. § 102.67(c). In other words, under the current rules, if employees vote in favor

of representation, the filing of a request for review does not stay or delay the employer's obligation to bargain.

## Regulatory History

## The 2014 Election Rule

On December 15, 2014, the NLRB published a final rule containing comprehensive amendments of the regulations governing employees' right to seek an election and obtain representation. Representation – Case Procedures, 79 Fed. Reg. 74,308 et seq. (Dec. 15, 2014) (the "2014 election rule"). Two of the Board's five members issued a vigorous and extended dissent to the adoption of the 2014 rule. 79 Fed. Reg. at 74,430-60.

Because of the significant and substantive nature of the rule, the Board not only gave notice and provided an opportunity to comment before adopting the rule, it held a public hearing on the proposed rule. The preamble to the 2019 election rule recognizes the extraordinary public input solicited by the Board prior to issuing the 2014 rule:

> The 2014 amendments resulted from a deliberative process that included two Notices of Proposed Rulemaking,[2] that accepted comments on those proposals for a total of 141 days, and that conducted two public hearings over a total of 4 days. This process yielded tens of thousands of comments and more than a thousand transcript pages of oral commentary.

84 Fed. Reg. at 69,528 The two NPRMs resulted in just shy of 75,000 comments.[3]

---

[2] The Board repeated the rulemaking process because the first final rule was struck down on the grounds that the Board lacked a quorum when it was adopted. *See Chamber of Commerce of the U.S. v. NLRB*, 879 F. Supp. 2d 18, 28-30 (D.D.C. 2012). In the second proceeding, the Board incorporated the prior rulemaking record, but still accepted new comments and held a second public hearing. 79 Fed. Reg. at 74,311.

[3] *See* Docket for First NPRM, https://www.regulations.gov/document?D=NLRB-2011-0002-0001 (posted Jun. 22, 2011); Docket for Second NPRM https://www.regulations.gov/document?D=NLRB-2011-0002-65959 (posted Feb. 6, 2014).

The 2014 election rule made 25 changes in the Board's regulations. 79 Fed. Reg. at 74,308-10. We outline here only the central, substantive changes that the 2019 election rule seeks to undo.

First, the 2014 rule eliminated parties' right to litigate questions of individual eligibility and inclusion in the unit at the pre-election hearing. With the 2014 rule, the Board expressly overruled its decision in *Barre-National. See* 79 Fed. Reg. at 74,385-86.[4]

Second, the 2014 rule required RDs to set the election for "the earliest date practicable," *Id.* at 74,310, and eliminated a requirement that "[e]lections . . . be automatically stayed [for 25 to 30 calendar days] in anticipation of requests for review." *Id.* at 74,309. The Board found that "this delay served little purpose" because the Board rarely granted requests for review and almost never ruled on them prior to an election even with the waiting period. *Id.* at 74,310.

Third, the 2014 rule codified the *Excelsior* eligibility list requirement and further provided that the employer should serve the list on the petitioner within two business days of the direction of election. 79 Fed. Reg. at 74,310.

Fourth, the 2014 rule provided that the task of certifying the results of elections should be performed at the RD level in every case. "Regional directors can and should issue final decisions because they are delegated authority to do so pursuant to Section 3(b)." *Id.*

Fifth, the 2014 rule provided that a party's filing of a request for review by the Board would not stay the election, the counting of ballots, or the RD's certification of the results "unless specifically ordered by the Board." *Id.* at 74,309.

---

[4] The 2014 amendments (1) gave RDs discretion to permit disputed individuals to vote subject to challenge with such challenges being resolved, if necessary, post-election and (2) required that the notice of election so inform unit employees. 29 C.F.R. § 102.67(b).

Even after the Board had taken the public's comments into account, the 2014 election rule remained highly controversial. Two major business groups, the United States Chamber of Commerce and the Associated Builders and Contractors, filed two suits alleging the rule, *inter alia*, was inconsistent with the NLRA, violated the First Amendment, and was arbitrary, capricious, and an abuse of discretion. The Chamber and its fellow plaintiffs "mount[ed] a broad attack on the rule as a whole, claiming that it 'makes sweeping changes to the election process' and that it 'sharply curtails' employers' statutory, due process, and constitutional rights." *Chamber of Commerce of U.S. v. NLRB*, 118 F. Supp. 3d 171, 177 (D.D.C. 2015). Two federal district courts, including the District Court for the District of Columbia, and the Fifth Circuit upheld the rule in full. *See Associated Builders & Contractors of Tex., Inc. v. NLRB*, 826 F.3d 215 (5th Cir. 2016); *Associated Builders & Contractors of Tex., Inc. v. NLRB*, 2015 WL 3609116 (W.D. Tex. 2015); *Chamber of Commerce*, 118 F. Supp. 3d 171. The rule took effect on April 14, 2015 – nearly five years ago. Thousands of petitions have been filed since then and thousands of elections have been conducted under the 2014 rule.

### The 2017 Request for Information

In December 2017, the NLRB issued a request for information ("RFI") concerning how the 2014 election rule was working. Representation – Case Procedures, 82 Fed. Reg. 58,783 (Dec. 14, 2017). In the RFI, the Board specifically asked for

> information relating to the following questions: 1. Should the 2014 Election Rule be retained without change? 2. Should the 2014 Election Rule be retained with modifications? If so, what should be modified? 3. Should the 2014 Election Rule be rescinded? If so, should the Board revert to the Election Regulations that were in effect prior to the 2014 Election Rule's adoption, or should the Board make changes to the prior Election Regulations? If the Board should make changes to the prior Election Regulations, what should be changed?

*Id.* at 58,784. The RFI stated, "the Board believes it will be helpful to solicit and consider public responses to this request for information." *Id.* at 58,783.

9

The Board received nearly 7,000 submissions in response to the RFI.[5] The

Board's own RDs, who process petitions and supervise elections, submitted a response to

the RFI, stating, "While parties initially voiced great concerns about the 2014 Election

Rule, to all the parties' credit, after the initial learning curve, there have been very few

difficulties in the adoption of the rules." Regional Director Committee's Response to RFI

at 4.[6]

Plaintiff AFL-CIO also submitted a detailed response to the RFI.[7] The AFL-CIO's

submission was based on the NLRB's response to an extensive Freedom of Information

Act request for data concerning the operation of the 2014 election rule during the two and

a half years it had been in effect and data concerning a comparable time period just prior

to the 2014 election rule taking effect. The data was analyzed by a leading academic

expert on NLRB elections, Professor John-Paul Ferguson, then of Stanford now of

McGill University.[8] Professor Ferguson produced a 47-page report that was appended to

the AFL-CIO's submission.[9] Professor Ferguson's report demonstrated that the 2014

election rule had been successful in expediting the processing of petitions without

---

[5] *See* NLRB Webform Submissions, https://www.nlrb.gov/reports-guidance/public-notices/request-information/submissions?items_per_page=All

[6] *See* NLRB Regional Director Committee, Regional Director Committee's Response and Comments to the NLRB's Request for Information on the Representation – Case Procedures (April 13, 2018), https://www.nlrb.gov/sites/default/files/webform/uploads/rd.comm_.2014.election.rule_.pdf.

[7] *See* AFL-CIO, Submission of the American Federation of Labor and Congress of Industrial Organizations in Response to Request for Information Concerning the Rules Governing Representation Cases (April 18, 2018), https://www.nlrb.gov/sites/default/files/webform/uploads/nlrb_rin_3142-aa12_submission_of_the_afl-cio.pdf.

[8] The Board itself has cited Professor Ferguson's work in other rulemaking proceedings. *See, e.g.*, Representation – Case Procedures:  Election Bars; Proof of Majority Support in Construction Industry Collective-Bargaining Relationships, 84 Fed. Reg. 39,930, 39,931 n. 5 (Aug. 12, 2019).

[9] *See* John-Paul Ferguson, Report: Assessing the Impact of the April 2005 Amendments to the NLRB Representation Case Procedures (April 17, 2018), https://www.nlrb.gov/sites/default/files/webform/uploads/nlrb_rfi_afl-cio_expert_report_4-18-18.pdf.

producing any adverse consequences. "I concluded that the amendments are associated

with a significant decrease in the time between petition and election and the time between

petition and the closing of cases, but that the amendments are not associated with any

other significant changes in case processing variables or outcomes."[10] In other words, the

Board was informed that its own data revealed that the 2014 election rule produced

significant efficiencies without any adverse consequences.[11]

### The 2019 Election Rule

On December 18, 2019, the NLRB published the final rule at issue here, largely repealing

the 2014 amendments and making additional changes in the rules that were not previously

considered. 84 Fed. Reg. 69,524. The 2019 rule occupies 77 pages in the Federal Register. One

of the four sitting Board Members issued a vigorous and extended dissent to the issuance of the

rule. *Id.* at 69,557-87. The rule was not preceded by any notice or any opportunity for public

comment. Despite requesting and receiving well-founded and probing information about the

functioning of the 2014 election rule only two years prior, the Board expressly stated, in issuing

the 2019 election rule, "[n]one of the procedural changes that we make today are premised on the

responses to the Request for Information; indeed, we would make each of these changes

irrespective of the existence of the Request for Information." *Id.* at 69,528 n.12.

---

[10] *Id.* at 1.

[11] The Board Member who dissented from the 2019 rule confirms:

> The number of Board reversals of regional director decisions and directions of elections has
> remained stable, as has the number of cases involving post-election objections and determinative
> challenges. Similarly, the number of rerun elections has shown equal stability.

84 Fed. Reg. at 69, 562 (Member McFerran dissenting, citing Board's own data) (footnotes omitted). *See also Id.* at 69,582 (citing "remarkable stability in every relevant statistical measure since the 2014 rule went into effect").

## ARGUMENT

"On a motion for a preliminary injunction, the district court must balance four factors: (1) the movant's showing of a substantial likelihood of success on the merits, (2) irreparable harm to the movant, (3) substantial harm to the nonmovant, and (4) public interest." *Davis v. PBGC*, 571 F.3d 1288, 1291 (D.C. Cir. 2009). "The four factors have typically been evaluated on a 'sliding scale.' If the movant makes an unusually strong showing on one of the factors, then it does not necessarily have to make as strong a showing on another factor." *Id.* at 1291-92 (citation omitted). Below, Plaintiff makes a strong showing on each of the four factors.

### PLAINTIFF IS LIKELY TO SUCCEED ON THE MERITS

Plaintiff is likely to succeed on the merits for three separate reasons: (1) the Board violated the APA by issuing the 2019 election rule without notice and comment; (2) as a whole, the issuance of the rule was arbitrary, capricious and an abuse of discretion; and (3) the rule is inconsistent with the NLRA.

### I.   The Rule Is Invalid Because It Was Not Promulgated After Notice and Comment and It Does Not Fall into the Exception for Rules of Procedure

The rule was promulgated without either notice or an opportunity for public comment, as required by the APA. 5 U.S.C. § 553. The NLRB contends that the rule falls into the exception to the APA's notice-and-comment mandate on the sole ground that it is a "rule[] of agency . . . procedure" under 5 U.S.C. § 553(b). 84 Fed. Reg. at 69,528. That is incorrect.

"The procedural safeguards of the APA help ensure that government agencies are accountable and their decisions are reasoned." *Sequoia Orange Co. v. Yeutter*, 973 F.2d 752, 758 (9th Cir. 1992). For that reason "[t]he exception for procedural rules is narrowly construed." *Mendoza v. Perez*, 754 F.3d 1002, 1023 (D.C. Cir. 2014). *See also Nat. Res. Def. Council v. Abraham*, 355 F.3d 179, 204 (2d Cir. 2004) ("[E]xceptions to the APA requirements 'should be

narrowly construed and only reluctantly countenanced.'" (quoting *Zhang v. Slattery*, 55 F.3d 732, 744 (2d Cir. 1995)); *Sequoia Orange*, 973 F.2d at 757 ("the APA's exception for procedural rules usually is interpreted narrowly"). Indeed, the D.C. Circuit has emphasized that, in particular, the "procedural rule exception is to be construed *very* narrowly." *Reeder v. FCC*, 865 F.2d 1298, 1305 (D.C. Cir. 1989) (emphasis added).

The D.C. Circuit has explained that a procedural rule is one that "do[es] not [it]sel[f] alter the rights or interests of parties, although it may alter the manner in which the parties present themselves or their viewpoints to the agency." *Batterton v. Marshall*, 648 F.2d 694, 707 (D.C. Cir. 1980). We concede that certain, subsidiary amendments contained in the 2019 election rule are procedural, for example, the amendment permitting post-hearing briefs in all cases. *See* 84 Fed. Reg. at 69,595 (new § 102.67(h)). But the contrast between those subsidiary amendments, which govern "the manner in which the parties present themselves . . . to the agency," *Batterton*, 648 F.2d at 707, and the central amendments in the 2019 rule, described above, demonstrates that the central amendments are not procedural and that the rule as a whole is invalid because the subsidiary elements are not severable.

The 2019 election rule alters parties' substantive rights in five key respects: (1) by inserting obstacles in the path of a party seeking an election and giving parties a right to an advisory opinion on the status of particular individuals under the NLRA; (2) by lengthening the critical, campaign period; (3) by contracting petitioner's right to the list of eligible voters; (4) by restricting parties' choice of observers; and (5) by preventing employees who vote for representation from immediately obtaining the certification that obligates their employer to bargain with their chosen representative. We will address these changes one by one in the subsections that follow, showing that none of them are mere rules of agency "procedure" that fall

within the narrow exception to the APA's notice-and-comment requirement. We will then show that the five changes are not severable from each other, nor are they severable from the other subsidiary provisions of the rule.

### A.   The Rule Places Additional Obstacles in the Path of a Party Seeking an Election and Vests Parties with a Substantive Right to a Regional Director's Opinion on the Status of Individual Employees Under the Act

The 2019 rule is not a purely procedural rule because, first of all, it alters the obstacles a petitioner faces in obtaining an election and vests a substantive right in parties to an opinion from an RD on the status of individual employees under the Act prior to an election.

Section 9(c)(1) of the NLRA gives employers and employees a right to a Board-supervised election if they demonstrate at a pre-election hearing that "a question of representation exists." 29 U.S.C. § 159(c)(1). The 2019 rule alters that substantive right by adding to what can be litigated and, more importantly, what must be decided, before a petitioner can obtain an election.

The provisions from the existing (2014) regulations that the 2019 rule will repeal, effective April 16, make clear that a petitioner need only demonstrate the existence of a question of representation in order to obtain an election:

> The purpose of a hearing conducted under Section 9(c) of the Act is to determine if a question of representation exists. A question of representation exists if a proper petition has been filed concerning a unit appropriate for the purpose of collective bargaining or concerning a unit in which an individual or labor organization has been certified or is being currently recognized by the employer as the bargaining representative. . . . If, upon the record of the hearing, the regional director finds that a question of representation exists, the director shall direct an election to resolve the question.

29 C.F.R. § 102.64(a).[12]

---

[12] The 2019 election rule leaves the definition of "a question of representation" unchanged. *See* 84 Fed. Reg. at 69,593 (new § 102.64(a)). The Board also concedes that showing that a question of representation exists is the only

Logically proceeding from the definition of the statutory term "a question of representation," the existing (2014) regulations further provide:

> Disputes concerning individuals' eligibility to vote or inclusion in an appropriate unit ordinarily need not be litigated or resolved before an election is conducted.

29 C.F.R. § 102.64(a). The Board concedes that this deferral of disputes about the status of individual employees was proper under the Act: "we do not dispute that deferral of issues that do not bear on the existence of a question of representation is permissible under the Act." 84 Fed. Reg. at 69,539. The Board further notes that "court challenges asserting the contrary were rejected. *Associated Builders & Contractors of Tex.*, 826 F.3d at 220-223; *Chamber of Commerce*, 118 F. Supp. 3d at 196-200." *Id.* at 69,539 n.63.

Nevertheless, the 2019 rule will insert further obstacles that a petitioner seeking an election faces by adding to what may be litigated and what must be decided by the RD prior to directing an election, thereby reversing the 2014 amendments and even going further. The 2019 rule provides:

> Disputes concerning unit scope, voter eligibility and supervisory status will normally be litigated and resolved by the Regional Director before an election is directed.

*Id.* at 69,593 (new § 102.64(a)). The only express exception to this new, substantive requirement is if the parties agree otherwise. *See id.* ("However, the parties may agree to permit disputed employees to vote subject to challenge, thereby deferring litigation concerning such disputes until after the election.") Thus, unless another party to the proceeding does not raise a question about *any* individual employee's eligibility to vote or inclusion in the unit – such as whether a particular employee is a seasonal employee with no expectation of future employment – or all

---

statutory prerequisite to obtaining an election. *See id.* ("we readily agree that the existence of such a question of representation is the prerequisite to the direction of an election").

other parties agree to defer such issues, a party petitioning for an election will face new obstacles to obtaining an election if the 2019 rule is allowed to take effect.

The change is analogous to changing the elements of a cause of action. The rule changes what an RD must decide before granting the relief prayed for by the petitioner – a Board-supervised election. That is not a procedural change.

In *Pickus v. United States. Board of Parole*, 507 F.2d 1107, 1113 (D.C. Cir. 1974), the D.C. Circuit held that procedural rules "[c]ertainly" do "not include formalized criteria adopted by an agency to determine whether claims for relief are meritorious." The "claim for relief" at issue here is the request for an election. At present, the Board will grant that relief if the petitioner can demonstrate the existence of a question of representation. The 2019 rule would alter the "criteria" by permitting non-petitioning parties to interject and compel disposition of additional, collateral issues before relief in the form of an election can be granted. That is "certainly" not a procedural rule.

The change not only places a new, substantive obstacle in the way of a petitioner seeking an election, it vests a new substantive right in the party seeking a determination of an individual potential voter's status under the Act. Under the 2019 rule, parties have a right to a determination by the RD of the status of any individual arguably in the voting unit prior to an election. This is analogous to creating a right to an advisory opinion.

The Board acknowledges that a determination of the status of particular individuals may not be necessary to resolve the question of representation even after an election, for example, if a disputed individual does not vote or if the disputed individual's vote is not potentially outcome determinative. *See* 84 Fed. Reg. at 69,541 (acknowledging that "election results" may "render

the issues moot"). But the Board nevertheless vests in all parties a right to obtain an opinion on an employee's status from the RD prior to an election.

The Board justifies the creation of this substantive right on grounds that are in no way procedural:

> [R]esolving issues such as supervisory status before the election ensures that the parties know who speaks for management and whose actions during the election campaign could give rise to allegations of objectionable conduct or unfair labor practice charges.

84 Fed. Reg. at 69,529. The majority further reasons,

> by not resolving supervisory issues before the election,
> ". . . . Many employers will be placed in an untenable situation regarding such individuals based on uncertainty about whether they could speak as agents of the employer or whether their individual actions—though not directed by the employer—could later become grounds for overturning the election."

*Id.* at 69,540 (quoting 79 Fed. Reg. at 74,438 n.581 (Members Miscimarra and Johnson dissenting)). *See also id*. at 69,525 ("the final rule will give better guidance to the employees and parties and will help avoid conduct that may give rise to objections or unfair labor practices"); *id.* at 69,540 ("provide the parties with better guidance," "assist the parties in knowing who . . . speaks for management"). In other words, the majority is concerned that employers will be uncertain about whether specific individuals are supervisors, who the employer can require to campaign against union representation, and whose unlawful or objectionable conduct can be attributed to the employer. Such a concern – that a party may not know how the law applies to it – is substantive, not procedural. It relates to what information the agency will provide to the parties, not "the

17

manner in which the parties present . . . their viewpoints to the agency." *Batterton*, 648

F.2d at 707.[13]

The Board repeatedly acknowledges that the choice to permit litigation of these questions

and to require their resolution by RDs pre-election is a "policy matter," not a procedural matter.

*See* 84 Fed. Reg. at 69,539 ("[W]e conclude that, as a policy matter, the Board should return to

the practice of permitting parties to" litigate these issues pre-election.). *See also id.* at 69,541

n.70; *id.* at 69,545.

The D.C. Circuit has held that a change in the questions a party is permitted to raise in a

proceeding is not a procedural rule. In *Reeder*, the agency altered the rules governing

counterproposals in licensing proceedings without notice and comment. 275 F.2d at 1300. The

agency contended that counterproposals that could no longer be considered under the new rule

could be filed as independent applications later. *Id.* But the Court found that the grant of licenses

at the conclusion of the original proceeding might effectively preclude a party from making its

counterproposal at a later time. *Id.* at 1302. The Court rejected the agency's contention that this

was a procedural rule. *Id.* at 1305.

*Reeder* presents the mirror image of the rule at issue here. The postponement of litigation

of disputes concerning the status of individual employees under the current rule effectively

precludes resolution of such disputes in cases where they are rendered moot, as explained above,

just as the rule governing counterproposals did in *Reeder*. The amendment contained in the 2019

election rule, which *permits* such litigation, is a substantive change, just like the preclusion of

such litigation constituted a substantive change in *Reeder*.

---

[13] The majority also expresses concern about employees in the proposed bargaining unit not knowing if disputed employees are in the unit prior to voting, 84 Fed. Reg. at 69,541, but that alternative concern is undercut by the fact that the rule allows the parties (typically only the employer and the union) to agree to defer such disputes. Moreover, concern about employees' knowledge about how the law applies is also a substantive, not a procedural concern.

Finally, the interest the Board seeks to protect via the rule – employers' and employees' interest in receiving guidance on the status of particular individuals prior to an election – is a substantive one. As a court in this district has made clear, "informational rights are substantive, thus meriting APA protection." *Nat'l Ass'n of Waterfront Emp'rs v. Solis*, 665 F. Supp. 2d 10, 17 (D.D.C. 2009). By expressly stating that the rule is intended to give guidance to parties prior to an election, the Board has "encode[d] a substantive value judgment" in the rule. *Pub. Citizen v. Dep't of State*, 276 F.3d 634, 640 (D.C. Cir. 2002).

The Board's policy choice to place additional obstacles in the way of parties seeking a Board-supervised election and to vest all parties with the right to a pre-election RD determination of the status of individual employees was, in sum, a substantive and not a procedural choice.[14]

### B.    The Rule Substantively Alters the Critical, Campaign Period

The current (2014) rule provides that the RD shall schedule the election "for the earliest date practicable." 29 C.F.R. § 102.67(b). In contrast, the 2019 election rule provides that an RD shall "not schedule an election before the 20th business day after the date of the direction of election." 84 Fed. Reg. at 69,595. This is an important, substantive change in the critical campaign period.

---

[14] If this case proceeds to a final decision on the merits, we will also argue this amendment is arbitrary and capricious because it delays the conduct of elections and requires RDs to decide issues that will often be rendered moot by the election results while providing neither timely nor final information to the parties. The rule would leave parties without the guidance cited by the majority from the start of the campaign (which is typically no later than the filing of the petition) to the time of the RD's decision. In most cases, even if the rule goes into effect, parties and employees will only have the RD's decision for 20 business days before the election. In addition, RD decisions are subject to Board review, and even when the waiting period for elections was still in effect prior to the 2014 amendments, the Board almost never granted review and disposed of the request for review prior to an election; and, even when the Board did rule on a request for review prior to an election, it almost always did so only days before the election. Finally, even Board decisions on these issues are subject to judicial review. Thus, the rule will not provide timely or final guidance to employers, employees, or unions on questions about the status of individuals. It will simply place additional obstacles in the way of petitioners seeking an election as explained above.

The primary criticism of the existing rules when they were adopted in 2014 was that they would not provide parties with enough time to campaign. The 2014 election rule was widely derided by its critics as permitting "quickie elections." *See, e.g.*, *Associated Builders & Contractors*, 826 F.3d at 227. *See also Chamber of Commerce*, 118 F. Supp. 3d at 189 (finding that plaintiffs challenging the 2014 rule "rely heavily on the repetition of disparaging labels, referring to the Final Rule as the "'ambush' or 'quickie' election rule" that compels employees to "'vote now, understand later.'") The dissenting Board Members in 2014, who are cited repeatedly by the current majority in the preamble to the 2019 election rule, contended:

> By requiring elections to occur as quickly as possible, the Rule curtails the right of employers, unions and employees to engage in protected speech. We believe this infringement on protected speech is impermissible, but even if it is within the Board's authority, it is ill-advised and poorly serves the Act's purposes and policies.

79 Fed. Reg. at 74,431. Indeed, one of the central arguments of the parties who unsuccessfully challenged the 2014 election rule was that its provisions, including eliminating a mandatory waiting period between direction of election and election, "interfere with the protected rights of employers and their employees because [the rule] is intended to, and already has, substantially shortened the time between the filing of a representation petition and the date of the election, thereby curtailing the ability of parties to exercise their rights to due process and protected speech." Brief of Appellants, *Associated Builders & Contractors*, 826 F.3d 215, (No. 15-50497), 2015 WL 4937572, at *45.

Whether or not the existing rules, as amended in 2014, provide parties with a sufficient amount of time to campaign is, of course, not the question here. The only question here is whether significantly altering the critical, campaign period is a substantive change. The answer is yes. Extending the critical, campaign period does not alter "the manner in which the parties

present themselves or their viewpoints to the agency," but rather alters their opportunity to present their viewpoints to the voters, *i.e.*, "alter[s] the rights . . . of parties." *Batterton*, 648 F.2d at 707. It is clearly not a procedural rule.

The fact that the Board advances a procedural rationale for the substantive amendment does not render the change any less substantive. The Board states that the extension of the campaign period is intended "to permit the Board to rule on any requests for review which may be filed." 84 Fed. Reg. at 69,595. But even if that rationale made sense, which it does not, *see* n.15, *infra*, it would not render the rule procedural. If Congress moved the general election day from November to October, it would be a substantive change even if the legislative history suggested the move was intended to allow courts more time to resolve any legal challenges before inauguration day. The same is true here.

Nor can the Board argue that the rule is procedural because it governs election procedures. If that was the case, every rule adopted by the Federal Election Commission would be a procedural rule because it governs election procedures. Such a construction would expand the word procedural far beyond its intended meaning.

The 2019 rule significantly extends the period between the filing of a petition and the resulting election. It thereby significantly alters the parties' opportunity to campaign. It is thus a substantive rule.[15]

---

[15] This amendment is also inconsistent with the NLRA as we show in § III *infra*. If this case proceeds to a final judgment on the merits, we will also argue that this amendment is arbitrary and capricious. The majority asserts that the purpose of the across-the-board waiting period is to "permit the Board to rule on any request for review that may be filed." 84 Fed. Reg. at 69,595. But dissenting Member McFerran reported, "requests for review of regional directors' pre-election decisions were filed in less than 5% of elections . . . , they were granted in less than 1% of elections . . . , and regional directors' pre-election decisions have been reversed, on average, in fewer than 4 cases per fiscal year." *Id.* at 69,586 n.262. Moreover, the Board acknowledges that "the Board frequently failed to rule on pre-election request for review prior to the conduct of elections before the 2014 amendments," *i.e.*, when a parallel waiting period was in place. The dissenting Board Member examined the 16 cases in which the Board granted review in Fiscal Year 2013-14 and found that the Board ruled on the merits before the election in only one case. *Id.*

### C.       The Rule Contracts the Petitioner's Substantive Right to an Eligibility List

The 2019 rule delays the provision of the voter list to the petitioner. As explained above, under the current (2014) regulations, the employer is bound to provide a list of all eligible voters within two business days absent extraordinary circumstances. 29 C.F.R. § 102.67(*l*). The 2019 election rule allows the employer to wait five business days. 84 Fed. Reg. at 69,531.

The 2019 election rule would permit employers to campaign with full access to the identity of all eligible voters and information about how to contact them without providing parallel access to the union or petitioning employees for three additional days. This delays the equal access that the Supreme Court explained is the purpose of the "disclosure requirement" – "allowing unions the right of access to employees that management already possesses." *Wyman-Gordon Co.*, 394 U.S. at 767. The change is no different than a state government controlled by one party giving that party access to the voter rolls three days before the minority party. It is a substantive rule with a clear substantive impact.

The Board suggests the change will not have a large impact because the 2019 election rule also delays the election, as explained above, giving the union or petitioning employees more time to use the list. 84 Fed. Reg. at 69,531 ("the parties entitled to the list will . . . have additional time to make use of the list to communicate with employees prior to the election"). But that not only contradicts the Board's claim of severability, as explained below, it is no answer because the employer still would have more time to campaign using the list than the union.[16] The point is

_____

at 69,584 (Member McFerran dissenting). The Board has thus imposed a waiting period in every case so that it can rule on requests for review in the small number of cases in which they are filed, even though experience demonstrates that the Board almost never does so before the election even with a waiting period. Finally, as with pre-election determination of issues of eligibility and inclusion by the RD, even if the Board were to rule pre-election, it will often be on questions that are mooted by the election results. *See id.* at 69,546 ("there may be circumstances where the election results moot the issues raised by a pre-election request for review").

[16] This argument also confirms our subpoint B, *supra*, that the 20 business day delay of the election alters a substantive right, because it provides "additional time" "to communicate with employees prior to the election."

that the rule adversely affects unions' and employees' right to organize by delaying production of the voter list.

### D.     The Rule Contracts the Parties' Substantive Right to Select Election Observers

The current regulations place no limitation on the parties' selection of observers. Rather, the subject of who can be an election observer – for the employer and for the union – has been addressed in Board decisions dating back decades, resulting in a highly-reticulated policy. *See generally* NLRB Casehandling Manual § 11310 (describing cases). Sweeping aside these decisions, the 2019 election rule provides that "whenever possible, a party shall select a current member of the voting unit as its observer." 84 Fed. Reg. at 69,597 (new § 102.69(a)(5)).[17] By enacting a new rule that significantly changes existing law and narrows parties' right to select an observer, the Board has clearly engaged in substantive policymaking. *See* 29 C.F.R. § 102.69(a).

In general, under current law, "the Board will *not* find the use of a nonemployee as an observer to be objectionable, absent evidence of misconduct by that observer or of prejudice to another party by the choice of that observer." *Embassy Suites Hotel, Inc.*, 313 N.L.R.B. 302, 302 (1993) (emphasis added). However, in the specific circumstance of an election seeking to terminate representation, the Board applies "a bright-line rule prohibiting incumbent labor organizations from using their nonemployee agents as election observers." *Butera Finer Foods, Inc.*, 334 N.L.R.B. 43, 43 (2001).

The 2019 election rule overrules both of these established precedents and others. *See* 84 Fed. Reg. at 69,551-52 & n.116. By providing that only current members of the voting unit may be observers absent a showing by the party seeking to use the observer that using a member of

---

[17] The new rule also states that, "when no such individual is available, a party should select a current nonsupervisory employee as its observer." New § 102.69(a)(5).

the voting unit is not possible, the 2019 election rule reverses the presumption set forth in *Embassy Suites*, which *permits* the use of nonemployees as observers absent a showing by another party of misconduct or prejudice.

The 2019 election rule also overrules the bright-line rule of *Butera Finer Foods* that unions are prohibited from using nonemployee union representatives as observers in decertification elections. Under the 2019 election rule, no such bright-line rule applies. Rather, a union may use a nonemployee union representative as its observer as long as it can show that it is not possible to use a member of the voting unit because, for example, current employees who support the union fear retaliation from employees who support the decertification effort.

The 2019 election rule's provision concerning observers is, therefore, indisputably substantive. A rule that overrules established Board precedent – set forth in numerous Board decisions – and narrows parties' right to select observers cannot reasonably be characterized as merely "procedural."[18]

### E. The Rule Deprives the Party That Wins A Representation Election of the Substantive Rights That Previously Attached to the Regional Director's Immediate Certification of the Results

The central substantive right at stake in the representation elections governed by the 2019 rule is the right to bargain collectively. Under long-standing law, that substantive right is triggered by an RD's certification that the union prevailed in the representation election. The

---

[18] If this case proceeds to a final judgment on the merits, we will also argue that it was arbitrary and capricious for the Board to overrule precedent without specifying what precedents it is overruling, and without adequately explaining its actions. *See NLRB v. CNN Am., Inc.*, 865 F.3d 740, 751 (D.C. Cir. 2017). It was also arbitrary and capricious to require that parties, including the employer, choose a member of the voting unit as their observer when that will encourage employers to violate the law against polling employees. *See Allegheny Ludlum Corp.*, 333 N.L.R.B. 734 (2001), *enf'd*, 301 F.3d 167 (3d Cir. 2002). The Board simply failed to account for the reality that, under its new rule, employers will have to ask unit employees to serve as observers thus requiring that they visibly display their support of or opposition to the employer's position.

2019 rule significantly contracts that substantive right by delaying the RD's certification of election results, and it is therefore not a procedural rule.

As explained *supra* at 3-4, Congress amended the NLRA in 1959 specifically to expedite the process though which employees exercise their right to select a representative by providing in § 3(b) that the Board has authority to delegate its power over representational matters to its RDs, including the power to "certify the results [of an election]." 29 U.S.C. § 153(b).

The certification referenced in § 9 and delegated to RDs pursuant to § 3(b) is the key administrative action needed to effectuate employees' rights, as it is the certification of a representative that gives employees the legal right to commence collective bargaining. The Board fully acknowledges this fact:

> The issuance of a certification of representative triggers legal obligations on the parts of the employer and the certified representative. Both parties become obligated to bargain with each other in good faith; the union must meet its duty of fair representation; and the employer must refrain from making unilateral changes to mandatory subjects of bargaining. . . . Likewise, the issuance of a certification of results may, depending on the circumstances, dissolve a previous bargaining obligation and/or require a union (or unions) to refrain from filing a petition to represent the unit for a period of time.

84 Fed. Reg. at 69,554 (footnotes omitted). *See also Gissel*, 395 U.S. at 598-99 ("A certified union has the benefit of numerous special privileges.") and *id.* at 599 n.14 (detailing those "privileges").

The 2019 rule significantly constricts employees' substantive rights by providing that RDs "will only issue certifications after the time for filing a request for review has passed without any being filed" or "[i]f any request for review is filed, the certification will issue only after the Board's ruling on that request." 84 Fed. Reg. at 69,554. *See id.* at 69,597-99 (new

§ 102.69). The delay of certification will deprive parties of the legal rights that attach to certification of election results for what may be significant periods of time.[19]

Under the rules that the 2019 election rule would displace – rules that have been in effect for decades – an RD may issue a certification *even if* a petition for review is pending with the Board. *See, e.g., Allstate Ins. Co*., 234 N.L.R.B. 193 (1978) (when "recognition was requested and refused during the pendency of the employer's request for review of the Regional Director's certification of representative . . . [,] [i]t is well established that an employer refuses to recognize a certified labor organization at its peril"). The current rule appropriately places the risk of acting contrary to the will of the majority on the party challenging the election's outcome. That is what the Board meant when it stated that the employer acts "at its peril" in refusing to bargain or in unilaterally changing wages, hours or working conditions after certification. That makes sense because in the vast majority of cases the election results and the certification are upheld.[20] But the 2019 election rule, by preventing RDs from certifying the results of elections until the time for appeal to the Board has run or the Board has ruled on an appeal, deprives employees who vote for representation or against continued representation of the rights that flow from those decisions for an indeterminate amount of time.

In the context of an initial certification election where the employees have voted to be represented, the 2019 election rule would relieve the employer of the obligation to bargain and deprive employees of the right to bargain. In the context of a decertification election where the employees have voted no longer to be represented, the rule would permit the union to retain the

---

[19] That is the case because the Board often does not rule on requests for review for an extended period of time. *See, e.g.*, *Entergy Mississippi, Inc.*, 15-UC-000149 (4.5-year delay between request for review and Board ruling); *Manhattan College*, 02-RC-023543 (1.5-year delay between request for review and Board ruling).

[20] In fact, the Board has repeatedly stated that it is loath to overturn the results of a secret-ballot election. *See, e.g.*, *Quest International*, 338 N.L.R.B. 856, 857 (2003) ("'Representation elections are not lightly set aside. There is a strong presumption that ballots cast under specific NLRB procedural safeguards reflect the true desires of the employees.'") (quoting *NLRB v. Hood Furniture Mfg. Co.*, 941 F.2d 325, 328 (5th Cir. 1991)).

right to bargain and deprive employees of the right not to be represented. The rule thus directly alters substantive rights.

The majority does not even attempt to justify the rule in procedural terms. Rather, it makes clear that it is simply reallocating the risk of being wrong away from the party that *lost* the election:

> The issuance of a certification despite the (potential) pendency of a request for review places an employer in the difficult position of either (1) refusing to bargain while awaiting the Board's ruling on a request for review, or (2) devoting resources to bargaining while awaiting the Board's ruling. In the former scenario, the employer risks committing unfair labor practices should the Board uphold the certification; in the latter scenario, the employer risks wasting resources should the Board invalidate the bargaining obligation.

84 Fed. Reg. at 69,554-55 (footnote omitted). Those are the "problems" the Board sought to resolve via the rule,[21] and they are substantive not procedural problems, problems having to do with the parties' legal rights and obligations for the months and sometimes years that an appeal is pending.

The provision barring RDs from certifying representatives in no way alters "the manner in which the parties present . . . their viewpoints to the agency." *Batterton*, 648 F.2d at 707. Rather, it regulates when the express desires of employees will be given legal effect. The rule "substantially affects the rights of those over whom the agency exercises authority" and is thus not a procedural rule. *Pickus*, 507 F.2d at 1113.

The Second Circuit's decision in *Time Warner Cable, Inc. v. FCC*, 729 F.3d 137 (2d Cir. 2013), is closely on point. In that case, the agency promulgated a "standstill rule" without notice and comment on the grounds that it was a rule of procedure. The standstill rule authorized the agency to order a "temporary standstill of the price, terms, and other conditions of an existing

---

[21] "All of these problems are readily solved by simply requiring regional directors to refrain from issuing certifications until the Board has ruled on any request for review." 84 Fed. Reg. at 69,555.

programming contract" between a video programming distributor and a programming vendor while the distributor sought renewal of the contract. *Id*. at 150. The rationale for the standstill rule, like the rationale for the 2019 election rule, was to preserve the status quo during litigation. Yet, the Second Circuit held that the standstill rule was not a rule of procedure. *Id*. at 168-69. The Court reasoned that "substantive rules 'change existing rights and obligations,'" *id.* at 168 (quoting *Donovan v. Red Star Marine Servs., Inc*., 739 F.2d 774, 783 (2d Cir. 1984)), and the standstill rule did just that by requiring parties to preserve the status quo of their relationship during litigation. The standstill rule was not procedural and neither is the analogous rule here.

F.     **The Provisions of the Rule Are Not Severable**

Anticipating that some portions of the rule might be struck down, the majority includes the following language in the preamble to the 2019 election rule:

> In accordance with the discrete character of the matters addressed by each of the amendments listed, the Board hereby concludes that it would adopt each of these amendments individually, or in any combination, regardless of whether any of the other amendments were made, except as expressly noted in the more detailed discussion of the timelines set forth in § 102.63 below. For this reason, the amendments are severable.

84 Fed. Reg. at 69,525 n.5. But the amendments are not discrete and it would be illogical to adopt some of the reforms without regard to whether others were adopted. They are not severable.

"Whether [an] offending portion of a regulation is severable depends upon the intent of the agency *and* upon whether the remainder of the regulation could function sensibly without the stricken provision." *MD/DC/DE Broadcasters Ass'n v. FCC*, 236 F.3d 13, 22 (D.C. Cir. 2001) (emphasis in original). While the claim of severability in the preamble suggests that the Board intends the provisions of its rule to be severable, it is contradicted by other statements in the preamble, and, in any case, such a claim of

severability by an agency "is an aid merely; not an inexorable command." *New York v. U.S. Dept. of Health and Human Servs.*, 414 F. Supp. 3d 475, 577 (S.D.N.Y. 2019) (quotation marks and citation omitted). The court must determine whether "there is substantial doubt that the agency would have adopted the same disposition regarding the unchallenged portion if the challenged portion were subtracted[.]" *Epsilon Elecs., Inc. v. U.S. Dept. of Treasury*, 857 F.3d 913, 929 (D.C. Cir. 2017) (quoting *North Carolina v. FERC*, 730 F.2d 790 (D.C. Cir. 1984)).

Because the substantive provisions of the 2019 rule are so deeply "intertwined" with the procedural provisions that the procedural provisions could not "function sensibly with the stricken provision[s]," *MD/DC/DE Broadcasters*, 236 F.3d at 22, the court should not let the subsidiary, procedural provisions stand. *Id*. For example, the questions of how long parties need to prepare for the pre-election hearing, how long they need to prepare their pre-hearing statement of position, and whether they should have a right to file post-hearing briefs, all depend on what issues may be raised at the pre-election hearing. Thus, because the provision establishing what issues can be raised and must be resolved at the pre-election hearing is invalid, all the related provisions must also fall because the Board could not reasonably establish procedures for a hearing without first establishing what must be resolved at the hearing.

The majority acknowledges the "intertwined character of the [rule's] component parts," *Tel. and Data Sys., Inc. v. FCC*, 19 F.3d 42, 50 (D.C. Cir. 1994), in explaining the amendments. Explaining why the 2019 rule gives parties a right to file post-hearing briefs, for example, the majority states:

> we do not agree with the 2014 amendments' pronouncement that post-hearing briefs are generally unnecessary because representation cases are so prone to

29

> "recurring and uncomplicated legal and factual issues" as to make briefing unnecessary in a "majority" of cases. . . . As discussed above, under the final rule, properly-raised eligibility and inclusion issues will also once again be litigated at pre-election hearings. Many of these issues, such as those involving alleged supervisory or independent contractor status, frequently require detailed factual analyses in the context of multi-factor legal tests.

84 Fed. Reg. at 69,542. The amendment concerning briefs is thus tied explicitly to the amendment regarding litigation of individual eligibility and inclusion issues. The Board itself does not treat the different parts of the rule as severable. They are not, and neither are the other amendments that are logically tied to the issues that may be litigated at the pre-election hearing.[22]

Even more fundamentally, while repeatedly acknowledging that many elements of the 2019 rule will delay the conduct of an election, the Board majority suggests that the delay is justified by other benefits. For example, the majority states:

> We acknowledge here that the 20-business-day period will detract from how promptly elections were—or at least could be—conducted under the 2014 amendments. Such tradeoffs are unavoidable when balancing competing interests.

*Id.* at 69,546. But when a multipart rule is justified based on tradeoffs between competing interests, component provisions of that rule – each of which figures into the balancing of those interests – cannot logically be assessed individually. For example, the 12-day delay caused by the amendment concerning the opening of the pre-election hearing cannot be assessed separately from the 20-day delay caused by the amendment creating the waiting period or any of the other delays caused by other amendments. The "tradeoffs" must be assessed as a whole, and the individual amendments that together make up the 2019 election rule are thus not severable.

---

[22] In several other places in the preamble, the majority ties different elements of the rule together. *See, e.g.*, 84 Fed. Reg. at 69,544 n.83 (justifying greater discretion given to RDs to specify election details subsequent to direction of election with reference to mandatory waiting period between direction of election and election); *id* at 69,545 (stating that the amendment requiring a waiting period before an election "goes hand-in-hand with the amendment permitting litigation of eligibility and inclusion issues at the pre-election hearing").

## II.    Promulgation of the Rule Was Arbitrary and Capricious as a Whole Because the Board Completely Ignored Available Evidence That Contradicts the Rationale for the Rule

The Supreme Court has explained that the NLRA's "statutory authorization 'from time to time to make, amend, and rescind' rules and regulations expressly contemplates the possibility that the Board will reshape its policies *on the basis of more information and experience in the administration of the Act.*" *Amer. Hosp. Ass'n v. NLRB*, 499 U.S. 606, 618 (1991) (emphasis added). Such an action must be "based on substantial evidence and supported by a reasoned analysis." *Id*. at 619 (quotations and citation omitted). The Board's "decreed result" must not only be "within the scope of its lawful authority," "the process by which it reaches that result must be logical and rational." *Allentown Mack Sales and Serv., Inc. v. NLRB*, 522 U.S. 359, 374 (1998). Courts must "set aside agency regulations which, though well within the agencies' scope of authority, are not supported by the reasons that the agencies adduce." *Id*. While the "Court must accord the agency [ ] deference," "it also must determine whether the Board considered the relevant factors when seeking to further [its] goals, and whether it articulated a rational connection between the facts it found and the choices it made." *Chamber of Commerce*, 118 F. Supp. 3d at 210.

Decision-making that falls short of this standard is arbitrary, capricious, and an abuse of discretion under the APA. 5 U.S.C. § 706(2)(a). To avoid an arbitrary and capricious finding, the Supreme Court has stated that an agency must "examine the relevant data and articulate a satisfactory explanation for its action." *Motor Vehicle Mfrs. Ass'n of United States, Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). A court will vacate an agency rule where "the agency offers no evidence suggesting" the problem its rule seeks to address exists, and instead, where the agency "relies on one unsubstantiated conclusion heaped on top of another." *Sorenson Commc'ns Inc. v. FCC*, 755 F.3d 702, 707-08 (D.C. Cir. 2014). *See also id.* at 710 (vacated rule

31

"was intended to defeat a bogeyman whose existence was never verified," and "there was

contrary evidence questioning [the rule's] efficacy and necessity"); *NRDC* v. *Herrington,* 768

F.2d 1355, 1391 (D.C. Cir. 1985) (agency ''may not tolerate needless uncertainties in its central

assumptions when the evidence fairly allows investigation and solution of those uncertainties'').

The 2019 election rule fails this basic standard of reasoned decision-making. Here, the

Board not only did not seek comments on a proposed rule; it expressly did not rely on the 7,000

comments submitted in response to its own RFI; and it did not explore any empirical evidence

concerning the impact of the current rule readily available in the Board's own records.

Dissenting Member McFerran summarized:

> [M]y colleagues appear to have conducted no analysis of the more than four years
> of available agency data and records about the actual, real-world impact of the
> 2014 rule. In justifying the changes enacted today, the majority does not cite even
> anecdotal evidence that significant problems with the operation or implementation
> of the 2014 rule have actually emerged. Instead, my colleagues base their
> criticism of the 2014 rule largely on their own unsupported suppositions, and
> those of previous dissenting Board members. Incredibly, the majority does not
> expressly invoke its own experience administering the 2014 rule to justify its
> amendments.
>
> .. . . . The majority cites no data whatsoever substantiating its conclusion that the
> 2014 rule has *impaired* those interests. Nor does it cite any evidence supporting
> its conclusions that the changes it makes today will *promote* these goals – despite
> the fact that my colleagues characterize several of these changes as a functional
> reversion to practice prior to 2014, which would presumably allow them to draw
> on a wealth of historical agency experience.
> . . . .
> The rule makes radical changes to the Board's 2014 rule without any factual basis.
> Simply put, there is no administrative record here supporting the rule. Indeed,
> the majority seems to have made a determined effort to *avoid* making factual findings
> related to the 2014 rule.

84 Fed. Reg. at 69,559, 69,560 (Member McFerran, dissenting) (emphasis in original). An agency cannot simply ignore readily available evidence bearing directly on the need for and likely impact of a rule.[23]

A few specific examples illustrate the arbitrary consequences of the majority's refusal to consider available evidence.

As explained previously, the 2019 election rule extends the time for employers to produce an eligibility list after an election is directed from two to five business days. *Id.* at 69,596 (new § 102.67(*l*)). But the majority did not consider whether any employer had requested additional time to produce the list under the current rule,[24] or whether any such requests, if made, had been denied. Indeed, the Board acknowledges, "This is not to suggest that it is impossible or unreasonable for employers to produce the voter list within 2 business days; many employers have clearly been able to do so." *Id.* at 69,532.[25] Thus, the rule reduces the time a petitioning union has access to a complete list of eligible voters without evidence that *any* employer – much less, every employer – required additional time to produce the list under the 2014 rule. The same is true for the other

---

[23] While not giving notice and accepting comments and while disclaiming reliance on submissions in response to the RFI, the majority nevertheless repeatedly seeks to bolster its assertions with vague references to comments submitted in the earlier rulemaking proceedings, responses to the RFI from unidentified sources, and other even more ill-identified concerns and criticisms. For example, the majority supports its conclusion that the prior rules placed too high a premium on speed on "concerns that have been previously and repeatedly voiced," but fails to disclose when, where, or by whom such concerns were raised. 84 Fed. Reg. at 69,529. *See also id.* at 69,533 n.44 (taking "administrative note" of unspecified regional personnel expressing concern); *id.* at 69,535 n.52 (unspecified comments and submissions in response to RFI); *id.* at 69,536 (unspecified criticism). This too was arbitrary and capricious.

[24] The current rules permit a RD to grant more time based on a showing of "extraordinary circumstances," such as "an employer's particularized demonstration that it is unable to produce the list within the required time limit." 79 Fed. Reg. at 74,354.

[25] It should be noted that the median size of voting units is so small that in half of all elections the employer has to compile a list of 28 or fewer names. *See* 84 Fed. Reg. at 69,564 (Member McFerran dissenting, citing Board's own data).

deadlines the Board extends.[26] The majority did not *in any instance* examine whether any party had requested additional time under the 2014 rule, how many had done so, or how RDs had ruled on any such requests.

The categorical refusal to consider evidence about the operation of the current rule leads the majority to make assertions that are demonstrably false. For example, the majority asserts, "Given that many such [individual status] issues could be litigated *and decided* prior to the direction of election, actively *promoting their deferral to post-election proceedings comes at the cost of swifter certainty and finality*." 84 Fed. Reg. at 69,540 (emphasis added).[27] But that claim is both logically flawed and demonstrably false. The 2019 rule would shift the litigation of these disputes from after the election to before the election, even though the majority acknowledges that election results will often moot the dispute altogether. *See id.* at 69,529 n.20 ("it is true that in some cases the results of the election may obviate the need to address certain questions of unit scope or voter eligibility").[28] Moreover, it takes no less time to determine if an employee is a supervisor before an election than after. *See Associated Builders & Contractors of Tex.*, 2015 WL 3609116 at *16 ("it is not clear why deferring the timing of litigation will increase its length"). Thus, because the 2019 election rule will require individual status issues to be litigated

---

[26] The other extended time periods are between the filing of a petition and the opening of the pre-election hearing, for the employer to post the notice of election, for the non-petitioning party to file a statement of position, and between the direction of election and the election. In addition, the 2019 election rule relaxes the standard for obtaining extensions of these already extended time periods.

[27] The majority makes this erroneous assertion concerning both the litigation of individual issues at the pre-election hearing and concerning the waiting period to permit consideration of requests for review. *See id.* at 69,546 ("deciding issues prior to the election . . . will contribute to a more efficient resolution of the question of representation by clearing away issues that may otherwise linger on after the election.")

[28] 79 Fed. Reg. at 74,408 ("[I]n the Board's experience, many pre-election disputes are either rendered moot by the election results or can be resolved by the parties after the election and without litigation once the strategic considerations related to the impending elections are removed from consideration.") The Board's RDs informed the Board in response to the RFI that "having the authority to defer certain eligibility issues to the challenged ballot procedure worked well in reducing the amount of unnecessary pre-election litigation.'' Regional Directors' Response to RFI at 3. The dissenting Board Member cites the Board's own data demonstrating that the reduction in pre-election litigation has not led to any "corresponding increase in post-election litigation." 84 Fed. Reg. at 69,575 (Member McFerran dissenting).

more often than under the current rule, it demonstrably does not promote "swifter . . . finality." This is confirmed by the fact that the time between petition and final disposition of cases reached record lows in three of the four years after the 2014 amendments took effect. 84 Fed. Reg. at 69,558 and n.140 (Member McFerran dissenting, relying on published Board data). As Professor Ferguson found, "the [2014] amendments are associated with a significant decrease in the time between . . . petition and the closing of cases." Ferguson Report at 1. By disregarding information supplied to it upon its own request and disregarding its own internal data, the Board based the 2019 election rule on demonstrably erroneous assertions of fact. *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 537 (2009) (agency cannot "ignore inconvenient facts" in its rule-making) (Kennedy, concurring).

The Board's total failure to consider available evidence was arbitrary and capricious.

### III.     The Rule Is Inconsistent with the NLRA

The 2019 election rule is directly contrary to Congress's express directive in NLRA § 3(b) that a party's filing of a request for review of an RD's representation case decision does not operate to stay that decision absent a specific order by the Board. Three provisions of the 2019 election rule categorically require a stay of representation case proceedings based on a party's filing – or potential filing – of a request for review. These provisions are contrary to the NLRA and thus unlawful under the APA as "in excess of statutory jurisdiction, authority, or limitations, [and] short of statutory right." 5 U.S.C. § 706(2)(C).

NLRA § 3(b) authorizes the Board to delegate its authority in representation cases to its RDs with the limitation that "upon the filing of a request [for review] with the Board by any interested person, the Board may review any action of a regional director delegated to him under this paragraph, but *such a review shall not, unless specifically ordered by the Board, operate as a stay of any action taken by the regional director.*" 29 U.S.C. § 153(b) (emphasis added).

As noted earlier, the Supreme Court has observed that, "'[t]his authority to delegate to the regional directors is designed… to speed the work of the Board.'" *Magnesium Casting*, 401 U.S. at 141 (quoting Senator Goldwater). Central to the goal of "speed[ing] the work of the Board," is Congress's clear statement in NLRA § 3(b) that "the filing of a request [for review] . . . shall not . . . operate as a stay of any action taken by the regional director" absent a "specific[] order[] by the Board." 29 U.S.C. § 153(b). Three provisions of the 2019 election rule violate Congress's requirement in § 3(b) of a "specific[] order[] by the Board" by *automatically* placing RD representation decisions on hold based solely on a party filing a request for review. 29 U.S.C. § 153(b).

First, new § 102.67(c) states – contradictorily – that: "The filing of such a request [for review] shall not, unless otherwise ordered by the Board, operate as a stay of the election or any other action taken or directed by the Regional Director, *except that if a request for review of a decision and direction of election is filed* within 10 business days of that decision and has not been ruled upon or has been granted before the election is conducted*, ballots whose validity might be affected by the Board's ruling on the request for review or decision on review shall be segregated in an appropriate manner, and *all ballots shall be impounded and remain unopened pending such ruling or decision*." (Emphasis added). By requiring the RD to automatically impound all ballots "pending [a] ruling or decision" on any request for review filed within 10 business days of a direction of election, this provision violates NLRA § 3(b)'s clear command – namely, the requirement of a "specific[] order[] by the Board" before the filing of a request for review may "operate as a stay of any action taken by the regional director," 29 U.S.C. § 153(b).[29]

---

[29] If this case proceeds to a final judgment on the merits, we will argue that the required impounding is arbitrary and capricious because it places employers in an impossible position and forces the Board to decide issues that in many cases will be revealed as moot once the ballots are opened. Longstanding Board precedent bars employers from

Second, new § 102.69 states in several places that the RD may certify the election results only "if no request for review . . . is pending." *See* §§ 102.69(b), (c)(1), (c)(2). By depriving the RD of authority to certify the election results on the basis that a request for review is pending, this provision also violates NLRA § 3(b)'s clear requirement of a "specific[] order[] by the Board" before the filing of a request for review may "operate as a stay of any action taken by the regional director," 29 U.S.C. § 153(b).

Finally, new § 102.67(b) states that "[t]he Regional Director shall schedule the election for the earliest date practicable, but unless a waiver is filed, *the Regional Director will normally not schedule an election before the 20th business day after the date of the direction of election, to permit the Board to rule on any request for review* which may be filed pursuant to paragraph (c) of this section." (Emphasis added). By requiring the RD to automatically delay the scheduling of the election for one month for the purpose of permitting the Board to rule on any request for review "which may be filed," this provision also violates NLRA § 3(b)'s clear requirement of a "specific[] order[] by the Board" before the filing of a request for review may "operate as a stay of any action taken by the regional director," 29 U.S.C. § 153(b).

The Board majority denies that any of these provisions violates NLRA § 3(b), but its semantic arguments are unavailing. The Board argues that "[p]roviding the 10-business-day period for filing a pre-election request for review, and for automatic impoundment when such a request is filed but not yet ruled on when the election is held . . . is not a 'stay' of the regional

---

unilaterally changing terms and conditions of employment starting on the date of the election if the union is ultimately certified. *See, e.g., Overnite Transp. Co.*, 335 N.L.R.B. 372, 372-73 (2001). The impounding of ballots prevents the employer from knowing whether it is likely to have this legal obligation to preserve the status quo. In addition, the impounding of ballots prevents the Board from knowing whether the issues raised in the request for review are moot. For example, the employer may seek review of an RD's decision that five employees were eligible to vote, but the employees may have voted against representation by more than five votes. Forcing the Board to decide issues that turn out to be moot is not only inefficient, it is irrational.

director's action," but rather merely "postpon[es] the count." 84 Fed. Reg. at 69,548. But elsewhere the Board contradicts itself by acknowledging that "[t]he grant of a request for review shall not, *outside of the provision for impoundment* set forth in paragraph (c) of this section, *stay* the Regional Director's action unless otherwise ordered by the Board." *Id.* at 69,596 (emphasis added).

Similarly, as to the requirement that RDs not certify election results while a request for review is pending, the Board characterizes the rule as "requiring regional directors to *refrain* from issuing certifications until the Board has ruled on any request for review," claiming without further explanation that, "[a]lthough section 3(b) states that a request for review 'shall not, unless specifically ordered by the Board, operate as a stay of any action taken by the regional director,' it has nothing to say about the time at which a certification should issue vis-à-vis a request for review." *Id.* at 69,555 & n.129. However, elsewhere, the Board frankly acknowledges that its rule requires "Stays of Certifications." *Id.* at 69,553. *See also id.* at 69,555 (acknowledging that the rule "will eliminate the perceived need or incentive for parties to file requests to stay certifications").

Finally, the Board argues that the restriction that RDs cannot schedule elections for less than 20 business days from the direction of election "is not a stay," instead characterizing its rule as "set[ting] a uniform minimum period of time during which a pre-election request for review may be filed and ruled on by the Board prior to an election." 84 Fed. Reg. at 69,546.

The Board majority's purported distinction between the filing of a request for review "operat[ing] as a stay of any action taken by the regional director," 29 U.S.C. § 153(b) – which it acknowledges is impermissible under the Act – and the filing of a request for review "postpon[ing]" when the RD can count the ballots, 84 Fed. Reg. at 69,548, "requiring regional

directors to refrain from issuing certifications," *id.* at 69,555, or requiring a "uniform minimum period" before the RD may schedule the election, *id.* at 69,546 – formulations which the Board majority claims are permissible – lacks merit.

*Black's* defines a "stay" as

**1.** The postponement or halting of a proceeding, judgment, or the like.

**2.** An order to suspend all or part of a judicial proceeding or a judgment resulting from that proceeding.

*Black's Law Dictionary* (11th ed., 2019). *See also Webster's II New College Dictionary* (2001) ("To delay or stop the effect of (e.g., an order) by legal action or mandate."). That straightforward definition is fully consistent with the use of the term in the federal rules of procedure. *See* Fed. R. Civ. P. 62 (Stay of Proceedings to Enforce a Judgment); Fed. R. App. P. 8 (Stay or Injunction Pending Appeal); Fed. R. App. P. 18 (Stay Pending Review).

Automatically "postpon[ing]" when ballots may be counted, requiring RDs to "refrain" from certifying election results, 84 Fed. Reg. at 69,555, and setting a "uniform minimum period" before an election may be conducted, *id.* at 69,546, all constitute "stay[s] of . . . action[s] taken by the regional director," 29 U.S.C. § 153(b), within any ordinary meaning of the terms used. "The postponement or halting of a proceeding" or "[a]n order to suspend . . . a . . . proceeding," *Black's Law Dictionary*, are literally the dictionary definitions of a "stay."

Nor does the Board gain any ground with its claim that NLRA § 3(b) "has nothing to say about the time at which a certification should issue vis-à-vis a request for review." 84 Fed. Reg. at 69,555 n.129. To the contrary, NLRA § 3(b)'s mandate could not be clearer: the filing of a request for review "*shall not* . . . operate as a stay of *any action* taken by the regional director" "unless *specifically ordered* by the Board." 29 U.S.C. § 153(b) (emphasis added). Absent a

specific order by the Board staying a RD's representation case decision, the RD is free to carry

out the statutory mandate to "direct an election," count the votes, and "certify the results." 29

U.S.C. § 153(b). The 2019 rule is thus inconsistent with the NLRA.

### PLAINTIFF WILL SUFFER IRREPARABLE HARM IF THE RULE TAKES EFFECT

Plaintiff will suffer irreparable harm if the 2019 election rule takes effect. AFL-CIO

unions and their locals are currently organizing employees who will file petitions for elections on

April 16, 2020, and in the days and weeks immediately thereafter. If the rule takes effect, it will

slow the processing of those petitions and extend the time between the filing of the petition and

the election, putting a halt to the employees' organizing momentum and making it less likely

they will obtain representation in the election. Moreover, in those cases where employees vote in

favor of representation,[30] the 2019 rules will often delay the counting of the ballots and

certification of the results, thereby delaying bargaining and consequent improvements in wages

and working conditions, and, in some cases, preventing the unions from achieving a collective

bargaining agreement at all.

In Fiscal Year 2019, 1,993 petitions for election were filed with the NLRB. NLRB,

Number of Petitions Filed in FY19, https://www.nlrb.gov/news-outreach/graphs-data/petitions-

and-elections/number-petitions-filed-fy17. That averages to over 7.5 petitions per business day.

In any given month, about half the petitions processed involve an AFL-CIO affiliated union. For

example, AFL-CIO unions accounted for just over half of 103 representation cases closed in

December 2019. Sweeney Dec. ¶ 5. This data demonstrates that AFL-CIO unions are regularly

and consistently filing representation case petitions, and this regular and consistent filing of

---

[30] The Board reports that employees voted in favor of representation in 70% of union-filed election cases in fiscal year 2019. NLRB, Election Report for Cases Closed (Feb. 26, 2020),
https://www.nlrb.gov/sites/default/files/attachments/basic-page/node-6857/fy-2019-totals.pdf.

petitions will continue if the 2019 election rule takes effect on April 16, 2020. *See* Sweeney Dec. ¶ 3; *see also id.* ¶ 4 (describing current organizing efforts by AFL-CIO unions).

The petitions AFL-CIO unions will file after the effective date of the rule will immediately be subject to the delays described above. The delays will cause irreparable harm to Plaintiff's affiliated unions by placing the brakes on their momentum and making it less likely they will be selected as the employees' representative. The Supreme Court has recognized that "the union, unless an election can promptly be held to determine the choice of representation, runs the risk of impairment of strength by attrition and delay while the case is dragging on." *Boire v. Greyhound Corp.*, 376 U.S. 473, 478 (1964). Indeed, the very majority of the Board that promulgated the 2019 election rule recognized four months earlier that employees who file NLRB petitions, whether in support of representation or for decertification of a current employee representative, are "adversely affected by delay" because "[d]elay robs the petition effort of momentum." Representation – Case Procedures: Election Bars; Proof of Majority Support in Construction Industry Collective-Bargaining Relationships, 84 Fed. Reg. 39,937 (Aug. 12, 2019).

Even if the AFL-CIO unions are able to counter the loss of momentum caused by the delay of the election in individual cases and win some elections, the 2019 election rule will cause a further delay in collective bargaining in many cases because of the impounding of ballots and delay of certification. The delay in bargaining will cause an irreparable loss of employee wages, benefits, and improvement in working conditions because no court could reconstruct what employees would have gained if not for the delay.

The delay will also cause employee disaffection, making agreement in collective bargaining less likely at any time. The D.C. Circuit has recognized that "[e]mployee interest in a

union can wane quickly as working conditions remain apparently unaffected by the union or collective bargaining," thus "when the company is finally ordered to bargain with the union," "the union may find that it represents only a small fraction of the employees." *Int'l Union of Elec., Radio & Mach. Workers v. NLRB*, 426 F.2d 1243, 1249 (D.C. Cir. 1970). "With only limited support," after the disaffection caused by delay, "the Union will be unable to bargain effectively regardless of the ultimate relief granted." *Scott ex. rel. NLRB v. Stephen Dunn & Assocs.*, 241 F.3d 652, 667 (9th Cir. 2001). Accordingly, "[t]he value of the right to enjoy the benefits of union representation is immeasurable in dollar terms once it is delayed or lost." *Id*. at 667 (quotation marks and citation omitted). The Board itself recognizes the irreparable harm caused by delays in bargaining and the consequent need for preliminary relief to "ensure that the employees will not be denied the benefits of union representation for the entire period of litigation . . . and to prevent the irreparable injury to the union's support among the employees which predictably would occur if the union were unable to represent them." NLRB, Office of the General Counsel, Section 10(j) Manual (Feb. 2014), at 5.

For both of these reasons, the AFL-CIO and its affiliated unions will suffer irreparable harm in the absence of preliminary relief.

**INJUNCTIVE RELIEF WOULD CAUSE NO SUBSTANTIAL HARM TO THE BOARD**

A preliminary injunction would cause no substantial harm to the Board, as it would simply require the Board to continue to apply the extant rules to representation petitions. The Board has applied those rules since April 14, 2015, and nowhere in the 2019 election rule does the Board claim that doing so has caused it substantial harm. To the extent that an injunction may cause the Board some inconvenience related to its internal preparations for implementation of the 2019 election rule, that harm is not substantial and pales in comparison to the irreparable harm

that will be caused in the absence of injunctive relief. Accordingly, this factor weighs in favor of a preliminary injunction.

## THE PUBLIC INTEREST WEIGHS IN FAVOR OF PRELIMINARY RELIEF

There is a strong public interest in protecting the collective bargaining process and ensuring that agencies conduct reasoned decision-making. "The National Labor Relations Act was enacted to protect the integrity of the collective bargaining process." *D'Amico v. U.S. Serv. Indus., Inc.*, 867 F. Supp. 1075, 1086 (D.D.C. 1994). Additionally, "the APA establishes the public's right to have input into the rulemaking process and to be bound by agency rules that are the product of reasoned decision making that has been informed by all of the relevant facts." *Make the Road N.Y. v. McAleenan*, 405 F. Supp. 3d 1 (D.D.C. 2019) (emphasis omitted). The public interest, then, will be served by allowing public input to ensure reasoned agency decision-making, especially where, as here, that decision-making affects the integrity of the collective bargaining process. The public interest favors a preliminary injunction.

## CONCLUSION

For the foregoing reasons, Plaintiff AFL-CIO respectfully requests that this Court grant its motion for a preliminary injunction.

Dated: March 9, 2020       Respectfully Submitted,

            /s/ Leon Dayan
            Leon Dayan (D.C. Bar No. 444144)
            Bredhoff & Kaiser, P.L.L.C.
            805 15th Street, NW, Ste. 1000
            Washington, D.C. 20005
            Phone: (202)-842-2600
            E-mail: ldayan@bredhoff.com

            James B. Coppess (D.C. Bar No. 347427)
            Matthew J. Ginsburg (D.C. Bar No. 1001159)
             (application for admission pending)
            Maneesh Sharma (D.C. Bar No. 1033407)
             (application for admission pending)

AFL-CIO Legal Department
815 16th Street, NW
Washington, DC 20006
Phone: (202)-637-5337
E-mail: jcoppess@aflcio.org
E-mail: mginsburg@aflcio.org
E-mail: msharma@aflcio.org

*Counsel for Plaintiffs*