## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____
)
**AMERICAN FEDERATION OF LABOR –** )
**CONGRESS OF INDUSTRIAL ORGANIZATIONS,** )
)
**Plaintiff,** )
)       **Case No. 20-cv-00675-KBJ**
**v.** )
)       **Motion hearing set for**
**NATIONAL LABOR RELATIONS BOARD,** )       **5/14/2020 at 10:30 a.m**
)
**Defendant.** )
_____ )

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
## NATIONAL LABOR RELATIONS BOARD'S MOTION FOR SUMMARY JUDGMENT

HELENE D. LERNER
*Supervisory Trial Attorney*
T: (202) 273-3738
Helene.Lerner@nlrb.gov
D.C. BAR NO. 420455

TYLER JAMES WIESE
*Field Attorney, Region 18*
T: (952) 703-2891
Tyler.Wiese@nlrb.gov
*Federal Office Building*
*212 3rd Avenue S, Suite 200*
*Minneapolis, MN 55401*

MOLLY SYKES
Molly.Sykes@nlrb.gov
T: (202) 273-1747
JESSICA MENDOZA URIOL
Jessica.MendozaUriol@nlrb.gov
T: (202) 971-7853
*Attorneys, Contempt, Compliance and*
*  Special Litigation Branch*

WILLIAM G. MASCIOLI
*Assistant General Counsel*

DAWN L. GOLDSTEIN
*Deputy Assistant General Counsel*

National Labor Relations Board
Contempt, Compliance, and
  Special Litigation Branch
1015 Half Street, S.E., Fourth Floor
Washington, D.C. 20003
F: (202) 273-4244

# TABLE OF CONTENTS

I.   Introduction ........................................................................................................1

    A.   Statutory and Regulatory Background, and Relevant Facts .....................................1

    B.   AFL-CIO's Complaint and Motion for a Preliminary Injunction.............................6

II.  The 2019 Amendment Is Procedural and Did Not Require Notice and Comment.............9

    A.   The Provision that Regional Directors Must Permit Litigation of and Decide Unit Scope, Voter Eligibility, and Supervisory Status Issues Before the Election Is Procedural ...........................................................................................10

    B.   The Amendment's Incidental Effect Upon the Length of the "Critical Period" for Election Campaigning Does Not Make the Amendment Substantive .............12

    C.   The Amendment's Extension of the Time to Produce a Voter List Is Procedural .............................................................................................................14

    D.   The Amendment's Restriction on Who Can Serve as an Election Observer Is Procedural .............................................................................................................14

    E.   The Amendment's Requirement that Regional Directors Certify Election Results Only After the Board Has Ruled on Requests for Review Is Procedural .............15

III. The 2019 Amendment Is Not Arbitrary and Capricious as a Whole ................................17

    A.   Standard of Review for Arbitrary and Capricious Challenges .............................17

        1.   The Board is entitled to extraordinary deference in crafting its own representation procedures .............................................................................17

        2.   Lawful rules need only be rational and well-explained ..................................19

    B.   The Board's Explicitly Articulated Goals Are Permissible and Furthered by the Amendment....................................................................................................21

IV.  The Portions of the 2019 Amendment Challenged by AFL-CIO Are Not Arbitrary and Capricious.................................................................................................25

    A.   The 2019 Amendment Provision that Eligibility and Supervisory Status Issues Will Normally Be Litigated at the Pre-Election Hearing and Decided by the Regional Director Prior to the Election Is Reasonable .........................................25

    B.   The 2019 Amendment Provision Requiring Regional Directors to Set Election Dates at Least Twenty Business Days from the DDE Is Rational ........................30

C.    The 2019 Amendment's Requirement that Ballots Be Impounded When a Request for Review Is Filed Within Ten Days of a DDE Promotes Efficiency and Transparency ...................................................................................31

D.    The 2019 Amendment Governing the Selection of Election Observers Is a Product of Reasoned Decisionmaking ....................................................................34

E.    The 2019 Amendment's Three-day Extension of Time for Employers to File and Serve the Voter List Is Not Arbitrary and Capricious ...................................37

V.    The 2019 Amendment Does Not Violate Section 3(b) of the Act ....................................39

VI.    Even if AFL-CIO's Challenges to the Provisions It Alleges to Be Substantive Succeed, the Remainder of the 2019 Amendment Is Severable .......................................................43

VII.    Conclusion ......................................................................................................................45

# TABLE OF AUTHORITIES

## Cases

*Allegheny Ludlum Corp.*, 333 NLRB 734 (2001), *enf'd*, 301 F.3d 167 (3d Cir. 2002) .............. 36

*Am. Fed'n of Labor v. NLRB*, 308 U.S. 401 (1940) ................................................. 1, 11

\*Am. Hosp. Ass'n v. Bowen*, 834 F.2d 1037 (D.C. Cir. 1987) ...................................... 10

\*Am. Hosp. Ass'n v. NLRB*, 499 U.S. 606 (1991) ................................................. 42, 43

*Am. Trucking Ass'ns, Inc. v. Fed. Motor Carrier Safety Admin.*,
  724 F.3d 243 (D.C. Cir. 2013) ......................................................... 19, 20

*Amalgamated Clothing & Textile Workers v. NLRB*, 736 F.2d 1559 (D.C. Cir. 1984) ............... 13

\*Associated Builders & Contractors of Tex., Inc. v. NLRB,* 826 F.3d 215 (5th Cir. 2016) .......... 26

*Associated Builders & Contractors of Tex., Inc. v. NLRB*, 2015 WL 3609116 (W.D. Tex. June 1,
  2015), *aff'd*, 826 F.3d 215 (5th Cir. 2016) ................................................... 5

*Barre-Nat'l, Inc.*, 316 NLRB 877 (1995) .......................................................... 27

\*Batterton v. Marshall*, 648 F.2d 694 (D.C. Cir. 1980) ............................................. 10

*Boire v. Greyhound Corp.*, 376 U.S. 473 (1965) ................................................. 3, 30

*Browning-Ferris Industries of California, Inc.*, 327 NLRB 704 (1999) .............................. 36

*Butera Finer Foods, Inc.*, 334 NLRB 43 (2001) .................................................... 35

*Carlson v. Postal Regulatory Comm'n*, 938 F.3d 337 (D.C. Cir. 2019) ............................. 43

*Certainteed Corp. v. NLRB*, 714 F.2d 1042 (11th Cir. 1983) ....................................... 21

*Chamber of Commerce of U.S. v. NLRB*, 118 F. Supp. 3d 171 (D.D.C. 2015) ....................... 5

*Chamber of Commerce of U.S. v. Sec. & Exch. Comm'n*, 412 F.3d 133 (D.C. Cir. 2005) .......... 23

\*Chamber of Commerce v. U.S. Dep't of Labor*, 174 F.3d 206 (D.C. Cir. 1999) ................. 15, 17

\*Chevron, U.S.A., Inc. v. Natural Resource Defense Council, Inc.*,
  467 U.S. 837 (1984) ..................................................... 40, 41, 43

*Decker v. Nw. Envtl. Def. Ctr.*, 568 U.S. 597 (2013) ............................................. 19

*Embassy Suites*, 313 NLRB 302 (1993) ........................................................... 34

\*Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117 (2016) ................................. 20, 26, 36

*Equinox Holdings, Inc.*, 364 NLRB No. 103 (Aug. 26, 2016) ....................................... 35

*Excelsior Underwear, Inc.*, 156 NLRB 1236 (1966) ................................................ 37

*FCC v. Fox Television Stations, Inc.*, 556 U.S. 502 (2009) ..................................... 20, 36

*Ideal Elec. & Mfg. Co.*, 134 NLRB 1275 (1961) ................................................... 13

*In re Barr Labs., Inc.*, 930 F.2d 72 (D.C. Cir. 1991) ............................................. 19

\*Inland Empire Dist. Council, Lumber & Sawmill Workers Union v. Millis*,
  325 U.S. 697 (1945) ................................................... 4, 18, 26

*James V. Hurson Assocs. v. Glickman*, 229 F.3d 277 (D.C. Cir. 2000) ............................. 13

*Jat Transportation*, 131 NLRB 122 (1961) ........................................................ 35

*Mike O'Connor Chevrolet*, 209 NLRB 701 (1974), *enf. denied on other grounds*, 512 F.2d 684
  (8th Cir. 1975) ................................................... 16, 33

*Multicultural Media, Telecom & Internet Counsel v. FCC*, 873 F.3d 932 (D.C. Cir. 2017) ....... 19

*Nat'l Ass'n of Waterfront Emp'rs v. Solis*, 665 F. Supp. 2d 10 (D.D.C. 2009) ..................... 12

*Nat'l Whistleblower Center v. NRC*, 208 F.3d 256 (D.C. Cir. 2000) ............................... 14

\*NLRB v. A.J. Tower Co.*, 329 U.S. 324 (1946) ................................................. 4, 18

iii

*NLRB v. Sav-On Drugs, Inc.*, 728 F.2d 1254 (9th Cir. 1984) (en banc) ..................................... 41

*NLRB v. Waterman S.S. Corp.*, 309 U.S. 206 (1940) ................................................................ 18

*Ozburn-Hessey Logistics*, 366 NLRB No. 177 (Aug. 27, 2018), *aff'd in part, rev'd on other grounds, Ozburn-Hessey Logistics, LLC v. NLRB,* No. 19-1054, 2020 WL 1199264 (6th Cir. Mar. 12, 2020) ...................................................................................................................... 16

*Pickus v. United States Board of Parole*, 507 F.2d 1107 (D.C. Cir. 1974) ................................ 15

*Pub. Citizen v. Dep't of State*, 276 F.3d 634 (D.C. Cir. 2002) ................................................... 12

*Reeder v. FCC*, 865 F.2d 1298 (D.C. Cir. 1989) ....................................................................... 12

*Sebelius v. Auburn Reg'l Med. Ctr.*, 568 U.S. 145 (2013) ......................................................... 19

*Time Warner Cable, Inc. v. FCC*, 729 F.3d 137 (2d Cir. 2013) ................................................ 17

*Union of Concerned Scientists v. NRC*, 920 F.2d 50 (D.C. Cir. 1990) ...................................... 20

*United States v. Picciotto*, 875 F.2d 345 (D.C. Cir. 1989) ........................................................ 10

*Van Hollen, Jr. v. Fed. Election Comm'n*, 811 F.3d 486 (D.C. Cir. 2016) .......................... 19, 25

*Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council*, 435 U.S. 519 (1978) ..................................................................................................................................... 24

*VT Hackney, Inc.,* 367 NLRB No. 15 (Oct. 24, 2018) ............................................................... 12

## Statutes

5 U.S.C. § 553(b)(A) ..................................................................................................................... 9

5 U.S.C. § 553(b)(B) .................................................................................................................... 10

5 U.S.C. § 706(2)(A) ................................................................................................................ 6, 17

5 U.S.C. § 706(2)(C) ...................................................................................................................... 6

5 U.S.C. § 706(2)(D) ..................................................................................................................... 6

29 U.S.C. § 153(b) .................................................................. 6, 7, 8, 9, 39, 40, 41, 42, 43

29 U.S.C. § 153(d) ....................................................................................................................... 16

29 U.S.C. § 156 .................................................................................................................. 1, 18, 43

29 U.S.C. § 157 .............................................................................................................................. 1

29 U.S.C. § 158(a)(5) ..................................................................................................................... 3

29 U.S.C. § 159 .............................................................................................................................. 1

29 U.S.C. § 159(b) ................................................................................................................. 11, 42

29 U.S.C. § 159(c) .......................................................................................................................... 1

29 U.S.C. § 159(c)(1) ............................................................................................................ 1, 2, 17

29 U.S.C. § 159(c)(1)(B) .............................................................................................................. 11

29 U.S.C. § 159(c)(4) ................................................................................................................. 1, 2

29 U.S.C. § 160 ........................................................................................................................ 1, 37

29 U.S.C. § 160(e) ......................................................................................................................... 3

Government Performance and Results Modernization Act of 2010, Pub. L. No. 111-352, 124 Stat. 3866 (codified as amended in scattered sections of 5 U.S.C. and 31 U.S.C.) ................. 19

## Rules

Fed. R. Civ. P. 56 .......................................................................................................................... 1

Local Civ. R. 7(a) ........................................................................................................................... 1

Local Civ. R. 7(h) .......................................................................................................................... 1

**Regulations**

11 Fed. Reg. 177A-602 ................................................................................................. 34
29 C.F.R. § 101.21(d) (1962) ....................................................................................... 30
29 C.F.R. § 102.62(d) (2019) ................................................................................. 3, 37
29 C.F.R. § 102.63(b)(1) (2019) .................................................................................... 2
29 C.F.R. § 102.64(a) (2019) .................................................................................. 7, 27
29 C.F.R. § 102.67 (2014) ........................................................................................... 32
29 C.F.R. § 102.67 (2019) ............................................................................................. 3
29 C.F.R. § 102.67(b) (2019) ................................................................................. 7, 30
29 C.F.R. § 102.69 (2019) ...................................................................................... 3, 11
29 C.F.R. § 102.69(a) (2019) ...................................................................................... 44
29 C.F.R. § 102.69(b) (2019) ........................................................................................ 3
29 C.F.R. § 102.69(b)(2) (2019) ................................................................................... 8
29 C.F.R. § 102.69(c)(1)(i) (2019) ................................................................................ 3
79 Fed. Reg. at 74,310 ................................................................................................. 18
79 Fed. Reg. at 74,311 ............................................................................................ 2, 10
79 Fed. Reg. at 74,314 ................................................................................................. 18
79 Fed. Reg. at 74,315 ................................................................................................. 21
79 Fed. Reg. at 74,353 ................................................................................................. 37
79 Fed. Reg. at 74,386 ................................................................................................. 27
79 Fed. Reg. at 74,409 ................................................................................................... 9
82 Fed. Reg. at 58,784 ................................................................................................. 24
84 Fed. Reg. at 69,524 ................................................................................... 2, 4, 5, 18
84 Fed. Reg. at 69,526 .............................................................................. 32, 33, 39
84 Fed. Reg. at 69,527 ......................................................................................... 5, 18, 21
84 Fed. Reg. at 69,528 ................................................................... 2, 4, 5, 21, 23, 24
84 Fed. Reg. at 69,529 ..................................................................... 21, 22, 28, 29
84 Fed. Reg. at 69,530 ................................................................... 18, 21, 23, 29
84 Fed. Reg. at 69,531 ................................................................................................. 37
84 Fed. Reg. at 69,532 ............................................................................ 23, 37, 38
84 Fed. Reg. at 69,533 ...................................................................................... 24, 44
84 Fed. Reg. at 69,534 ................................................................................................. 21
84 Fed. Reg. at 69,535 ................................................................................................. 24
84 Fed. Reg. at 69,536 ................................................................................................. 24
84 Fed. Reg. at 69,538 ................................................................................................. 26
84 Fed. Reg. at 69,539 ........................................................................................... 26, 27
84 Fed. Reg. at 69,540 ........................................................................................... 27, 34
84 Fed. Reg. at 69,541 ................................................................................................. 28
84 Fed. Reg. at 69,544 ................................................................................................. 30
84 Fed. Reg. at 69,545 ................................................................................................. 30
84 Fed. Reg. at 69,546 ................................................................................................. 31
84 Fed. Reg. at 69,547 ............................................................................................. 9, 32
84 Fed. Reg. at 69,549 ................................................................................................. 31

84 Fed. Reg. at 69,551 ................................................................................. 8, 34, 35
84 Fed. Reg. at 69,552 ............................................................................. 34, 35, 36
84 Fed. Reg. at 69,553 ............................................................................. 34, 35, 36
84 Fed. Reg. at 69,555 ......................................................................... 16, 31, 33, 41
84 Fed. Reg. at 69,556 ........................................................................................ 21
84 Fed. Reg. at 69,559 ........................................................................................ 30
84 Fed. Reg. at 69,586 ........................................................................................ 31
84 Fed. Reg. at 69,588 .......................................................................................... 7
85 Fed. Reg. at 17,500 .......................................................................................... 4
Amended 29 C.F.R. § 102.62(d) ................................................................... 23, 44
Amended 29 C.F.R. § 102.63(a)(1) ............................................................... 23, 44
Amended 29 C.F.R. § 102.63(b) .......................................................................... 44
Amended 29 C.F.R. § 102.63(b)(1)(ii) ................................................................. 23
Amended 29 C.F.R. § 102.63(b)(2)(iii) ................................................................ 23
Amended 29 C.F.R. § 102.63(b)(3)(ii) ................................................................. 23
Amended 29 C.F.R. § 102.64(a) ............................................. 7, 10, 11, 23, 28, 44
Amended 29 C.F.R. § 102.66(h) ........................................................................... 13
Amended 29 C.F.R. § 102.67(b) ................................................... 7, 12, 30, 44
Amended 29 C.F.R. § 102.67(c) ................................................... 9, 31, 32, 45
Amended 29 C.F.R. § 102.67(l) .................................................. 7, 14, 23, 44
Amended 29 C.F.R. § 102.69 ................................................................................. 8
Amended 29 C.F.R. § 102.69(a)(5) ..................................... 8, 14, 34, 35, 44
Amended 29 C.F.R. § 102.69(b) ................................................................... 15, 45
Amended 29 C.F.R. § 102.69(c) ......................................................................... 15

## Other Authorities

HOW TO TAKE A CASE BEFORE THE NLRB (Brent Garren, et al., eds., 9th ed. 2016)................. 2, 3
JEFFREY S. LUBBERS, A GUIDE TO FEDERAL AGENCY RULEMAKING (6th ed. 2018) ................... 24
NFL, *Top 50 Sound FX | #23: Herm Edwards: You Play to Win the Game!*, YOUTUBE (Nov. 13, 2015) (last visited April 11, 2020) ........................................................................ 11
OMB Circular A-11 Part 6, Section 200.10 (last visited April 13, 2020) .................................... 19
S. Rep. No. 573, Committee on Education and Labor, 74th Cong., 1st Sess. ............................. 11

The National Labor Relations Board (the "NLRB" or the "Board") submits the following Memorandum of Points and Authorities in Support of its Motion for Summary Judgment in the above-captioned matter. *See* Fed. R. Civ. P. 56 and Local Civ. R. 7(a), (h).

## I.   Introduction

### A.   Statutory and Regulatory Background, and Relevant Facts

In enacting the National Labor Relations Act ("NLRA" or "Act"), Congress assigned the Board two principal responsibilities: (1) conducting secret ballot elections in which employees may vote as to whether they wish to be represented by a labor organization under 29 U.S.C. § 159, and (2) regulating the conduct of employers and unions that has a reasonable tendency to impair employee free choice under 29 U.S.C. § 160. *See Am. Fed'n of Labor v. NLRB*, 308 U.S. 401, 405 (1940). The NLRA grants employees the right "to bargain collectively through representatives of their own choosing . . . and to . . . refrain from . . . such activit[y]." 29 U.S.C. § 157. Section 9 of the Act, 29 U.S.C. § 159, gives the Board authority to conduct a secret ballot election and certify the results.

Section 9 sets forth only the basic steps for resolving a question of representation.[1] In Section 6, Congress recognized the need for the Board to promulgate rules to carry out its statutory responsibilities. 29 U.S.C. § 156 (Board has "authority [. . .] to make, amend, and rescind . . . such rules and regulations as may be necessary to carry out the provisions of the Act."). In addition, Section 9(c) grants the Board specific authority to prescribe rules for processing representation petitions. 29 U.S.C. § 159(c). In exercising the authority granted to it

---

[1] These include the filing of an election petition by an employee, labor organization, or employer (29 U.S.C. § 159(c)(1)); next, if there is reasonable cause, an appropriate hearing is held to determine whether a question of representation exists, unless the parties waive the hearing and agree to an election (*id.* § 159(c)(1), (4)); if there is such a question of representation, a secret ballot election is conducted, and finally, the election results are certified (*id.*).

by Congress, the Board has amended its representation case procedures more than three dozen times without notice and comment. *Representation-Case Procedures* (the "2019 Amendment" or "Amendment")*, 84 Fed. Reg. 69,524, 69,528 (Dec. 18, 2019) (citing to *Representation-Case Procedures* ("2014 Rule")*, 79 Fed. Reg. 74,308, 74,311 (Dec. 15, 2014)). Only in 2011 did the Board first use notice and comment to amend these procedures, which culminated in the 2014 Rule. 84 Fed. Reg. at 69,528 (see below, n.6). Thus, amending representation rules without notice and comment is the norm rather than the exception.

Representation cases proceed in four stages: petition, pre-election/hearing (or election agreement), election, and certification/post-election, 84 Fed. Reg. at 69,524, and disputes can arise at any of these stages. First, a petition is filed with the Board by an employee, a labor organization, or an employer "in accordance with such regulations" as the Board may prescribe. 29 US.C. § 159(c)(1); 84 Fed. Reg. at 69,524. The petition asks for an election among a specific group, or "unit," of employees. How to Take a Case Before the NLRB 5-3 (Brent Garren, et al., eds., 9th ed. 2016). In response, the employer must submit a Statement of Position, responding to certain issues raised by the petition. 29 C.F.R. § 102.63(b)(1) (2019). Second, if there is reasonable cause, an appropriate hearing is held on due notice to determine whether a question of representation exists, unless the parties waive the hearing and agree to an election. 29 U.S.C. § 159(c)(1), (4). Where both parties agree to the terms of an election, their agreement is set forth in a document called a consent or stipulated election agreement. The vast majority of elections are conducted through stipulated agreements. *See* 84 Fed. Reg. at 69,528, n.16 (in fiscal year 2019, 91.3% of elections were by agreement).

Third, if the Regional Director finds a question concerning representation, he or she will then issue a decision and direction of election ("DDE") specifying the election date and a

description of the voting unit. While the DDE resolves certain disputed issues, questions may arise about whether a particular employee or sub-category of employees is eligible to vote in the election. *See* HOW TO TAKE A CASE at 5-38. Either party may file with the Board a request for review of the DDE. 29 C.F.R. § 102.67 (2019). And within two days after the DDE, under the 2014 Rule, the employer must provide the Board and union with a "voter list" of all potentially eligible voters, including personal contact information. *See* 29 C.F.R. § 102.62(d) (2019).

At the election stage, any disputed voters can cast ballots under challenge. *See* HOW TO TAKE A CASE at 8-7. The unchallenged ballots are tallied shortly after the polls close. The challenges will be litigated only if there is no clear winner; otherwise, they are moot.[2] The Regional Director also currently has discretion to resolve some of these disputes pre-election in the DDE, but this is not required.

After the election, one party may argue that the election was unfair, and so the results should not be certified. These "objections" are investigated by the Regional Director. 29 C.F.R. § 102.69(c)(1)(i) (2019). An election is complete when the Board, or its Regional Director by delegation, has (in the words of the Act's Section 9(c)(1)(B)), "certif[ied] the results thereof," which cannot be done until the Board or its Regional Director has determined that the results of the election are accurate, not subject to valid objections, and do not hinge upon disputed ballots. *See generally* 29 C.F.R. § 102.69 (2019).[3]

---

[2] 29 C.F.R. § 102.69(b) (2019) (challenges will not be litigated "if the challenged ballots are insufficient in number to affect the results of the election…").

[3] The issuance of a certification, however, does not immediately result in a legally enforceable bargaining obligation for the employer. An employer can put the validity of the certification before the Board by refusing to bargain in order to prompt the union to file an unfair labor practice charge alleging that an employer is violating Section 8(a)(5) of the Act (29 U.S.C. § 158(a)(5)) by its refusal. *See Boire v. Greyhound Corp.*, 376 U.S. 473, 476-79 (1965). These unfair labor practice charges virtually always result in the issuance of a complaint by the Board's General Counsel seeking an order commanding the employer to bargain, and the eventual Board order, once issued, is judicially enforceable. 29 U.S.C. § 160(e).

Aside from Section 9's general requirements, however, the statute says very little about representation case procedures. Instead, Section 9 grants the Board "a wide degree of discretion in establishing the procedure and safeguards necessary to insure the fair and free choice of bargaining representatives by employees." *NLRB v. A.J. Tower Co.*, 329 U.S. 324, 330 (1946). The "broad" and "general" statutory requirements that "notice must be 'due' [and] the hearing 'appropriate'" reflect Congress's understanding that the Board has "great latitude concerning procedural details." *Inland Empire Dist. Council, Lumber & Sawmill Workers Union v. Millis*, 325 U.S. 697, 706 (1945).

In 2019, the Board amended its representation case procedures, without notice and comment. 84 Fed. Reg. at 69,528-30. This Amendment will take effect on May 31, 2020. *Representation-Case Procedures,* 85 Fed. Reg. at 17,500 (Mar. 30, 2020). The 2019 Amendment makes some fifteen changes, summarized at 84 Fed. Reg. at 69,524-26, which the Board determined would further the interests of efficiency, uniformity, transparency, finality, and the reduction of litigation. *Id.* at 69,526. These provisions apply equally to initial organizing cases (when a union files a petition seeking to represent nonunion employees) and to decertification cases (when employees file a petition seeking to rid themselves of an unwanted incumbent union).

The Board's new amendments modify its representation case procedures to, among other things, permit parties additional time to comply with pre-election requirements, resolve certain unit scope and voter eligibility issues prior to an election, and ensure that only the Board will issue certifications when disputes about the election arise. As explained below, the Board intended in the 2019 Amendment to restore efficiency, fairness, and accuracy to representation cases, which aspects of the 2014 Rule had sacrificed for speed.  84 Fed. Reg. at 69,524.

By way of background, the 2019 Amendment revises some of the procedural rules implemented by the Board in 2014. The 2014 Rule made twenty-five amendments to the then-existing rules, including imposing new procedural requirements on the parties, limiting the scope of pre-election hearings, and ending the automatic delay of all directed elections for twenty-five days in anticipation of requests for Board review. 79 Fed. Reg. at 74,309-10. After challenge by the Chamber of Commerce, this Court upheld the 2014 Rule in full, *Chamber of Commerce of U.S. v. NLRB*, 118 F. Supp. 3d 171 (D.D.C. 2015), and this Court's decision was not appealed. In separate litigation challenging that Rule, the United States District Court for the Western District of Texas also upheld the 2014 Rule in full, and the Fifth Circuit Court of Appeals affirmed that judgment. *Associated Builders & Contractors of Tex., Inc. v. NLRB*, 2015 WL 3609116 (W.D. Tex. June 1, 2015), *aff'd*, 826 F.3d 215 (5th Cir. 2016).

The Board first gathered information about how the 2014 Rule had been working by issuing a Request for Information in 2017. *Representation-Case Procedures* ("2017 Request for Information"), 82 Fed. Reg. at 58,783 (Dec. 14, 2017); *see* 84 Fed. Reg. at 69,528. In promulgating the 2019 Amendment, the Board sought to address certain problems it identified with the 2014 Rule through its independent review, as well as those brought to its attention by stakeholders in the almost five years since the 2014 Rule's changes were implemented. 84 Fed. Reg. at 69,524. In addition, many of the new changes stand entirely apart from the 2014 changes, clarifying pre-2014 regulatory text, resolving asymmetries between related provisions, and introducing new provisions. *Id.* at 69,527-28. The Board made all its 2019 Amendment changes to facilitate "fairness, accuracy, orderly litigation, and efficiency" in its processing of representation cases. *Id.* at 69,528.

**B.  AFL-CIO's Complaint and Motion for a Preliminary Injunction**

The Complaint for Declaratory and Injunctive Relief filed by the American Federation of Labor and Congress on Industrial Relations ("AFL-CIO") contains four counts. In Count One, AFL-CIO alleges that what it describes as the "central parts" of the 2019 Amendment [Doc. 1, p. 9, ¶ 47] are substantive and thus should not have been issued without notice and comment, in violation of the APA (5 U.S.C. § 706(2)(D)), and that the remainder of the amendments are not severable [Doc. 1, pp. 9-10]; Count Two alleges that the Board's promulgation of its 2019 Amendment as a whole was arbitrary and capricious and an abuse of discretion in violation of the APA (5 U.S.C. § 706(2)(A)) [Doc. 1, pp. 10-11]; Count Three specifies four provisions of the 2019 Amendment that AFL-CIO alleges as arbitrary and capricious, and an abuse of discretion in violation of the APA [Doc. 1, pp. 11-13]; and Count Four alleges that three provisions of the 2019 Amendment violate Section 3(b) of the Act (29 U.S.C. § 153(b)), and the APA (5 U.S.C. § 706(2)(C)) [Doc. 1, pp. 13-15]. After AFL-CIO filed a Motion for Preliminary Injunction ("PI Motion") [Doc. 3], and a memorandum in support ("Memo") [Doc. 3-1][4], the parties agreed to brief the merits by filing Cross-Motions for Summary Judgment, pursuant to a briefing schedule set by the Court. [*See* March 26, 2020 Minute Order].

The following portions of the 2019 Amendment are specifically challenged by AFL-CIO in its Complaint and PI Motion:

---

[4] Citations to the memorandum in support of AFL-CIO's PI Motion will be as follows: [Memo, p. --] and not to [Doc. 3-1, p.---].

1.    **Amended Section 102.64(a)**[5] provides that questions of individual eligibility and unit-inclusion are to be litigated at the pre-election hearing and requires Regional Directors to decide such questions prior to an election.

      a.  Under the 2014 Rule, Section 102.64(a) read, "[d]isputes concerning individuals' eligibility to vote or inclusion in an appropriate unit ordinarily need not be litigated or resolved before an election is conducted.";

      b.  AFL-CIO alleges in Count I that this provision is substantive [Doc. 1, p. 9, ¶ 48]; and in Counts II [Memo, pp. 34-35] and III [Memo, p. 19, n.14] that it is arbitrary and capricious.

2.    **Amended Section 102.67(b)** requires Regional Directors to schedule an election not earlier than twenty business days following the DDE.

      a.  Under the 2014 Rule, Section 102.67(b) read, "The Regional Director shall schedule the election for the earliest date practicable consistent with these rules."

      b.  AFL-CIO alleges in Count I that this provision is substantive [Doc. 1, p. 9, ¶ 48; Memo, pp. 19-21]; in Count III that it is arbitrary and capricious [Doc. 1, p. 12]; and in Count IV that it violates the Section 3(b) of the Act (29 U.S.C. § 153(b)). [Doc. 1, p. 13; Memo, pp. 37-38].

3.    **Amended Section 102.67(l)**  requires the voter list to be provided to the petitioner within five business days of the DDE.

      a.  The 2014 Rule required the list to be provided within two business days of the DDE; 29 C.F.R. § 102.67(l).

---

[5] The amended regulatory text of the new 2019 Amendment is located at 84 Fed. Reg. at 69,588-600.  References to the amended regulations will be referred to as "Amended Section _____."

  b. AFL-CIO alleges in Count I that this provision is substantive [Doc. 1, p. 9, ¶ 48; Memo, pp. 22-23] and in Count II as arbitrary and capricious. [Memo, pp. 33-34].

4. **Amended Section 102.69(a)(5)** provides that whenever possible, a party will select as its election observer, either a current member of the voting unit, or a current nonsupervisory employee.

  a. Previously, there was no regulation as to selection of observers, only case law explaining that the parties may be represented by observers. *See* 84 Fed. Reg. at 69,551 and nn. 106-19;

  b. AFL-CIO alleges in Count I that this provision is substantive [Doc. 1, p. 9, ¶ 48; Memo, pp. 23-24] and in Count III that it is arbitrary and capricious [Doc. 1, p. 12].

5. **Amended Section 102.69** provides that Regional Directors will issue election certifications only after a request for review has been decided by the Board or after the time for filing a request for review has passed.

  a. Under the 2014 Rule, Regional Directors were required to certify election results, despite the pendency or possibility of a request for review. 29 C.F.R. § 102.69(b)(2) (2019).

  b. AFL-CIO alleges in Count I that this provision is substantive [Doc. 1, pp. 9-10, ¶ 48; Memo, pp. 24-28] and in Count IV, that it violates Section 3(b) of the Act (29 U.S.C. § 153(b)) [Doc. 1, p. 13; Memo, pp. 37-38].

6.     **Amended Section 102.67(c)** provides that when a request for review of a DDE is filed within ten business days, the ballots will be impounded pending the Board's decision.

    a.   The 2014 Rule had removed the provision for automatic impoundment. (79 Fed. Reg. at 74,409; 84 Fed. Reg. at 69,547). Prior to the 2014 amendments, Section 102.67(b) provided that when a pending request for review had not been ruled upon or had been granted prior to the conduct of the election, ''all ballots shall be impounded and remain unopened pending such decision.'' (*See* 79 Fed. Reg. at 74,409);

    b.   AFL-CIO alleges in Count III that this provision is arbitrary and capricious [Doc. 1, pp. 12-13, ¶¶ 67-68] and in Count IV that it violates Section 3(b) of the Act (29 U.S.C. § 153(b)) [Doc. 1, p. 13-14; Memo, pp. 36-38].

As explained below, the Board was not required to use notice and comment in enacting the 2019 Amendment because its provisions are procedural. The Board acted within the scope of the broad authority granted by Congress to make, amend, and rescind rules necessary to carry out the Act; therefore, neither the 2019 Amendment as a whole, nor its parts, is arbitrary and capricious under the APA, nor does it violate the Act. And even if certain portions of the Amendment are found unlawful, the remainder of the Amendment is severable.[6]

## II.     The 2019 Amendment Is Procedural and Did Not Require Notice and Comment

The APA distinguishes between procedural rules, which are exempt from the APA's notice-and-comment requirement, 5 U.S.C. § 553(b)(A), and substantive rules, which are not.

---

[6] The Board is working diligently to complete the administrative record and will file it soon. The parties have accordingly, where necessary, cited to the administrative record currently located on regulations.gov.

The D.C. Circuit has articulated two critical distinctions between procedural and substantive rules. First, a procedural rule does not itself "alter the rights or interests of the parties, although it may alter the manner in which the parties present themselves or their viewpoints to the agency." *Batterton v. Marshall*, 648 F.2d 694, 707 (D.C. Cir. 1980); *see Am. Hosp. Ass'n v. Bowen*, 834 F.2d 1037, 1051 (D.C. Cir. 1987) (noting that a procedural rule does not "impose[] anything greater than incidental mechanical burdens on regulated [entities]"). Second, a procedural rule does not "encode[] a substantive value judgment or put[] a stamp of approval or disapproval on a given type of behavior." *Am. Hosp. Ass'n*, 834 F.2d at 1047.

The APA's procedural exception is "narrow," *United States v. Picciotto,* 875 F.2d 345, 347 (D.C. Cir. 1989), but nonetheless, the 2019 Amendment is procedural.[7]

### A. The Provision that Regional Directors Must Permit Litigation of and Decide Unit Scope, Voter Eligibility, and Supervisory Status Issues Before the Election Is Procedural

Amended Section 102.64(a) states in relevant part that unit scope, voter eligibility, and supervisory status are to be litigated at the pre-election hearing and decided by the Regional Director prior to an election. This section does not change the basic elements that must be adjudicated in a representation proceeding. All it changes is *when* those issues are presented to, and decided by, the Board.

---

[7] Contrary to AFL-CIO's pronouncement that the 2014 Board gave notice and provided a comment period "[b]ecause of the significant and substantive nature of the rule." [Memo, p. 7], the 2014 Board instead explained that:

> The sole purpose of these procedures was to give the Board the benefit of the views of the public. To be clear, none of this process was required by law: The Board has never engaged in notice and comment rulemaking on representation case procedures, and all of the proposed changes could have been made without notice and comment—in part by adjudication, and in part by simply promulgating a final rule.

79 Fed. Reg. at 74,311. Indeed, the 2014 Board characterized its Rule as "primarily procedural as defined in 5 U.S.C. § 553(b)(B)." *Id.* n.9.

AFL-CIO notes that Section 9(c)(1) of the Act gives parties a right to an election if they can demonstrate that a question concerning representation exists. [Memo, p. 14]. This is correct, under both the 2014 Rule and the 2019 Amendment. Indeed, the Act does not permit the Board to proceed to an election without a determination after a hearing, or the parties' stipulation, that a question of representation exists. And as Section 9(b) of the Act (29 U.S.C. § 159(b)) provides, "[t]he Board shall decide in each case whether . . . the unit appropriate for the purposes of collective bargaining shall be the employer unit, craft unit, plant unit, or subdivision thereof[.]" Last, as noted above at p. 3, an election cannot be complete until the Board, or its Regional Director by delegation, has "certif[ied] the results thereof," 29 U.S.C. § 159(c)(1)(B). As noted above, prior to certification, it must be determined that the results are accurate, not subject to valid objections, and do not hinge upon disputed ballots. *See generally* 29 C.F.R. § 102.69 (2019).

These essential elements of a certification have not changed as a result of Amended Section 102.64(a); all that is different is when those essential elements are to be litigated. AFL-CIO's argument that the Amendment's "change is analogous to changing the elements of a cause of action" is incorrect: parties petition the Board to obtain a certification of representative; the election is one step toward that goal.[8]

AFL-CIO's remaining contentions are easily dispensed with. The assertion that the new Amendment gives parties the right to an "advisory opinion" [Doc. 1, p. 9; Memo, pp. 20, 23] is

---

[8] At the very passage of the Act, Congress noted that the holding of an election was nothing more than a "preliminary determination of fact"—a stepping-stone to the Board's determination that a union did, or did not, represent a majority of the employees in an appropriate bargaining unit. *Am. Fed'n of Labor v. NLRB*, 308 U.S. 401, 409 n.2 (1940) (quoting S. Rep. No. 573, Committee on Education and Labor, 74th Cong., 1st Sess., pp. 5, 6).

To quote former New York Jets coach Herm Edwards, "you play to win the game. Hello? *You play to win the game*. You don't play to just play it." NFL, *Top 50 Sound FX | #23: Herm Edwards: You Play to Win the Game!*, YOUTUBE (Nov. 13, 2015) (last visited April 11, 2020).

factually incorrect—a decision cannot be called "advisory" merely because of the hypothetical prospect that the issue may become moot at a future time. Rather, at the time parties litigate voter eligibility issues at a pre-election hearing, those issues are very much alive and relevant. And AFL-CIO's assertion that the Amendment is "justifie[d] . . . on grounds that are in no way procedural" [Memo, p. 24] is equally incorrect. The objective of giving parties information about unit scope, voter eligibility, and supervisory status earlier in cases is procedural, as it relates to the order of proceedings rather than the content of those proceedings.[9] It is a quintessential "judgment about procedural efficiency" — a category of decision that the D.C. Circuit has firmly placed within the exceptions to notice-and-comment rulemaking. *Pub. Citizen v. Dep't of State*, 276 F.3d 634, 641 (D.C. Cir. 2002).

### B.  The Amendment's Incidental Effect Upon the Length of the "Critical Period" for Election Campaigning Does Not Make the Amendment Substantive

Amended Section 102.67(b) specifies that an election will be scheduled by the Regional Director no less than twenty business days following a DDE's issuance. This extension of time lengthens the "critical period" between the filing of the petition and the election. *See VT Hackney, Inc.,* 367 NLRB No. 15, slip op. at 5, n.15 and accompanying text (Oct. 24, 2018). AFL-CIO alleges that this makes the Amendment change substantive and not procedural.

But AFL-CIO's argument has no substance. The import of the critical period is that when the Board rules upon allegations that an election result has been tainted by misconduct, it generally will not consider alleged improprieties occurring outside that period. *Ideal Elec. &*

---

[9] Thus, even to the extent that *Nat'l Ass'n of Waterfront Emp'rs v. Solis*, 665 F. Supp. 2d 10, 17 (D.D.C. 2009), can be read to suggest that access to particular types of information presents a substantive issue, that case does not support the AFL-CIO's position; the challenged regulation here is about *when* parties get information not *what* information they get. For the same reason, *Reeder v. FCC*, 865 F.2d 1298, 1305 (D.C. Cir. 1989), is inapposite. That case dealt with a rule prohibiting a party from raising certain kinds of arguments at *any* stage of a proceeding, not with a rule like the instant one that merely changes the order in which arguments are adjudicated.

*Mfg. Co.*, 134 NLRB 1275, 1278 (1961). The critical-period rule is a "convenient device to limit the inquiry to the period near the election when improper acts are most likely to affect the employees' freedom of choice." *Amalgamated Clothing & Textile Workers v. NLRB*, 736 F.2d 1559, 1567 (D.C. Cir. 1984). Absent "extremely unusual circumstances," conduct occurring before the critical period cannot be the basis for overturning an election. *Id*. Since the critical-period rule *itself* is procedural, *ipso facto* changing the length of the period is as well.

If AFL-CIO were correct, then even the most minute change to the timeline of a representation case—changing any deadline by even a single day—arguably would constitute a substantive rule change requiring notice and comment because it would expand or contract the length of the critical period. Further, under this reasoning, some of the rules *that AFL-CIO itself concedes are procedural*, such as Amended Section 102.66(h), entitling parties to file post-hearing briefs after every pre-election hearing, would then become substantive because they incidentally affect critical period length.  This cannot be correct.

Both employers and unions may have to refrain from engaging in election-related misconduct for a longer period of time under the Amendment—which is hardly a consequence worth criticizing—but this is not the kind of encoded "value judgment" that can render a rule substantive.[10] Instead, the lengthening of the critical period amounts to an incidental effect on parties, which does not render the rule substantive under well-settled law. *See James V. Hurson Assocs. v. Glickman*, 229 F.3d 277, 281 (D.C. Cir. 2000).

---

[10] Contrary to AFL-CIO's claim [Memo, p. 21], changing the length of the critical period does not alter the parties' "opportunity to campaign," i.e. to speak to employees about unionization. Parties always have the right to speak about unionization, whether an election petition is pending or not. The critical period affects only the consequences of *misusing* that right, or of committing non-speech-related election misconduct.

### C.  The Amendment's Extension of the Time to Produce a Voter List Is Procedural

The third Amendment provision challenged as substantive, Amended Section 102.67(l), extends the time for employers to produce voter lists containing employee names, addresses, and available phone numbers and email addresses. Under the 2014 Rule, an employer has two business days after an election is directed or stipulated to produce the list; under the Amendment, it has five. This provision is about as self-evidently procedural as possible. *Nat'l Whistleblower Center v. NRC*, 208 F.3d 256, 262 (D.C. Cir. 2000) (rules "governing the content and timing of case filings" are procedural). AFL-CIO cites no case to the contrary.

As AFL-CIO notes, this provision effectively gives the employer more time to speak to its employees after an election petition is filed, without the union having a corresponding opportunity to communicate with employees using the voter list contact information. [Memo, p. 22]. But this is only because employers control that information by default. There is thus no merit to AFL-CIO's analogy to a state government election in which the incumbent running for reelection receives voter information from the state earlier than the challengers. [Memo, p. 29.] Employers are not receiving information; they have earlier access to employees' information not because of preferential legal treatment but because they *already maintain that information for unrelated business purposes*. In short, this Amendment's change of a filing due date is procedural, and the AFL-CIO's assertion of it as substantive is illogical.

### D.  The Amendment's Restriction on Who Can Serve as an Election Observer Is Procedural

The NLRB has long allowed parties to choose election observers to represent them during balloting and to challenge voters that the party believes are ineligible to vote in the election. Amended Section 102.69(a)(5) requires that in selecting election observers, whenever

14

possible, a party will now select a current member of the voting unit; but when no such individual is available, a party should select a current nonsupervisory employee.

AFL-CIO suggests, without support, that because the Board overruled caselaw concerning observers, this somehow makes this portion of the Amendment a substantive, rather than a procedural provision. [Memo, pp. 30-31.] But designating who can serve as party representatives in particular proceedings is the very epitome of a procedural rule—the Amendment regulates *who* can present a party's positions to the Board, while leaving totally unchanged *what positions* can be presented. Again, changes to "the manner in which the parties present themselves" are procedural, not substantive. *Chamber of Commerce v. U.S. Dep't of Labor*, 174 F.3d 206, 211 (D.C. Cir. 1999).

### E.   The Amendment's Requirement that Regional Directors Certify Election Results Only After the Board has Ruled on Requests for Review Is Procedural

AFL-CIO's last contention is that Amended Section 102.69(b) and (c) are substantive. [Memo, pp. 24-28]. These provide that Regional Directors may issue certifications only after a request for review is ruled on or the time for filing a request for review has passed. AFL-CIO contends that what it characterizes as a "categorical[]" stay on certification of election results during the pendency of outstanding issues renders notice and comment automatically required for this change. Again, this is a procedural change.

The Amendment does not alter the substantive *criteria* that must be met for the issuance of a certification—only the timing, *see* above p. 11.[11] Noting that early certification by Regional Directors before crucial issues have been determined caused "unnecessary confusion and

---

[11] For this reason, AFL-CIO's citation to *Pickus v. United States Board of Parole*, 507 F.2d 1107, 1113 (D.C. Cir. 1974) is inapposite, because that case dealt with changes to the agency's decisionmaking criteria, not the timeframe for its decisions to take effect.

needless litigation," 84 Fed. Reg. at 69,554, the Board's Amendment provides that such certifications may issue only after those requests for review are decided by the Board, or after the time for filing a request for review expires.

      While this will delay the issuance of some certifications, the Board found, on the facts of *this* record, that the practical impact of such delays is near-zero—its regional offices generally have not issued unfair labor practice complaints asserting that employers were not bargaining pursuant to certifications subject to pending requests for review. 84 Fed. Reg. at 69,555.[12]  Based upon this evidence of nonenforcement, the Board reasonably concluded that the effect of its change to certification timelines was essentially *de minimis*. *Id.* ("we can detect no harm in waiting to issue the certification"). There is almost no practical difference between (i) certifying a union, then holding unfair labor practice charges premised on that certification in abeyance pending review of the certification, and (ii) holding final issuance of a certification in abeyance pending review of the Regional Director's decision. In either case, if employers unilaterally alter terms and conditions of employment (or otherwise refuse to accord the union the privileges of representative status) while a request for review of the election is pending, and the union is then certified as representative, an employer may be later found to have committed an unfair labor practice.[13]

---

[12] The rationale for this apparent policy of nonenforcement is outside of the Board's control; the agency's independent General Counsel controls whether and when unfair labor practice complaints issue. 29 U.S.C. § 153(d).

[13] *Mike O'Connor Chevrolet*, 209 NLRB 701, 703 (1974) (employer acts at its peril when it makes unilateral changes to working conditions following an election; if the union is later certified as representative, those changes will be found to be unfair labor practices), *enf. denied on other grounds,* 512 F.2d 684 (8th Cir. 1975); *Ozburn-Hessey Logistics*, 366 NLRB No. 177, slip op. at 2 n.8 (Aug. 27, 2018) (same, for union's entitlement to information about working conditions); *id.* at 4 (same, for employees' rights to be represented by union at investigatory interviews), *aff'd in part, rev'd on other grounds, Ozburn-Hessey Logistics, LLC v. NLRB,* No. 19-1054, 2020 WL 1199264 (6th Cir. Mar. 12, 2020).

Noting the Board's statement that union certification affects "legal obligations on the part of the employer and the certified representative," [Memo, p.25 (quoting 84 Fed. Reg. at 69,554)], AFL-CIO relies on *Time Warner Cable, Inc. v. FCC*, 729 F.3d 137 (2d Cir. 2013) to argue that this change is substantive [Memo, p. 27]. But that case is inapposite because there, the FCC did not dispute that its rule, by delaying cable operators' ability to exercise certain contractual powers, "significantly affect[ed] substantive rights." *Id.* at 168. For the reasons just shown, the Board's certification change impacts substantive rights in only a *de minimis* way that does not alter unions' material interests. *See Chamber of Commerce*, 174 F.3d at 211. Thus, summary judgment in the Board's favor on this issue is warranted.

## III.    The 2019 Amendment Is Not Arbitrary and Capricious as a Whole

### A.   Standard of Review for Arbitrary and Capricious Challenges

#### 1.   The Board is entitled to extraordinary deference in crafting its own representation procedures

This case comes down to AFL-CIO's disagreement over the policies underlying the current Board's changes to its election procedures. But the APA only deems unlawful an agency action found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Because Congress entrusted the Board with broad discretion as to how to formulate rules to carry out its Section 9 responsibilities, the Board is entitled to extraordinary deference here, and the AFL-CIO's APA and statutory challenges to the 2019 Amendment must fail.

The broad deference owed the Board in designing procedures for representation elections is striking. Section 9 of the NLRA itself gives only basic requirements for representation case procedures (see p. 1, n.1), leaving details to "such regulations as may be prescribed by the Board." 29 U.S.C. § 159(c)(1). This statutory construction was intentional; Congress granted the

Board "great latitude concerning procedural details" in representation cases. *Inland Empire*, 325 U.S. at 706. Congress "entrusted the Board with a wide degree of discretion in establishing the procedure and safeguards necessary to insure the fair and free choice of bargaining representatives by employees." *A.J. Tower Co.,* 329 U.S. at 330. To ensure that fair and free choice, the Board must establish rules so "that employees' votes may be recorded accurately, efficiently and speedily," *id*. at 331, but it is ultimately left to the Board to make "such formal rules of procedure [it] may find necessary to adopt in the sound exercise of its discretion." *Id. at 333*; *see also NLRB v. Waterman S.S. Corp.*, 309 U.S. 206, 226 (1940) ("The control of the election proceedings, and the determination of the steps necessary to conduct that election fairly were matters which Congress entrusted to the Board alone.").

In promulgating its final rule, the Board acted within this "wide degree of discretion." *A.J. Tower*, 329 U.S. at 330. The Board balanced the factors that it found to contribute to the "accurate[], efficient[] and speed[y]" resolution of questions of representation (84 Fed. Reg. at 69,524 (quoting *A.J. Tower*, 329 U.S. at 331)), namely: "speed . . . fairness, accuracy, transparency, uniformity, efficiency and finality." 84 Fed. Reg. at 69,530. The Board assessed the 2014 Rule procedures, weighed the relevant policy concerns and evidence, and properly found that its representation procedures could, and should, be improved upon. 84 Fed. Reg. at 69,527. This is in keeping with the Act's congressional mandate and the Board's "longstanding practice of incrementally evaluating and improving its processes." *Id*. (citing 29 U.S.C. § 156 and quoting 79 Fed. Reg. at 74,310, 74,314). These are legitimate practices and patently valid goals for any agency rulemaking – indeed, every federal agency must "continuous[ly] improve[], . . . focus on better outcomes and lower-cost ways to operate, . . . [and] search for . . . effective

practices." <u>OMB Circular A-11 Part 6, Section 200.10</u> (last visited April 13, 2020).[14] Thus, the 2019 Amendment is the product of the Board's exercise of its broad discretion to formulate procedures and safeguards best serving the purposes of Section 9. Such judgments are entitled to extraordinary deference.

### 2. Lawful rules need only be rational and well explained

As a general matter, the APA allows a court to set aside a rule only in a limited number of circumstances, namely, where the rule is "arbitrary, capricious, or manifestly contrary to the [law]." *Sebelius v. Auburn Reg'l Med. Ctr.*, 568 U.S. 145, 157 (2013). "The arbitrary and capricious standard is highly deferential and presumes agency action to be valid." *Am. Trucking Ass'ns, Inc. v. Fed. Motor Carrier Safety Admin.*, 724 F.3d 243, 245 (D.C. Cir. 2013) (internal quotations omitted). Under this standard, a court "must ensure that the agency's action - and the agency's explanation for that action - falls within a zone of reasonableness." *Multicultural Media, Telecom & Internet Counsel v. FCC*, 873 F.3d 932, 937 (D.C. Cir. 2017). Thus, "a reviewing court may not set aside an agency rule that is rational, based on consideration of the relevant factors, and within the scope of the authority delegated to the agency by the statute." *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co. (State Farm),* 463 U.S. 29, 42 (1983)

To invalidate a regulation, a challenger must show that an agency action was "not a product of reasoned decision making." *Van Hollen, Jr. v. Fed. Election Comm'n*, 811 F.3d 486, 495 (D.C. Cir. 2016). Even where an agency departs from prior policy, it need not show "the

---

[14] *See also In re Barr Labs.*, *Inc.,* 930 F.2d 72, 76 (D.C. Cir. 1991) (suggesting rulemaking to improve FDA's efficiency in reviewing drug applications); *Decker v. Nw. Envtl. Def. Ctr.*, 568 U.S. 597, 618 (2013) (Scalia, J., concurring in part and dissenting in part) ("Making regulatory programs effective is the purpose of rulemaking") (emphasis removed); *see also* Government Performance and Results Modernization Act of 2010, <u>Pub. L. No. 111-352, 124 Stat. 3866</u> (codified as amended in scattered sections of 5 U.S.C. and 31 U.S.C.).

reasons for the new policy are *better* than the reasons for the old one; it suffices . . . that there are good reasons for it, and that the agency *believes* it to be better." *FCC v. Fox Television Stations, Inc.,* 556 U.S. 502, 515 (2009) (emphasis in original); *see also Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2125 (2016) ("Agencies are free to change their existing policies as long as they provide a reasoned explanation for the change.").

The wide discretion afforded the Board with respect to representation proceedings, combined with the fact that the Board is amending procedural rules, places even greater limits on court review. *Union of Concerned Scientists v. NRC*, 920 F.2d 50, 54 (D.C. Cir. 1990) (where the process is uniquely discretionary, greater deference is required). This legal standard presents a considerable challenge to the AFL-CIO here, and one it fails to meet. Indeed, AFL-CIO has not made any allegations that could support a finding that the Board's promulgation of any of the challenged provisions of the Amendment was arbitrary, capricious, or manifestly contrary to the law.

Although an agency must provide its reasons for adopting a rule, the court's review is limited to searching only for "a rational connection between the facts found and the choice made." *State Farm,* 463 U.S. at 43 (quotation omitted). Consequently, "we do not look at the [agency's] decision as would a scientist, but as a reviewing court exercising our narrowly defined duty of holding agencies to certain minimal standards of rationality." *Am. Trucking*, 724 F.3d at 249 (internal citations and quotations omitted). And as the Supreme Court has made clear, neither a party nor a court can "substitute its judgment for that of the agency." *State Farm*, 463 U.S. at 43.

### B. The Board's Explicitly Articulated Goals Are Permissible and Furthered by the Amendment

When an agency changes its policy, "it is obligated to supply a reasoned analysis for the change," *State Farm*, 463 U.S. at 42–here the Board did exactly that. It considered many of the same policy considerations as those examined by the 2014 Board majority: efficiency, fair and accurate voting, transparency and uniformity, changed technology, and timeliness. 84 Fed. Reg. at 69,530 (citing "speed . . .  fairness, accuracy, transparency, uniformity, efficiency, and finality," from 79 Fed. Reg. at 74,315). However, in reviewing the 2014 Rule, the Board found that while elections may occur more speedily under the 2014 Rule, important interests, such as fairness, voting accuracy, and finality, had been sacrificed and would be better served by allowing more time for the electoral process. *See, e.g.*, 84 Fed. Reg. at 69,529 ("more time will promote fair and accurate voting") (citing *Certainteed Corp. v. NLRB*, 714 F.2d 1042, 1053 (11th Cir. 1983)); 84 Fed. Reg. at 69,557.

Moreover, the current Board did not simply rescind the 2014 Rule in its entirety, but instead made "targeted revisions" as part of its "ongoing process of continually evaluating and improving its [representation] procedures." 84 Fed. Reg. at 69,527, 69,528. In certain instances, the Board found that changes made in the 2014 Rule had greatly improved the Board's processes, and the Board retained those changes. 84 Fed. Reg. at 69,556, n.136 (retaining, among other changes, Statements of Position, reorganization of postelection appeal process, and the required Notices of Petition). The Board also expressed its openness to revisit issues should its predictions prove wrong. 84 Fed. Reg. at 69,534 n.45 (discussing potential for delay created by its new 'good cause' standard for requests for postponements).

Further, the Board premised its judgments on evidence of the costs to other goals created by the 2014 Rule. For example, with regard to deferring pre-election issues, it found that speed

had come at the cost of efficiency, certainty, and finality, because questions concerning representation remained unresolved in some cases for months after the election. 84 Fed. Reg. at 69,529, n.19. If issues had been litigated in those cases prior to the election, the parties might have reached agreement on at least some, if not all, of the issues. This would further the Act's goal to encourage agreement, while potentially reducing the need for a request for review or the number of outstanding issues. 84 Fed. Reg. at 69,529-30. Thus, deciding such issues before an election, or at least litigating them and building a record so that those issues could be promptly decided post-election, would be more efficient and final. 84 Fed. Reg. at 69,529.

As the Board explained, in situations where election results do not render questions of unit scope or voter eligibility moot, little efficiency is gained by quickly conducting the election, given that certainty and finality must wait until the conclusion of post-election litigation over these issues. Thus, the Board has articulated its preference to place the decision to defer litigation or resolution of pre-election issues in the hands of the parties, rather than adopt a default position of deferring issues to post-election proceedings in the hope the election results may render the issues moot. 84 Fed. Reg. at 69,529 n. 20. Such a conclusion is within the Board's broad discretion to balance speed, efficiency, and finality in its election proceedings.

AFL-CIO argues that the 2019 Amendment is arbitrary and capricious as a whole, arguing that the Board did not consider certain statistics cited by dissenting Member McFerran. [Memo, pp. 32-35]. But AFL-CIO misses the mark. The Board majority *did* consider this data, explicitly disagreed that it constituted "relevant data," and explained why it was rejected with respect to the Amendment. 84 Fed. Reg. at 69,557.

The Board explained that the dissent's statistics were irrelevant to the issues the Board majority wished to address in the Amendment.[15] For instance, while AFL-CIO challenges the Board's move to provide employers three more business days to produce voter lists [Memo, p. 33], the Board found that these additional days "will reduce the potential for inaccurate lists, as well as the litigation and additional party and Agency expenditures that may result therefrom [while potentially avoiding] rerun elections [that] greatly delay the final resolution of a question of representation." 84 Fed. Reg. at 69,532. The Board used its expertise and judgment to balance the relevant policy interests and reach the conclusions it did. *See Chamber of Commerce of U.S. v. Sec. & Exch. Comm'n*, 412 F.3d 133, 142 (D.C. Cir. 2005).

Thus, the Board did not ignore available information, as AFL-CIO claims. Instead, the Board majority simply balanced various key policy considerations differently than did Member McFerran. 84 Fed. Reg. at 69,557. For example, the Board found that while the median time between the filing of a petition and holding an election had decreased, it was still "reasonable to consider whether these gains in speed have come at the expense of other relevant interests." 84 Fed. Reg. at 69,528-29. In particular, the rate at which parties reached election agreements remained the same after the 2014 Rule changes. *Id.* Because the Board encourages agreement between parties, the Board reasonably concluded that improving the rate of election agreements was an appropriate goal to strive for through its 2019 Amendment changes. 84 Fed. Reg. at 69,530 & n.21. Accordingly, the current Board is: (1) extending the scheduling of pre-election hearings from eight calendar days to fourteen business days, (2) requiring petitioners to file and serve their Statement of Position three business days before pre-election hearings as opposed to

---

[15] *See*, *e.g.*, 84 Fed. Reg. at 69,525 (Amended Section 102.63(a)(1) (pre-election hearings), Amended Section 102.63(b)(1)(ii), (b)(2)(iii), and (b)(3)(ii) (petitioner's Statement of Position)), and Amended Section 102.64(a) (litigation of unit scope and voter eligibility)); 84 Fed. Reg. at 69,532 (Amended Sections 102.62(d) and 102.67(l) (voter lists)).

only presenting such positions orally at the hearing itself, and (3) normally requiring that disputes concerning unit scope and voter eligibility be litigated before an election while expressly permitting parties to agree to defer litigation on such issues. 84 Fed. Reg. at 69,525.

AFL-CIO also argues that the 2019 Amendment is arbitrary and capricious because the Board "expressly did not rely" upon comments received from its 2017 Request for Information. [Memo, p. 32]. But as explained below, the Board did indeed consider these comments, and permissibly chose not to issue a Notice of Proposed Rulemaking at that time. Agencies are permitted to gather information about whether to engage in rulemaking in a variety of ways and are not required to begin with a proposed rule. JEFFREY S. LUBBERS, A GUIDE TO FEDERAL AGENCY RULEMAKING 45, 216 (6th ed. 2018) (e.g., advanced notices of proposed rulemaking); *see also Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council*, 435 U.S. 519, 543-44 (1978) (an agency generally has discretion over its pre-NPRM procedures, including whether to use advanced NPRMs, negotiated rulemaking, or other pre-NPRM consultation).

Here, in 2017, the Board opted to gather information about the workings of the 2014 Rule by issuing a Request for Information and explained to the public that it was seeking information and not engaging in rulemaking at that time. 82 Fed. Reg. at 58,784 n.1. Then, in its 2019 Amendment, the Board reiterated that although its 2017 Request for Information had not been a notice-and-comment process, 84 Fed. Reg. at 69,528 n.12, it found certain responsive comments relevant and accordingly cited to those comments.[16] And in any event, the entire set of comments

---

[16] *See, e.g.*, 84 Fed. Reg. at 69,533 n. 43 (noting RFI comments noting employers challenged to meet eight-business-day timeline before hearing) and n.44 (NLRB Regional Director committee submitted RFI comment that "some regional directors do not agree with setting of hearings for eight days."); *see also id.* at 69,535 n.52 (citing RFI comments requesting more time to prepare Statement of Position); 84 Fed. Reg. at 69,536 n.57.

received after the 2017 Request for Information is contained in the administrative record of this proceeding.[17]

When viewed in light of the significant deference Congress granted the Board regarding representation proceedings, the Board's considered exercise of its discretion in promulgating the 2019 Amendment was neither arbitrary nor capricious. Because the Board has demonstrated the requisite "reasoned decision making" under *Van Hollen* in promulgating the challenged Amendment, this Court should find that the AFL-CIO has failed to meet its burden on Count Two of its Complaint.

**IV.    The Portions of the 2019 Amendment Challenged by AFL-CIO Are Not Arbitrary and Capricious**

AFL-CIO argues that certain provisions of the 2019 Amendment are arbitrary and capricious, suggesting that the provisions stake out new ground and are somehow beyond the pale of reasonableness. In reality, the 2014 Rule broke new ground and the 2019 Amendment challenged here revert in large part to tried and true election procedures that the Board has followed for decades.

**A.   The 2019 Amendment Provision that Eligibility and Supervisory Status Issues Will Normally Be Litigated at the Pre-Election Hearing and Decided by the Regional Director Prior to the Election Is Reasonable**

The Board's amendment of Section 102.64(a) provides, in relevant part, that "[d]isputes concerning unit scope, voter eligibility and supervisory status will normally be litigated and resolved by the Regional Director before an election is directed. However, the parties may agree to permit disputed employees to vote subject to challenge, thereby deferring

---

[17] The 2017 Request for Information, 82 Fed. Reg. at 58,783, is part of the administrative record and is available at Regulations.gov (last visited Apr. 7, 2020), as is a spreadsheet inventory of comments submitted in response to the RFI, including links to those comments. Regulations.gov (last visited Apr. 7, 2020)."

litigation concerning such disputes until after the election." Indeed, in permitting crucial questions concerning who may properly vote in an election to be decided prior to running the election, the Amendment reverted to decades-old Board practice. 84 Fed. Reg. at 69,538-39. The Board acknowledged that the 2014 Rule and the 2019 Amendment reflect different policy choices. The 2019 Amendment makes clear that pre-election hearings on these issues should be the norm to yield more accurate, transparent, efficient, and final election results.  84 Fed. Reg. at 69,540–41. The Board explained its rationale for this change and that rationale is reasonable. *Encino Motorcars*, 136 S. Ct. at 2125.

The Act says nothing about whether the Agency should resolve all disputes concerning individuals' eligibility to vote or inclusion in an appropriate unit before an election. Thus, this question has been a matter of the Board's sound discretion. As the Fifth Circuit explained when it construed the "appropriate hearing" language in the Act's Section 9(c) in *Associated Builders & Contractors of Texas*, "the phrase 'appropriate hearing upon due notice' is deliberately expansive," because "Congress intended to 'confer broad discretion upon the Board as to the hearing which Section 9(c) required before certification.'" *Associated Builders & Contractors of Tex, Inc. v. NLRB,* 826 F.3d 215, 222 (5th Cir. 2016) (quoting *Inland Empire*, 325 U.S. at 708). The Board exercised this discretion to permit eligibility and inclusion issues to be litigated at the pre-election hearing—and encouraging Regional Directors to resolve such issues before directing an election—in order to better serve the interests of certainty, finality, uniformity, transparency, fair and accurate voting, and efficiency. 84 Fed. Reg. at 69,539. And even under the 2014 Rule, Regional Directors have discretion to hold hearings on these issues pre-election.

In the 2019 Amendment, the Board explained that for decades prior to the 2014 Rules, Board precedent *required* eligibility and inclusion issues to be litigated before the election,

"creating a record permitting them to be resolved more quickly post-election even if the decisional process was deferred until then." *Id.; see Barre-National, Inc.*, 316 NLRB 877, 878 (1995). Then, in the 2014 Rule, the Board overruled *Barre-National*, because it chose to limit pre-election hearing litigation assertedly to moot at least some issues through election results. 79 Fed. Reg. at 74,386 (*see* 29 C.F.R. § 102.64(a) (2019)).

Most recently, when the Board examined how the 2014 Rule has been working, it found that "extensive hearings on these very issues after the election" are still necessary under the 2014 Rule and that the failure to litigate and decide these issues prior to the DDE, had "come[] at the cost of swifter certainty and finality." 84 Fed. Reg. at 69,540.[18] The Board further noted the potential for confusion when issues of eligibility and inclusion are deferred, because "employees cast their votes without the benefit of knowing the precise contours of the unit in which they are voting, and specific inclusions and exclusions may be of great significance to them." *Id.* at 69,540-41.[19] The Board thus concluded that "having eligibility and inclusion issues litigated and generally resolved before a [DDE] will assist the parties in knowing who is eligible to vote and who speaks for management," creating greater transparency and uniformity, *id.* at 69,540, as well as fairer and more accurate voting.[20]

---

[18] Thus, under the 2019 change, the Board sought to "maximize the opportunity for an election vote to provide immediate finality, subject only to the filing of objections to conduct allegedly affecting the results . . . Litigating and resolving eligibility and inclusion issues prior to an election will, as a general matter, reduce the number of challenged voters." *Id.* at 69,540.

[19] "Whenever a challenged vote is cast, it cannot but detract from certainty, because neither the Board nor the parties nor the individual voter can be sure, at the time the challenged vote is cast, whether it will be counted." 84 Fed. Reg. at 69,540.

[20] "[R]esolution of supervisory issues at some point prior to the election can provide the parties with better guidance for the remainder of the election campaign and increases the possibility of forestalling objectionable conduct during that time." 84 Fed. Reg. at 69,540.

In its Complaint, AFL-CIO argues that Amended Section 102.64(a) is arbitrary and capricious because 1) it "requires" Regional Directors to decide issues that will often be rendered moot by election results[21] [Doc. 1, ¶ 62], and 2) Regional Directors' decisions will provide neither a timely nor a final answer to such questions. [Doc. 1, ¶ 63].

Initially, AFL-CIO is incorrect that Regional Directors are "required" to decide these pre-election issues, as evidenced by Amended Section 102.64(a)'s text: "[d]isputes concerning unit scope, voter eligibility and supervisory status will *normally* be litigated and resolved by the Regional Director before an election is directed." (emphasis added). The Board further explained that Amended Section 102.64(a) does not "eliminat[e] the discretion of the Regional Director to defer resolution of eligibility and inclusion issues, although [it makes] clear that they should normally do so." 84 Fed. Reg. at 69,541-42.

As for mootness, the Board reasoned that although the current practice causes elections to occur sooner, "it is impossible to know in advance whether the eligibility and inclusion issues the parties have properly raised will be mooted by the election results, and little overall efficiency is gained when litigation of these issues proves necessary in post-election proceedings." *Id.* at 69,541.[22] The Board thoroughly explained its preference "to place the decision to defer litigation or resolution of pre-election issues in the hands of the parties, rather than to adopt a default position of deferring issues to post-election proceedings in the hope the results of the election

---

[21] AFL-CIO noted as an example that if one voter's eligibility is in dispute and the employees should vote against representation by more than one vote, a decision regarding the eligibility of that single person would not impact the final tally. [Memo, p. 5].

[22] *See* 84 Fed. Reg. at 69,529 n.20 (citing *Detroit 90/90* (*Axios, Inc.*), Case 07–RC–150097 (deferred eligibility issues required post-election litigation, which the Regional Director did not resolve until five months post-election, after which she directed a rerun election (based on objectionable conduct) two months later, after which the union withdrew its petition)).

will render the issues moot." *Id.* at 69,530 n.20.[23] The Board's reasoned decision to favor

transparency, accuracy, and finality over speed in elections is thus not arbitrary and capricious.

Second, AFL-CIO asserts that Regional Directors' decisions on pre-election issues will

be neither timely nor final, because a) the new amendment will leave parties without guidance

between the start of the campaign and the time of the Regional Director's decision, b) parties and

employees will only have that Regional Director's decision for twenty business days before the

election, c) prior to the 2014 Rule, the Board almost never granted review and disposed of the

request for review prior to an election and when it did, would resolve issues only days before the

election, and d) Board decisions on these issues are subject to judicial review. [Memo, p. 19,

n.14].

AFL-CIO's first argument is perplexing, because there is no way that a Regional Director

can tell the parties exactly who will be included in the unit prior to the hearing since that, after

all, is the very point of the hearing. And AFL-CIO's next argument contradicts its own allegation

that the Board should not have reinstated a minimum time period between the DDE and the

election [Doc. 1, p. 12, ¶ 64]; instead, AFL-CIO now appears to complain that the twenty-

business-day period is somehow too short to give the parties sufficient guidance. As for AFL-

CIO's point about the Board's past slowness in resolving requests for review, the Board

acknowledged the Board's "historical shortcomings" in this area, but nonetheless noted its firm

desire to improve its ability to provide the parties with a pre-election resolution. 84 Fed. Reg. at

69,546. Finally, when employers test the legitimacy of certifications by failing to bargain with a

---

[23] The Board did not, as AFL-CIO overstates, "acknowledge[] that election results will often moot the dispute altogether." [Memo, p. 34]. Rather, the Board commented, "it is true that in *some* cases the results of the election *may* obviate the need to address certain questions of unit scope of voter eligibility." 84 Fed. Reg. at 69,529 n.20 (emphasis added).

union, the resulting unfair labor practice cases subject the Board representation decisions to indirect judicial review. 84 Fed. Reg. at 69,559 n.150 (citing *Boire*, 376 U.S. at 477–79). Of course, having a judicial review process always adds a level of uncertainty. Nonetheless, this review process does not detract from the Board's considered opinion that this challenged amendment will lead to faster resolution of key issues prior to the election, as well as more efficient, certain, and final results, than is the case under the 2014 Rule. Such a discretionary judgment is neither arbitrary nor capricious.

### B.  The 2019 Amendment Provision Requiring Regional Directors to Set Election Dates at Least Twenty Business Days from the DDE Is Rational

The Board implemented a twenty-business-day period between a Regional Director's DDE and an election, to allow sufficient time for parties to file requests for review, and for the Board to rule on those requests for review, before the scheduled election date. 84 Fed. Reg. at 69,545 (Amended 29 C.F.R. § 102.67(b)). Absent waiver by the parties, a Regional Director will schedule an election for the earliest date practicable, but "normally will not schedule an election before the 20th business day after the date of the [DDE]." 84 Fed. Reg. at 69,525. In contrast, the 2014 Rule stated only that directed elections should be scheduled for the "earliest date practicable consistent with these rules." 29 C.F.R. § 102.67(b) (2019). The 2014 Rule changed the prior rule, which since around 1962 directed the election be scheduled between twenty-five to thirty calendar days after the DDE. 29 C.F.R. § 101.21(d) (1962).

As can be gleaned from the back and forth on these time frames, the Board has disagreed about what timeline is best in this area. But the current Board's change to the time period is not arbitrary, as AFL-CIO contends in its Complaint [Doc. 1, p. 12, ¶ 64]. The Board explained that after a DDE issues, parties may appeal that decision to the Board through a request for review. 84 Fed. Reg. at 69,544. If the Board is to have an opportunity to consider and decide the request

30

for review of issues such as eligibility, inclusion, and unit scope (84 Fed. Reg. at 69,546) before the election, it needs a reasonable amount of time to do so. 84 Fed. Reg. at 69,555. Permitting the Board the opportunity to resolve these disputes before the election will promote orderly litigation, transparency, and fair and accurate voting. 84 Fed. Reg. at 69,525-26.

AFL-CIO contends that this change is unjustified because of the relatively small number of pre-election requests for review filed; it cites Member McFerran's dissent, noting data indicating pre-election requests for review were filed in less than five percent of elections each fiscal year 2013-17. [Doc. 1, p. 12, ¶ 64; Memo, p. 21 n.15 (citing 84 Fed. Reg. at 69,586 n.262)]. But that small number does not make this change arbitrary and capricious. The Board acknowledged this change only applies to the small number of cases where an election is directed, and that it infrequently reverses DDEs. 84 Fed. Reg. at 69,549. But the Board did not find these facts compelling; it explained that when a request for review is filed, there is no final resolution of the question concerning representation until the Board rules on the issues raised by that request for review. *Id.* at 69,545. The Board explained that it balanced the interest in speedy elections with greater "finality and certainty," which is achieved where the Board has more time to resolve disputed issues before an election. *Id.* Accordingly, this section of the 2019 Amendment is neither arbitrary nor capricious.

### C. The 2019 Amendment's Requirement that Ballots Be Impounded When a Request for Review Is Filed Within Ten Days of a DDE Promotes Efficiency and Transparency

The 2019 Amendment provides that where a request for review is filed within ten days of a DDE, ballots that might be affected by the Board's final determination will be segregated and all ballots impounded pending such a decision. Amended 29 C.F.R. § 102.67(c).

31

In that circumstance, parties will not know the election's outcome until after the Board resolves the request for review. This change marks a partial return to the Board's procedures before the 2014 Rule. *See* 29 C.F.R. § 102.67 (2014).[24] The current Board found that reinstating automatic impoundment in these narrow circumstances will promote transparency, ending the possibility under the 2014 Rule that an initial tally of ballots might be reversed by the Board's final determination of the election challenges. 84 Fed. Reg. at 69,526. Notably, with this change, a party may still file a request for review of a DDE more than ten business days after the DDE, but in that case, impoundment of all ballots will not be required. Amended 29 C.F.R § 102.67(c). The Board found that preserving this option promotes efficiency, because it encourages parties to await election results that might moot the issues for which they would otherwise seek review. 84 Fed. Reg. at 69,526.

AFL-CIO alleges that this portion of the 2019 Amendment is arbitrary and capricious because it: (1) requires the Board to decide issues that may have been mooted by election results; and (2) deprives employers of information needed to determine whether they may lawfully make unilateral changes in wage, hours, and other working conditions. [Doc. 1, pp. 12-13, ¶¶ 67-69].

The first issue raised by AFL-CIO would only apply in relatively "narrow circumstances" of election cases in which 1) an employer submits a request for review within ten days of the DDE; and 2) there are challenged ballots that could potentially affect the election's outcome, or ballots whose validity might be affected by the Board's ruling on a request for review. Amended 29 C.F.R. § 102.67(c). While the 2019 Amendment may result in some cases where election

---

[24] "Prior to the 2014 amendments, the Board's rules provided that a request for review of a DDE could be filed with the Board within 14 days after the service of the direction of election. The regional director would schedule and conduct the election, but § 102.67(b) (2013) provided that 'if a pending request for review ha[d] not been ruled upon or ha[d] been granted ballots whose validity might be affected by the final Board decision shall be segregated in an appropriate manner, and all ballots shall be impounded and remain unopened pending such decision.'" 84 Fed. Reg. at 69,547. The 2019 Amendment provides that the pendency of requests for review filed more than ten days after a DDE "shall not require impoundment of the ballots." Amended 29 C.F.R. § 102.67(c).

results might moot the challenges under review, the rule nevertheless "promotes transparency by removing the possibility for confusion if a tally of ballots issues but is then affected by the Board's subsequent ruling on the pending request for review." 84 Fed. Reg. at 69,526.

AFL-CIO's second argument, that this provision arbitrarily limits information available to an employer to determine its legal obligations, does not hold water. An employer "acts at its peril" in making unilateral changes in terms and conditions of employment while an election remains unresolved. *Mike O'Connor Chevrolet,* 209 NLRB at 703; *see also* n.13 above. As explained in Section II. E., at least as a practical matter, there is no real change between the Agency's current practice and the 2019 change, because while requests for review have been pending with the Board, Regional Directors have not been issuing unfair labor practice complaints. 84 Fed. Reg. at 69,555. Thus, in reality, an employer's legal obligations to maintain the status quo or bargain over changes in working conditions will be unchanged by the Amendment.

In addition, the problem raised by AFL-CIO is one that employers can choose whether to risk for themselves. Thus, the decision whether an employer's unilateral changes are lawful is always viewed retrospectively from the Board's final determination of election challenges. Under the 2019 Amendment, if an employer chooses to request review within ten days of a DDE, that employer takes into account the risk that any unilateral changes in wages or other employment terms may later be found unlawful. If that employer has less information during this time frame, this is a known consequence of the choice to file a DDE within ten days. A more risk-averse party could instead choose to wait more than ten days from the DDE to request review and have the benefit of a ballot tally. As noted above, the Board explained that "[b]y preserving this option, which encourages parties to wait to see whether the results of the election

moot the issues for which they would otherwise seek review, the final rule also continues to promote efficiency." 84 Fed. Reg. at 69,540. Accordingly, the 2019 Amendment reflects the Board's considered judgment that the impoundment procedure, and the attendant risks and incentives it creates, best serves efficiency and transparency.

### D.  The 2019 Amendment Governing the Selection of Election Observers Is a Product of Reasoned Decisionmaking

Under the Act, there is no right to have an election observer at all.  This is why the Board describes having observers as "a courtesy and privilege, rather than a right." 84 Fed. Reg. at 69,552. The 2019 Amendment governing the selection of election observers amends the language of 29 C.F.R. § 102.69(a)(5) to codify the "Board's historical preference that parties use nonsupervisory employees as their observers." 84 Fed. Reg. at 69,552. This preference had previously been articulated only "in a handful of older Board decisions and the Casehandling Manual." *Id*.  The Board explained that over the past decades, this preference had been inconsistently applied in its regulations, adjudications, and casehandling manuals. *Id*.  Thus, in the 2019 Amendment the Board sought to eliminate these discrepancies and provide greater transparency to parties. *Id.; see also id.* at 69,553 (providing Board agents with guidance on implementing this new provision).

The Board initially explained that "the practice of permitting the parties to be represented by observers at Board-conducted elections dates to the earliest days of the Act." 84 Fed. Reg. at 69,551. Since 1946, the Board's regulations have provided that "[a]ny party may be represented by observers of [its] own selection, subject to such limitations as the Regional Director may prescribe." *Id*. (citing 11 Fed. Reg. 177A-602, 612 (Sep. 11, 1946)). Such limitations have served to prevent "intimidation that might take place should the employer choose to have supervisory employees present," *id.* at 69,552 (citing *Embassy Suites*, 313 NLRB 302, 302 (1993)), or should

a union choose to have a non-employee union official present. And the Board's ability to prescribe such limitations to prevent using management or union officials as observers, *id.* at 69,551, is supported by the fact that having observers at all is wholly a matter of the Board's discretion. *Id.* at 69,552.

The Board explained that its past practice of regulating nonemployee observers through adjudications created Board law "riddled with inconsistencies." 84 Fed. Reg. at 69,552.[25] Thus, the Board chose to amend its regulations to "better promote transparency, uniformity, and efficiency with respect to the selection of observers." *Id.* at 69,552. And so, "any party may be represented by observers of its own selection; whenever possible, a party shall select a current member of the voting unit as its observer, and when no such individual is available, a party should select a current nonsupervisory employee as its observer." *Id.* at 69,552 (Amended 29 C.F.R. § 102.69(a)(5)). The Board explained the high desirability "that the parties' observers be drawn from those persons most interested and invested in the outcome of the election:  The members of the voting unit." 84 Fed. Reg. at 69,553.

Yet it also recognized that implementing this general preference may not always be feasible. *Id.* at 69,552; 69,553, n.117 ("In those unusual situations where it is truly not possible for a party to use a nonsupervisory employee, a Board agent will determine whether the use of a proposed nonemployee observer is 'reasonable under the circumstances.'" (internal citations omitted)). Thus, in an "extremely rare case" a nonemployee observer may be used if a Board agent deems it reasonable under the circumstances. *Id.* at 69,553 n.117. The Board explicitly

---

[25] *Compare Jat Transportation,* 131 NLRB 122, 125–26 (1961) (Regional Director's prohibition on use of nonemployee observers by employer found appropriate) *with Equinox Holdings, Inc.,* 364 NLRB No. 103, slip op. at 1 n.1 (Aug. 26, 2016) (overruling employer objection to nonemployee observer utilized by union); *see also, e.g., Butera Finer Foods, Inc.,* 334 NLRB 43, 43–44 (2001) (nonemployee union officials cannot serve as observers at decertification elections while allowing individuals in same position to serve as observers in certification elections).

noted that it was overruling all contrary Board decisions. *Id.* at 69,553, n.116. Thus, the Board "provide[d] a reasoned explanation for that change" and "show[ed] that there are good reasons for the new policy." *Encino Motorcars,* 136 S. Ct. at 2125-26.

AFL-CIO challenges the 2019 Amendment on observers in two respects. Its first challenge, that the Board *sub silentio* overruled case law in this area [Doc. 1, p. 12, ¶ 65], is factually incorrect, because, as shown, the Board was explicit about this overruling. *See Fox*, 556 U.S. at 515 (agency not arbitrary and capricious so long as it displays "awareness that it *is* changing position"). AFL-CIO's second allegation, that that this change will cause "employees to visibly identify with the employer's position on representation . . . in violation of the Board's own prohibition of such polling," [Doc. 1, p. 12, ¶ 66; Memo, p. 24, n.18 (citing *Allegheny Ludlum Corp.*, 333 NLRB 734, 734 (2001), *enf'd*, 301 F.3d 167 (3d Cir. 2002))], also fails.

AFL-CIO's claim misunderstands the purpose of election observers. Observers represent their principals, challenge voters who may be ineligible to vote, generally monitor the election process, and assist the Board agent in conducting the election. 84 Fed. Reg. at 69,553. Observers are meant to "help to assure the parties and the employees that the election is being conducted fairly." *Id.* at 69,552 (quoting *Browning-Ferris Industries of California, Inc.,* 327 NLRB 704 (1999)). This is fundamentally different from the solicitation that took place in *Allegheny Ludlum Corp.*, where an employer violated Section 8(a)(1) of the Act by soliciting volunteers to participate in a coercive, anti-union video, and only telling select employees how the video would be used. Moreover, the Board, in resolving that case, set forth comprehensive principles to instruct employers on how to non-coercively obtain employee consent to appear in campaign publications. *Id.* at 743. If potentially coercive situations arise, an employee, a party, or any

individual may file and pursue an unfair labor practice charge with the Board. 29 U.S.C. § 160. AFL-CIO's challenge to this provision thus fails.

### E. The 2019 Amendment's Three-day Extension of Time for Employers to File and Serve the Voter List Is Not Arbitrary and Capricious

Amended Section 102.67(l) extends the current timeframe for employers to provide a voter list with contact information to the Regional Director and the parties, from two business days to five business days following the issuance of a DDE or approval of an election agreement, in order to better promote efficiency, accuracy, transparency, and uniformity. 84 Fed. Reg. at 69,532. In increasing this time, the Board explained that between the time of *Excelsior Underwear, Inc.*, 156 NLRB 1236 (1966),[26] and the 2014 Rule, the Board had required employers to produce the voter contact list within seven calendar days of an election agreement or DDE. The 2014 Rule reduced the voter list timeframe from seven to two calendar days, explaining that "advances in recordkeeping and retrieval technology as well as advances in record transmission technology . . . warrant reducing the time period." 79 Fed. Reg. at 74,353. Additionally, the 2014 Rule increased the amount of contact information required to be provided by employers. 84 Fed. Reg. at 69,531, n.28; 29 C.F.R. § 102.62(d) (2019).

The current Board determined that a five-business-day timeframe to submit the voter list is preferable, so that employers have more time to assemble it. While the Board noted that since the 2014 Rule, employers have generally been able to provide voter lists within two days, it did not wish to maintain the requirement of that "admirable speed" for all employers. 84 Fed. Reg. at 69,532. In particular, the Board was concerned with certain industries for which gathering the

---

[26] There, the Board required that seven calendar days after an election agreement is approved or a DDE, an employer must file a list with the Regional Director containing the names and home addresses of eligible voters, which the Regional Director would then distribute to all parties. *Id.* at 1239-40.

37

voter list information may be more involved, including the construction industry or joint- or multi-employer arrangements. *Id*. Additionally, the Board determined that a five-day period would increase accuracy of voter lists, as well as reduce litigation and additional agency and party expenditures. *Id*.[27] Finally, the Board reasoned that the additional three business days will promote more expeditious final resolutions of elections. Specifically, the Board stated: "[m]ost importantly, if providing the employer with three more business days to compile the list can avoid having just a few elections set aside based on noncompliant voter lists, this is a trade we are more than willing to make, given that rerun elections greatly delay the final resolution of a question of representation." *Id*.

AFL-CIO argues that the Board's promulgation of the 2019 Amendment expanding the timeline for providing the voter list is arbitrary and capricious, because "the majority did not consider whether any employer had requested additional time to produce the list under the current rule, or whether any such requests, if made, had been denied." [Memo, p. 33]. However, as explained, the Board has not acted arbitrarily and capriciously in modifying the election rule timeframe. Not only did the Board explicitly recognize that it was changing the 2014 Rule, but it specifically explained its reasons for the change, as well as how the Act would be better effectuated. The AFL-CIO's disagreement with how the current Board has balanced competing policy choices fails to establish that this change is arbitrary and capricious.

---

[27] The 2014 Board adopted the two-day requirement because of advancements in technology since the 1966 *Excelsior* decision. The current Board recognized those advances, but reasonably noted, "the mere fact that employers may have access to computers, spreadsheets, and email does not mean that the required information is always computerized or kept in one location." 84 Fed. Reg. at 69,532.

### V.     The 2019 Amendment Does Not Violate Section 3(b) of the Act

The Board's 2019 Amendment is a permissible exercise of its authority pursuant to

Section 3(b) of the Act (29 U.S.C. § 153(b)). Section 3(b) has two general functions pertinent

here. First, it authorizes the Board to delegate certain powers to Regional Directors:

> The Board is also authorized to delegate to its regional directors its powers under section
> 159 of this title to determine the unit appropriate for the purpose of collective bargaining,
> to investigate and provide for hearings, and determine whether a question of representation
> exists, and to direct an election or take a secret ballot under subsection (c) or (e) of section
> 159 of this title and certify the results thereof.

Next, Section 3(b) creates a process to request that the Board review actions taken by

Regional Directors:

> except that upon the filing of a request therefor with the Board by any interested person,
> the Board may review any action of a regional director delegated to him under this
> paragraph, but such a review shall not, unless specifically ordered by the Board, operate as
> a stay of any action taken by the regional director.

29 U.S.C. § 153(b).

In the 2019 Amendment, the Board made three changes implicating Section 3(b). The

first provision requires elections to occur no earlier than twenty business days following the

DDE. *See* Section IV. B., above. The second requires ballots to be impounded during the

pendency of a request for review of a DDE filed within ten days of that direction. *See* Section

IV. C. above.

The third provision authorizes the Regional Director to certify the results only if no

request for review is pending or the time for filing a request for review has passed. This

provision "eliminates confusion among the parties and employees and promotes orderly

litigation of both representation and consequent unfair labor practice cases." 84 Fed. Reg. at

69,526. Where a union wins the election and is certified, either party's failure to bargain in good

faith can lead to a Board order enforceable in court. *See* Section I. A., p. 3, n.3 above.

Under the 2014 Rule, a Regional Director can certify an election while a request for review is pending with the Board, forcing parties to choose whether to allocate resources to comply with disputed legal obligations or to risk unfair labor practice charges. *See* 84 Fed. Reg. at 69,554-55. This has been "a source of unnecessary confusion and needless litigation." *Id.* at 69,554. Thus, this Amendment is largely a return to decades-old Board practice, *id.* at 69,553, which the Board found that the 2014 Rule had changed, with unfavorable results.  Because the 2019 Amendment permits certification only *after* requests for review are resolved, it "advances transparency by eliminating confusion and complications." *Id.* at 69,554.

AFL-CIO alleges that these three provisions violate Section 3(b) of the Act by "categorically requir[ing] a stay of representation case proceedings based on a party's filing – or potential filing – of a request for review." [Memo, p. 35]. Further, AFL-CIO insists that the postponement of the Regional Director's action without a "specific order by the Board" violates Section 3(b)'s requirement that requests for review shall not "operate as a stay of any action taken by the regional director." [*Id.* at pp. 36-37]. However, AFL-CIO's analysis ignores congressional intent by glossing over key language in Section 3(b).

Where a rule relies upon the Board's interpretation of the Act, that interpretation is assessed using the two-step procedure set forth in *Chevron, U.S.A., Inc. v. Natural Resource Defense Council, Inc.*, 467 U.S. 837 (1984). First, the court must determine "whether Congress has directly spoken to the precise question at issue" by setting forth its "unambiguously expressed intent." *Id.* at 842-43. Second, if this Court concludes that the Act is either silent or ambiguous on that "precise question," it must determine whether the Board's interpretation is "based on a permissible construction of the statute." *Id.* at 843. If so, the Court must defer to that interpretation.

Congressional intent is evidenced by the text of Section 3(b), which states that a request for review shall not "operate as a stay of any action *taken* by a regional director." 29 U.S.C. § 153(b) (emphasis added). Congress intended this section to limit parties' ability to delay complying with Regional Directors' actions by requesting the Board's review. "When the regional director orders the parties to act, the parties must do so, regardless of the pendency of an appeal." *NLRB v. Sav-On Drugs, Inc.*, 728 F.2d 1254, 1257 (9th Cir. 1984) (en banc).

AFL-CIO fails to acknowledge this clear language referring to actions *taken*. Instead, AFL-CIO impermissibly reads into 3(b) a prohibition against the Board's ability to postpone actions that have yet to occur, arguing that the Amendment violates 3(b) by "'[a]utomatically postpon[ing]' when ballots may be counted, requiring RDs to 'refrain' from certifying election results, 84 Fed. Reg. at 69,555, and setting a 'uniform minimum period' before an election may be conducted." [Memo, p. 38]. In essence, AFL-CIO asks the Court to ignore the statutory language identifying the object of the stay – "any action *taken* by the regional director" and replace it with any "*proceeding*" before a Regional Director. *See id.* at 39. The Board agrees with AFL-CIO [Memo, p. 39] that the meaning of Section 3(b) is plain; but that meaning plainly does not support the interpretation with which AFL-CIO has laden it.

Alternatively, even if congressional intent were ambiguous, AFL-CIO's argument that the 2019 Amendment conflicts with Section 3(b) merely presents a disagreement over interpretation. Under the second step of *Chevron*, this Court should determine that the Board's interpretation is a permissible construction of the statute.

While Section 3(b) authorizes the Board "to delegate to its regional directors its powers under section 159" and to "review any action of a regional director delegated to him," it does not provide any specifics as to how these delegation and review powers are to function. In view of

that ambiguity, the Board relied on its Section 6 rulemaking authority to determine how best to

"carry out" Section 3(b), by amending its prior review procedures. Under the 2019 Amendment,

the Board authorizes Regional Directors to conduct elections, count ballots, and certify elections

after the Board has reviewed any disputes arising from the election. The 2019 Amendment does

not postpone (or stay) any action taken; rather, it authorizes Regional Directors to take certain

actions only *after* the Board's review has been completed (or the period during which to request

review has passed). As noted, the 2019 Amendment modifies the delegation to Regional

Directors of certain of its Section 9 powers, in order to promote efficiency and transparency, and

to reduce confusion. 84 Fed. Reg. at 69,525-26, 69,554-55. Consequently, it is a reasonable

interpretation of ambiguous language in Section 3(b).

Moreover, even if "stay" were interpreted as AFL-CIO is suggesting, this reading runs

headlong into a separate problem. That is, AFL-CIO is essentially arguing that Section 3(b)'s

requirement for stays to be "specifically ordered by the Board," means that the Board cannot

implement such stays by regulation. A very similar argument was rejected by the Supreme Court

in 1991: the American Hospital Association had charged that Section 9(b) of the Act (29 U.S.C.

§ 159(b)) "requires the Board to make a separate bargaining unit determination 'in each case'

and therefore, the Board was prohibited from using general rules to define bargaining units." *Am.*

*Hosp. Ass'n v. NLRB*, 499 U.S. 606, 608 (1991). The Supreme Court rejected this argument,

noting that neither Section 9(b) nor the legislative history expressly limited the Board's

rulemaking or refers to the Board's Section 6 rulemaking powers. *Id.* at 613-14 (Section 9(b)

merely requires "that the Board decide the appropriate unit in every case in which there is a

dispute," and does not preclude the Board from "adopt[ing] generally applicable rules to guide

its determination in each individual case."). Just like Section 9(b), Section 3(b) makes no

reference to the Board's rulemaking authority established under Section 6 of the Act, 29 U.S.C. § 156. *Id.* at 613 ("if Congress had intended to curtail in a particular area the broad rulemaking authority granted in § 6, we would have expected it to do so in language expressly describing an exception from that section or at least referring specifically to the section.").

Clearly then, to the extent the "stay" provision in Section 3(b) can be viewed as a statutory limit on Board actions in specific cases, it cannot be reasonably interpreted to extend to the Board's power to make rules of general applicability. *Id.* at 612 ("even if a statutory scheme requires individualized determinations, the decisionmaker has the authority to rely on rulemaking to resolve certain issues of general applicability unless Congress clearly expresses an intent to withhold that authority.").

Thus, under either *Chevron* step, AFL-CIO has failed to demonstrate that the three challenged portions of the 2019 Amendment violate Section 3(b) of the Act.

## VI.    Even if AFL-CIO's Challenges to the Provisions It Alleges to Be Substantive Succeed, the Remainder of the 2019 Amendment Is Severable

Invalidation of any of the five provisions challenged as substantive would not require the Court to invalidate any other portion of the 2019 Amendment. To find the Amendment severable, the Court must make two findings: first, that "the agency would have adopted the same disposition regarding the unchallenged portion of the regulation if the challenged portion were subtracted," and second, that the remaining parts of the regulation must be able to "function sensibly without the stricken provision." *Carlson v. Postal Regulatory Comm'n*, 938 F.3d 337, 351 (D.C. Cir. 2019), *reh'g denied,* No. 18-1328 (Nov. 8, 2019).

Here, the Board stated its clear intention that the provisions of the 2019 Amendment are, for the most part, severable. The Board explained the independent nature of each problem: "In accordance with the discrete character of the matters addressed by each of the amendments

listed, the Board … would adopt each of these amendments individually, or in any combination, regardless of whether any of the other amendments were made." 84 Fed. Reg. at 69,525 n.5. Indeed, this intention is evident from the Board's specifically excepting provisions that it intends to be interdependent (none of which the AFL-CIO challenges as being substantive). *Id.* [28]

The remaining portions are not "so deeply 'intertwined'" with unchallenged provisions [Memo, p. 29] as to prevent the Amendment from functioning sensibly. First, even if this Court strikes Amended Section102.64(a), generally requiring unit scope and voter eligibility issues to be addressed before the election, the remaining amendments would remain workable. Although there may be fewer matters to litigate before the election, parties will still use the time provided by Amended Section 102.63(a)(1) before the pre-election hearing to prepare, file, and serve the statement of position and newly-required responsive statement of position, as well as to prepare to litigate the issues that will continue to be addressed at the hearing. Amended 29 C.F.R. § 102.63(b).[29] Second, if the Court strikes Amended Section 102.67(b), setting at least twenty business days between the DDE and the election, reverting back to the 2014 "earliest date practicable" provision is compatible with the rest of the 2019 Amendment; Regional Directors would merely have to allow for five days to serve the voter list, under Amended Section 102.67(l). Third, if the Court strikes Amended Section 102.62(d), giving employers three additional days to provide the voter list, and employers instead have two days to provide the list, that would not interfere with the rest of the 2019 Amendment.  Fourth, if Amended Section 102.69(a)(5) concerning observers is struck, then 29 C.F.R. Section 102.69(a) (2019), permitting

---

[28] *See* 84 Fed. Reg. at 69,533 (extending timeline for setting pre-election hearings is directly linked to extending timeline for non-petitioning party to file its Statement of Position).

[29] If there are fewer matters to litigate before the election, there will be fewer issues to include in a post-hearing brief, [Memo, p. 30], which does not make that provision unworkable.

parties to select their own observers, would be in effect, but impacting no other part of the Amendment.

Finally, if the Court strikes Amended Section 102.69(b) addressing certifications, then ballots (in cases not subject to impoundment) would be counted and certified by the Regional Director after resolving challenged ballots and objections, but prior to when the Board rules on any pending request for review. But this would not impact the functional workings of the remainder of the Amendment. Of course, ballots in cases that are subject to impoundment (Amended Section 102.67(c)) could not be certified by Regional Directors for the obvious reason that, absent a count of the ballots, there would be nothing to certify. Striking Amended Section 102.69(b) thus would neither leave Amended Section 102.67(c) inoperable nor undercut the Board's justifications for promulgating that section.[30]

## VII.   Conclusion

Because AFL-CIO's challenges to the 2019 Amendment are without merit, the Board's Motion for Summary Judgment should be granted in its entirety.

Respectfully submitted,

WILLIAM G. MASCIOLI
*Assistant General Counsel*

DAWN L. GOLDSTEIN
*Deputy Assistant General Counsel*

HELENE D. LERNER
D.C. Bar No. 420455
*Supervisory Attorney*
Helene.Lerner@nlrb.gov
(202) 273-3738

---

[30] The AFL-CIO offers no authority for its assertion that the Rule is not severable because "when a multipart rule is justified based on tradeoffs between competing interests, component provisions of that rule . . . cannot logically be assessed individually." [Memo, p. 30]. This is likely because its argument confuses the interest-balancing inherent in all rulemakings with a close examination of the interplay between a rule's provisions, which is what severability analysis is meant to examine.

_s/Tyler James Wiese_____
TYLER JAMES WIESE
M.N. Bar No. 0392601
Tyler.Wiese@nlrb.gov
(952) 703-2891
*Field Attorney, Region 18*
*212 3rd Avenue S, Suite 200*
*Minneapolis, MN 55401*

MOLLY SYKES
Molly.Sykes@nlrb.gov
(202) 273-1747

JESSICA MENDOZA URIOL
Jessica.MendozaUriol@nlrb.gov
(202) 971-7853
*Attorneys*
*National Labor Relations Board*
*Contempt, Compliance, and Special Litigation Branch*
*1015 Half Street, S.E.*
*Washington, DC 20003*
*Fax: (202) 273-4244*

Dated this 15th day of April
in Washington, D.C. and in
Minneapolis, Minnesota