## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| AMERICAN FEDERATION OF LABOR AND CONGRESS OF INDUSTRIAL ORGANIZATIONS, | ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Civ. No. 20-cv-0675 (KBJ) |
| NATIONAL LABOR RELATIONS BOARD, | ) ) ) | |
| Defendant. | ) ) ) | |

## MEMORANDUM OPINION

Administrative agencies have a duty to both notify the public before promulgating rules that potentially affect the substantive rights of regulated parties and review the solicited public feedback before finally adopting such significant policy changes. *See* Administrative Procedures Act ("APA"), Pub. L. 79-404, 60 Stat. 237 (1946) (codified as amended at 5 U.S.C. §§ 551–559, 701–706). The law presumes that an agency will engage in notice-and-comment rulemaking in nearly every instance in which a final rule is adopted. Thus, if an agency promulgates a rule *without* providing notice and receiving public comments, the agency must be prepared to demonstrate that the rule it intends to enforce is not actually subject to those APA prescriptions, because it satisfies one of the narrow exceptions to notice-and-comment rulemaking that are specifically identified in the APA. The instant case involves one of those statutory exceptions: notice-and-comment rulemaking is not required with respect to "rules of agency organization, procedure, or practice[.]" 5 U.S.C § 553(b)(A). This is generally

and colloquially referred to as the APA exception for "procedural" rules.  *Mendoza v. Perez*, 754 F.3d 1002, 1023 (D.C. Cir. 2014).

On December 18, 2019, the National Labor Relations Board ("NLRB" or "the Board") took the rare step of promulgating a rule that prescribes certain procedures that employers, employees, and labor unions have to implement with respect to the election of employee representatives for collective bargaining purposes.  *See* 84 Fed. Reg. 69,524 (Dec. 18, 2019) (hereinafter "2019 Election Rule").  The undisputed purpose behind the 2019 Election Rule was to rescind certain election-related regulations that the Board had adopted in 2014:  back then, the NLRB undertook notice-and-comment rulemaking to promulgate a rule that was primarily designed to effectuate "the essential principle that [union] representation cases should be resolved quickly and fairly[,]" 79 Fed. Reg. 74,308, 74,308 (Dec. 15, 2014), while the 2019 Election Rule sought to implement various pre-election and pre-certification safeguards in order to "promote[] efficiency and expeditious *final* resolution of the question of representation," 84 Fed. Reg. at 69,529 (emphasis in original).

Significantly for present purposes, when the NLRB reversed course and enacted the 2019 Election Rule, the agency took the position that the rule it was adopting was merely procedural in nature for the purpose of the APA, and as such, it promulgated the rule amendments without notifying the public of the new provisions of law that implemented this policy shift and without soliciting public comment about them.  *See* 84 Fed. Reg. at 69,528.  One of the labor organizations that has a significant interest in NLRB rulemaking—the American Federation of Labor and Congress of Industrial Organizations ("AFL-CIO")—has filed the instant lawsuit to challenge the 2019

Election Rule, and argues that the NLRB's rulemaking violates the APA in several respects.  (*See* Compl., ECF No. 1, at 1.)  The AFL-CIO's primary argument is that notice-and-comment rulemaking was required with respect to certain provisions of the 2019 Election Rule (*see id.* ¶¶ 43–50 (Count I)), and it further maintains that the 2019 Election Rule is both arbitrary and capricious (as a whole (*see id.* ¶¶ 51–59 (Count II)) and with respect to specific provisions (*id.* ¶¶ 60–69 (Count III))), and inconsistent with the National Labor Relations Act ("NLRA"), 29 U.S.C. §§ 151–69 (*see id.* ¶¶ 70–81 (Count IV)).  Accordingly, the AFL-CIO seeks a declaration that the entire 2019 Election Rule violates the APA and a court order that vacates it.  (*See id.* at 15 ("Prayer for Relief").)

Before this Court at present are the parties' cross-motions for summary judgment (*see* Def.'s Mot. for Summ. J., ECF No. 22; Pl.'s Mot. for Summ. J., ECF No. 23), and also a threshold motion that the NLRB has filed, which argues that this matter must be transferred to the D.C. Circuit for lack of jurisdiction (*see* Def.'s Mot. to Transfer to the D.C. Cir. to Cure Want of Jurisdiction, ECF No. 15).  Given the May 31, 2020, effective date of the challenged rule, this Court held a telephonic motions hearing on May 14, 2020, after which it took the motions under advisement, on an expedited basis. (*See* Minute Entry of May 14, 2020.)  The Court then issued an Order on May 30, 2020, which **GRANTED** the AFL-CIO's motion for summary judgment, **DENIED** the Board's motion to transfer and cross-motion for summary judgment, and **REMANDED** the matter to the agency for reconsideration in light of this Court's ruling.  (*See* Order of May 30, 2020, ECF No. 34.)

The present Memorandum Opinion explains the reasons for this Court's Order. In short, the Court has concluded that it has subject-matter jurisdiction to entertain the AFL-CIO's challenges under 28 U.S.C. § 1331, and that the instant case need not be transferred to the U.S. Court of Appeals for the District of Columbia Circuit, because the direct-review provision of the NLRA that channels review of certain NLRB actions directly to the courts of appeals does not apply to the agency action at issue here.  With respect to the merits of the AFL-CIO's APA claims, this Court agrees that the challenged parts of the 2019 Election Rule do not qualify as procedural rules within the meaning of the APA's exception to notice-and-comment rulemaking, and the Court thus finds that those particular provisions were promulgated unlawfully and must be set aside.

## I.    BACKGROUND

### A.    The NLRB's General Authority To Regulate Labor Practices Under The National Labor Relations Act

The NLRB is an administrative agency that Congress created in 1935, when it enacted the National Labor Relations Act, 29 U.S.C. §§ 151–69, which is the primary federal statute that regulates private sector labor-employer relations in the United States.  The text of the NLRA makes clear that Congress intended to "encourag[e] the practice and procedure of collective bargaining" and to "protect[] the exercise by workers of full freedom of association, self-organization, and designation of representatives of their own choosing[.]"  *Id.* § 151.  In furtherance of these goals, the statute expressly bestows upon the NLRB the power to engage in general and specific rulemaking, *see id.* §§ 156, 159(c)(1), and to adjudicate certain disputes that commonly arise between labor organizations, employees, and employers, *see* §§ 158, 159, 160.

The NLRA also plainly distinguishes between the NLRB's exercise of its powers with respect to addressing alleged unfair labor practices, on the one hand, and regulating collective bargaining practices (generally referred to as "representation"), on the other.  Indeed, after establishing that employees have "the right to self-organization, to form, join, or assist labor organizations, to bargain collectively . . . [and] to refrain from any or all of such activities[,]" *id.* § 157, the NLRA enumerates the various actions that constitute "unfair labor practices" on the part of both employers and employees in one section of the statute, *see id.* § 158, and separately addresses "representatives and elections" (*i.e.*, how representatives are chosen and representation elections are conducted) for collective bargaining purposes in another, *see id.* § 159.

In the unfair labor practice realm, the NLRA empowers the NLRB "to prevent any person from engaging in any unfair labor practice affecting commerce."  *Id.* § 160(a).  Such unfair labor practices include an employer's "interfere[nce] with the formation or administration of any labor organization," *id.* § 158(a)(2), or the refusal on the part of either an employer or a labor organization to engage in collective bargaining with the other, *id.* §§ 158(a)(5), (b)(3).  And with respect to the employees' selection of their representatives for collective bargaining purposes, the NLRA confers upon the NLRB, *inter alia*, the power to determine "the unit appropriate for the purposes of collective bargaining[,]" *id.* § 159(b), and to adjudicate any "question of representation affecting commerce[,]" *id.* § 159(c)(1)(B); *see also* 29 C.F.R. § 102.64 (2019) (explaining that "[a] question of representation exists if a proper petition has been filed concerning a unit appropriate for the purpose of collective bargaining or concerning a

unit in which an individual or labor organization has been certified or is being currently recognized by the employer as the bargaining representative").

For present purposes, it is important to understand that the NLRA addresses the specific powers of the NLRB with respect to preventing unfair labor practices in section 160 of Title 29, which is entitled "[p]revention of unfair labor practices." *See* 29 U.S.C. § 160.  The first four subsections of section 160 pertain to various aspects of the Board's authority with respect to responding to such practices.  *See, e.g., id.* § 160(a) (the Board has general authority to address unfair labor practices "affecting commerce"); *id.* § 160(b) (the Board can issue a complaint and schedule a hearing when someone is accused of engaging in unfair labor practices); *id.* § 160(c) (the Board can take testimony, make findings, order the cessation of unfair labor practices, and take affirmative actions to effectuate the policies of the statute); *id.* § 160(d) (the Board is free to modify its orders concerning unfair labor practices until judicial review or judicial enforcement is sought).  Additionally, section 160 expressly provides that the Board's orders concerning unfair labor practices may be enforced or challenged in federal court.  *See id.* §§ 160(e), (f).  Pursuant to section 160(e), "[t]he Board shall have power to petition any court of appeals of the United States . . . wherein the unfair labor practice in question occurred or wherein such person resides or transacts business, for the enforcement of [the Board's] order[.]"  *Id.* § 160(e).  Likewise, and importantly, under section 160(f), "[a]ny person aggrieved by a final order of the Board granting or denying in whole or in part the relief sought may obtain a review of such order in any United States court of appeals in the circuit wherein the unfair labor practice in question was alleged to have been engaged in or wherein such person resides or

transacts business, or in the United States Court of Appeals for the District of Columbia[.]" *Id.* § 160(f).

### B.   The NLRB's Relatively Recent Rulemaking Concerning The Procedures For Conducting Representation Elections

Although section 156 of the NLRA provides the NLRB with the general "authority from time to time to make, amend, and rescind . . . such rules and regulations as may be necessary to carry out the provisions" of the statute, 29 U.S.C. § 156, the Board has seldom acted through notice-and-comment rulemaking on any subject, *see N.L.R.B. v. Curtin Matheson Sci., Inc.,* 494 U.S. 775, 818 (1990) (Scalia, J., dissenting) ("Despite the fact that the NLRB has explicit rulemaking authority, it has chosen— unlike any other major agency of the Federal Government—to make almost all its policy through adjudication." (internal citation omitted)); *see also generally* Cornelius Peck, *The Atrophied Rulemaking Powers of the National Labor Relations Board*, 70 Yale L.J. 729 (1961).  However, over the last decade, the Board has opted to regulate the procedures that relate to the election of union representatives through a series of rulemakings, *see* 29 U.S.C. § 159(c)(1), in addition to its adjudications.

First, in 2011, the NLRB issued a final rule that addressed certain representation-election practices.  *See Representation—Case Procedures*, 76 Fed. Reg. 80,138 (Dec. 22, 2011).  The final rule that the agency issued was unusual insofar as it was promulgated through notice-and-comment rulemaking.  *See id.* at 80,142 (explaining that "[a] review of prior Board rulemaking procedures" had "reveal[ed] that the Board ha[d] not held a public hearing attended by all Board Members for at least half a century").  The 2011 rule was challenged in court and was ultimately invalidated on the

sole ground that the Board acted in the absence of a quorum. *See Chamber of Commerce v. N.L.R.B.*, 879 F. Supp. 2d 18, 20–21, 30 (D.D.C. 2012).

In 2014, the NLRB announced a proposed rule that was almost identical to the 2011 regulation—it was likewise aimed at facilitating the expeditious certification of new labor organizations by "remov[ing] unnecessary barriers to the fair and expeditious resolution of representation cases[,]" eliminating "[d]uplicative and unnecessary litigation," and "simplify[ing] representation-case procedures," among other things. 79 Fed. Reg. at 74,308; *see also id.* (asserting that the 2014 rule would allow the Board to "better fulfill its duty to protect employees' rights by fairly, efficiently, and expeditiously resolving questions of representation"). The agency subjected its proposed regulation to notice-and-comment rulemaking, including holding at least one public hearing, and eventually promulgated the rules over the dissent of two Board members. *See id.* The 2014 rule survived a subsequent court challenge, *see generally Chamber of Commerce v. N.L.R.B.*, 118 F. Supp. 3d 171 (D.D.C. 2015); *Associated Builders & Contractors of Texas, Inc. v. N.L.R.B.*, No. 1:15-CV-026, 2015 WL 3609116, at *1 (W.D. Tex. June 1, 2015), *aff'd*, 826 F.3d 215 (5th Cir. 2016), and was implemented in full in 2015.

The 2014 rule made approximately twenty-five changes to the procedures that had previously governed the election of union representatives for collective bargaining purposes, 79 Fed. Reg. at 74,308–10 (summarizing the amendments)—five of which are relevant to the instant dispute. First, the 2014 rule eliminated parties' right to litigate questions of individual eligibility and inclusion in the unit *before* the election of a union representative (*i.e.*, at the pre-election hearing); instead, the rule gave NLRB

Regional Directors discretion to permit disputed individuals to vote subject to challenge, with the challenges being resolved (if necessary) after the election.  *See id.* at 74,385.[1]  Second, the 2014 rule required the Regional Directors to set a representation election for "the earliest date practicable," *id*. at 74,310, and eliminated the requirement that "[e]lections . . . be automatically stayed [for 25 to 30 calendar days] in anticipation of requests for review[,]" *id*. at 74,309.  Third, the 2014 rule codified the requirement that employers provide a list of eligible voters to the union or the petitioning employees, together with their contact information, and further provided that employers should serve the list on the petitioners within two business days of the direction of election.  *Id.* at 74,310.  Fourth, the 2014 rule stated that the task of certifying the results of elections should be performed at the Regional Director level in every case.  *Id.*  Fifth, and finally, the 2014 rule provided that a party's filing of a request for Board review of a Regional Director's certification of the election would not stay the election, the counting of ballots, or the certification itself, "unless specifically ordered by the Board[.]"  *Id*. at 74,309.[2]

When it promulgated the 2014 rule, the NLRB specifically recognized that the NLRA "enshrines a democratic framework for employee choice and, within that framework, charges the Board to promulgate rules and regulations in order that employees' votes may be recorded *accurately, efficiently and speedily*."  *Id.* at 74,314

---

[1] Per section 153 of the NLRA, the NLRB may delegate to Regional Directors various powers of the Board, including the authority "to determine the unit appropriate for the purpose of collective bargaining, to investigate and provide for hearings, and determine whether a question of representation exists, and to direct an election or take a secret ballot . . . and certify the results thereof."  29 U.S.C. § 153(b).

[2] Parties are authorized to seek Board review of a Regional Director's certification of a representation election under section 153(b) of the NLRA.  *See* 29 U.S.C. § 153(b).

(emphasis added) (internal quotation marks and citation omitted).  Accordingly, the

2014 rule was "[i]ntended to decrease the time preceding union elections," *Associated*

*Builders & Contractors*, 826 F.3d at 219, although timeliness was just "one of many

reasons proffered for the amendments[,]" 79 Fed. Reg. at 74,315.

### C.    The 2019 Election Rule

In December of 2017, the NLRB issued a request for information ("RFI")

concerning how the 2014 rule was working.  *See Representation–Case Procedures*, 82

Fed. Reg. 58,783 (Dec. 14, 2017).[3]  The NLRB posted that "it will be helpful to solicit

and consider public responses to this request for information[,]" *id*. at 58,783, and

sought public input with respect to the following questions:

> *1.* Should the 2014 Election Rule be retained without change?
>
> *2.* Should the 2014 Election Rule be retained with modifications?  If so, what should be modified?
>
> *3.* Should the 2014 Election Rule be rescinded?  If so, should the Board revert to the Election Regulations that were in effect prior to the 2014 Election Rule's adoption, or should the Board make changes to the prior Election Regulations?  If the Board should make changes to the prior Election Regulations, what should be changed?

*Id*. at 58,784.  The agency received nearly 7,000 submissions in response to its RFI (*see*

Pl.'s Mot. for Summ. J. at 17), including a response from the NLRB's own Regional

Directors.  Among other things, these highly interested stakeholders observed that,

---

[3] According to the Administrative Conference of the United States, "RFIs are generally used when an agency is determining whether to proceed at all and, if so, what general approach to take."  *Adoption of Recommendations*, 84 Fed. Reg. 2,139, 2,146–47 (Feb. 6, 2019); *see also* Michael Sant'Ambrogio & Glen Staszewski, *Final Report: Public Engagement with Agency Rulemaking*, Admin. Conf. of the U.S. at 50 n.234 (Nov. 19, 2018), https://perma.cc/2UGX-UCFE (explaining that RFIs are "requests for comments early in the rule development process or retrospective review when the agency is still considering whether to engage in a rulemaking project and is just beginning to consider potential approaches to a problem").

"[w]hile parties initially voiced great concerns about the 2014 Election Rule, to all the parties' credit, after the initial learning curve, there have been very few difficulties in the adoption of the rules[.]"  (Letter from Regional Director Committee to Marvin Kaplan, Chairman, N.L.R.B., at 4 (Apr. 13, 2018), J.A., Doc. 21, ECF No. 33-3, at 8721.)

Approximately 24 months after it issued the RFI, the NLRB promulgated the final rule at issue in this case, over the dissent of one of its three Board members.  *See Representation–Case Procedures*, 84 Fed. Reg. 69,524 (Dec. 18, 2019).  The 2019 Election Rule, which was eventually slated to take effect on May 31, 2020, *see Representation–Case Procedures*, 85 Fed. Reg. 17,500 (Mar. 30, 2020), largely repealed the election procedures that the agency had adopted in the 2014 rule, in order to "promote[] efficiency and expeditious *final* resolution of the question of representation, even if the election itself is not conducted as quickly as it may have been under the 2014 amendments[,]" 84 Fed. Reg. at 69,529 (emphasis in original).  The 2019 Election Rule spans more than 70 pages in the Federal Register, and the effective repeal of the 2014 rule is accomplished in a various ways.  As relevant here, certain provisions of the 2019 Election Rule directly impact the timing of many of the required steps that lead up to the certification of an election for union representatives, and the rule also provides directives concerning the employees' selection of an individual to serve as the election observer.

Specifically, while the 2014 rule had authorized *post*-election resolution of questions of individual eligibility and unit-inclusion, *see* 29 C.F.R. § 102.64(a) (2019), the 2019 Election Rule states that, normally, such questions are to be litigated during a

11

*pre*-election hearing and adjudicated prior to the election, *see* 84 Fed. Reg. at 69,539.[4]

The 2014 rule had also provided that "[t]he regional director shall schedule the election for the earliest date practicable consistent with these rules[,]" 29 C.F.R. § 102.67(b) (2019), but the 2019 Election Rule adds that "the Regional Director will normally not schedule an election before the 20th business day after the date of the direction of election, to permit the Board to rule on any request for review which may be filed pursuant to paragraph (c) of this section[,]" 84 Fed. Reg. at 69,595.  And instead of requiring the Regional Director to issue a certification of the results of the election "forthwith" (with some narrow exceptions), 29 C.F.R. § 102.69(b) (2019), the 2019 Election Rule provides that Regional Directors will issue certifications of election results only after the Board had decided a request for review or after the time for filing a request for review has passed, *see* 84 Fed. Reg. at 69,554, 69,597.[5]

The 2019 Election Rule also delays the employer's deadline to provide to the petitioner the voter list, which the Supreme Court has characterized as a record that promotes "the fair and free choice of bargaining representatives . . . by allowing unions

---

[4] The text of 2014 rule says that "[d]isputes concerning individuals' eligibility to vote or inclusion in an appropriate unit ordinarily need not be litigated or resolved before an election is conducted[.]" 29 C.F.R. § 102.64(a) (2019).  On this same subject, the 2019 Election Rule provides that "[d]isputes concerning unit scope, voter eligibility and supervisory status will normally be litigated and resolved by the Regional Director before an election is directed[,]" although "the parties may agree to permit disputed employees to vote subject to challenge, thereby deferring litigation concerning such disputes until after the election."  84 Fed. Reg. at 69,593.

[5] Under the 2014 rule, once certain prerequisites are satisfied, "the regional director shall forthwith issue to the parties a certification of the results of the election, including certification of representative where appropriate with the same force and effect as if issued by the Board."  29 C.F.R. § 102.69(b) (2019).  The 2019 Election Rule amended this provision by adding an additional requirement—that "no request for review filed pursuant to § 102.67(c) is pending," 84 Fed. Reg. at 69,597—so as to make clear that, "[i]f any request for review is filed, the certification will issue only after the Board's ruling on that request[,]" *id.* at 69,554.

the right of access to employees that management already possesses[.]"  *NLRB v. Wyman-Gordon Co.*, 394 U.S. 759, 767 (1969).  Under the 2014 rule, the employer was required to provide the voter list "within 2 business days after issuance of the direction" of an election, 29 C.F.R. § 102.67(*l*) (2019), while the 2019 amendment gives employers up to five business days to tender that record, 84 Fed. Reg. at 69,531. Moreover, rather than allowing parties to choose an election observer of their choice without restriction (except for various limitations that the Board's adjudications manifest, *see, e.g.*, *Embassy Suites Hotel, Inc*., 313 N.L.R.B. 302, 302 (1993)), the 2019 Election Rule provides that, whenever possible, a party will select as its election observer either a current member of the voting unit or a current nonsupervisory employee, *see* 84 Fed. Reg. at 69,597.

In the Federal Register notice that announces the 2019 Election Rule, the NLRB states that the agency did not need to undertake notice-and-comment rulemaking, because "the final rule is procedural as defined in 5 U.S.C. § 553(b)(A), and is therefore exempt from notice and comment."  84 Fed. Reg. at 69,528.  The Board further explained that, "although foregoing notice and comment deviates from the process used in 2014, it is consistent with the Board's general approach in this area" because, "despite having used notice-and-comment rulemaking [in 2014], the explanation for the 2014 amendments was at pains to emphasize that this process was not required by law[,]" and "the fact that the final rule modifies certain of the 2014 amendments that were adopted after notice-and-comment rulemaking in no way requires notice-and-comment rulemaking now."  *Id.*  The NLRB took care to clarify that "[n]one of the procedural changes . . . ma[d]e today are premised on the responses to the Request for

Information; indeed, [the Board] would make each of these changes irrespective of the existence of the Request for Information." *Id*. at 69,528 n.12.

### D.     Procedural History

The AFL-CIO filed the complaint in the instant case on March 6, 2020. (*See* Compl., ECF No. 1.)  The labor organization alleges that the Board's 2019 Election Rule violated the APA because certain provisions are not merely procedural for APA purposes, as the NLRB claims, and are thus not exempt from the APA's notice-and-comment requirement.  (*See id*. ¶¶ 43–50 (Count I).)  The AFL-CIO's complaint also claims that the 2019 Election Rule is arbitrary and capricious, both as a whole (*see id*. ¶¶ 51–59 (Count II)), and with respect to specific parts (*see id*. ¶¶ 60–69 (Count III)), and the union further maintains that the 2019 Election Rule is inconsistent with the NLRA (*see id*. ¶¶ 70–81 (Count IV)).

Three days after filing the complaint, the AFL-CIO filed a motion for preliminary injunction, requesting preliminary relief in light of the then-impending April 16, 2020, effective date of the 2019 Election Rule.  (*See* Mot. for Prelim. Inj., ECF No. 3.)  This Court held a telephonic status conference on March 18, 2020, during which an extension of the effective date of the rule was discussed, in order to permit full briefing and fair consideration of the issues in the context of proposed cross-motions for summary judgment that the Court would review on an expedited basis.  (*See* Min. Entry of Mar. 18, 2020.)  The following day, the NLRB notified the Court that the effective date of its rule would be postponed until May 31, 2020.  (*See* Notice, ECF No. 18.)

The parties then filed cross-motions for summary judgment (*see* Def.'s Mot. for

Summ. J., ECF No. 22; Pl.'s Mot. for Summ. J., ECF No. 23), and their respective responses followed (*see* Def.'s Opp'n to Pl.'s Mot. for Summ. J. ("Def.'s Summ. J. Opp'n"), ECF No. 28; Pl.'s Opp'n to Def.'s Mot. for Summ. J. ("Pl.'s Summ. J. Opp'n"), ECF No. 29).  In its motion, the NLRB argues that the agency is entitled to summary judgment because the 2019 Election Rule is a procedural rule, such that it is exempted from notice-and-comment rulemaking, and that it is neither arbitrary and capricious nor a violation of the NLRA, given that the Board "acted within the scope of the broad authority granted by Congress to make, amend, and rescind rules necessary to carry out the Act."  (*See* Def.'s Mot. for Summ. J. at 16).  For its part, the AFL-CIO reiterates its view that certain parts of the 2019 Election Rule are unlawful because they were not promulgated after the required notice-and-comment rulemaking (*see* Pl.'s Mot. for Summ. J. at 20), and also maintains that the entire rule fails to meet "basic standard[s] of reasoned decision-making" (*id.* at 39), and is otherwise in violation of the law (*id.* at 49).

The NLRB has also filed a motion to transfer the case to the U.S. Court of Appeals for the D.C. Circuit pursuant to section 160(f) of Title 29 of the United States Code.  (*See* Def.'s Mot. to Transfer, ECF No. 15; *see also* Def.'s Reply to Pl.'s Opp'n to Transfer ("Def.'s Reply to Transfer"), ECF No. 26.)  The motion argues, for the first time in the NLRB's history, that this direct-review provision vests the jurisdiction to review the instant exercise of rulemaking authority by the NLRB in the court of appeals rather than in the district court.  (*See* Def.'s Mot. to Transfer at 3–4.)  In opposition to the transfer motion, the AFL-CIO argues that section 160(f) is limited to NLRB orders that concern unfair labor practice disputes, and that this Court has subject-matter

jurisdiction under 28 U.S.C. § 1331 to review its challenge to the 2019 Election Rule, which pertains to the election of union representatives for collective bargaining purposes.  (*See* Pl.'s Opp'n to Mot. to Transfer ("Pl's Opp'n to Transfer"), ECF No. 20.)

This Court held a telephonic motions hearing on May 14, 2020, and at the end of the hearing the Court took the motion to transfer and cross-motions for summary judgment, now ripe for review, under advisement.  (*See* Minute Entry of May 14, 2020.)

## II.   LEGAL STANDARD

### A.   Motions To Transfer Cases To The Court Of Appeals Pursuant To A Direct-Review Statute

Although Congress certainly has the prerogative to "choose the court in which judicial review of agency decisions may occur[,]" *Five Flags Pipe Line Co. v. Dep't of Transp.*, 854 F.2d 1438, 1439 (D.C. Cir. 1988) (internal quotation marks, alterations, and citation omitted), "[i]n this circuit, the normal default rule is that persons seeking review of agency action go first to district court rather than to a court of appeals[,]" *Am. Petroleum Inst. v. S.E.C.*, 714 F.3d 1329, 1332 (D.C. Cir. 2013) (internal quotation marks and citation omitted).  "[T]he APA neither confers nor restricts jurisdiction," so it is "the general federal-question statute, 28 U.S.C. § 1331[,]" that is the font of authority for district courts to review claims brought under the APA.  *Trudeau v. F.T.C.*, 456 F.3d 178, 185 (D.C. Cir. 2006).  And, "unless Congress expressly says otherwise, APA review takes place first in the federal district courts, not the courts of appeals." *Rodriguez v. Penrod*, 857 F.3d 902, 906 (D.C. Cir. 2017).  Indeed, it is by now clear beyond cavil that, where the district court has subject-matter jurisdiction under section 1331, "[i]nitial review occurs at the appellate level only when a direct-

review statute specifically gives the court of appeals subject-matter jurisdiction to directly review agency action." *Watts v. S.E.C.*, 482 F.3d 501, 505 (D.C. Cir. 2007).

With respect to interpreting such direct-review statutes, "[w]hether initial subject-matter jurisdiction lies initially in the court of appeals must of course be governed by the intent of Congress and not by any views we may have about sound policy." *Florida Power & Light Co. v. Lorion*, 470 U.S. 729, 745 (1985). Because "courts have just so much jurisdiction as Congress has provided by statute[,]" *Sierra Club v. Thomas*, 828 F.2d 783, 792 (D.C. Cir. 1987), they must "act on the basis of statutory language and probative legislative history" in order to discern congressional intent with respect to jurisdictional provisions, including direct review provisions, *Am. Petroleum Inst.*, 714 F.3d at 1337. However, if a particular direct-review provision is "ambiguous on its face," it will likely be read to confer direct-review authority to the court of appeals, for the Supreme Court has specifically instructed that, "[a]bsent a firm indication that Congress intended to locate initial APA review of agency action in the district courts, we will not presume that Congress intended to depart from the sound policy of placing initial APA review in the courts of appeals." *Lorion*, 470 U.S. at 737. Thus, as relevant here, the D.C. Circuit has adopted a presumption with respect to ambiguous direct-review provisions, which holds that a statutory provision "creating a right of direct judicial review in the court of appeals of an administrative 'order' authorizes such review of *any* agency action that is otherwise susceptible of review on the basis of the administrative record alone." *N.Y. Republican State Comm. v. S.E.C. ("NYRSC")*, 799 F.3d 1126, 1131 (D.C. Cir. 2015) (emphasis added).

## B.     Summary Judgment In The APA Context

As a general matter, summary judgment may be granted in favor of a party

pursuant to Federal Rule of Civil Procedure 56 "if the pleadings, the discovery and disclosure materials on file, and any affidavits [or declarations] show that there is no genuine issue as to any material fact and that the movant is entitled to a judgment as matter of law." *Air Transp. Ass'n. of Am., Inc. v. Nat'l Mediation Bd*., 719 F. Supp. 2d 26, 31–32 (D.D.C. 2010), *aff'd*, 663 F.3d 476 (D.C. Cir. 2011) (alteration in original) (quoting Fed. R. Civ. P. 56(c)).   In the instant case, however, the parties have sought summary judgment with respect to an action of an administrative agency that allegedly violates the APA; as a result, the typical legal standard articulated in Federal Rule of Civil Procedure 56 does not apply.  *See Wilhelmus v. Geren*, 796 F. Supp. 2d 157, 160 (D.D.C. 2011) (internal citation omitted).

Instead, "in APA cases, the summary judgment standard functions slightly differently, because the reviewing court generally reviews the agency's decision as an appellate court addressing issues of law." *Policy & Research, LLC v. Dep't of Health & Human Servs*., 313 F. Supp. 3d 62, 74 (D.D.C. 2018) (internal quotation marks, alterations, and citation omitted).   Thus, in the instant context, "it is the role of the agency to resolve factual issues to arrive at a decision that is supported by the administrative record," and "the function of the district court is to determine whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did." *Zemeka v. Holder*, 963 F. Supp. 2d 22, 24 (D.D.C. 2013) (internal quotation marks and citations omitted).   "Summary judgment thus serves as the mechanism for deciding, as a matter of law, whether the agency action is supported by the administrative record and otherwise consistent with the APA standard of review." *Wilhelmus*, 796 F. Supp. 2d at 160 (citation omitted).

### III.   ANALYSIS

The NLRB vigorously maintains, as a threshold matter, that the instant APA
dispute concerning its newly promulgated election-procedures rule must be transferred
to the court of appeals forthwith, because the direct-review provision in section 160(f)
of the NLRA divests this Court of jurisdiction over the claims that the AFL-CIO brings
here.  (*See* Def.'s Mot. to Transfer at 5 (arguing that "the AFL-CIO's Complaint was
filed in a court which lacks subject-matter jurisdiction to hear it").)  The Board argues
further that, if this Court addresses the AFL-CIO's challenges to the 2019 Election
Rule, summary judgment must be granted in the NLRB's favor, because the challenged
regulatory provisions are procedural rules that did not require pre-promulgation notice-
and-comment rulemaking, and none of them is arbitrary and capricious or otherwise
violative of the NLRA.  (*See* Def.'s Mot. for Summ. J. at 16.)  The AFL-CIO responds
that section 160(f)'s direct-review provision is inapposite (*see* Pl.'s Opp'n to Transfer
at 1), and that the union is entitled to summary judgment on its APA claims, because
the NLRB's promulgation of the challenged election-procedures provisions required
notice-and-comment rulemaking, and not only violated the APA's prohibitions against
arbitrary and capricious rules, but also transgressed the NLRA (*see* Pl.'s Mot. for
Summ. J. at 9–10).

As explained below, this Court has concluded that section 160(f)'s direct-review
provision does not divest the district court of subject-matter jurisdiction over the instant
dispute, and it has further found that no fair assessment of the regulatory provisions
leads to the conclusion that the challenged parts of the 2019 Election Rule are mere
procedural rules.  Consequently, the APA required that the challenged parts of the 2019

Election Rule be promulgated through notice-and-comment rulemaking, and given that

the NLRB did not actually engage in such a pre-promulgation process, the provisions

that the AFL-CIO has challenged on notice-and-comments grounds must be set aside.

But this Court will not invalidate the entire rule to remedy the notice-and-comment

defect, in accordance with well-established legal norms that require deference to agency

decision-making in the wake of a district court's review of administrative action.

Instead, the Court will remand the matter to the agency for further consideration in light

of this Court's ruling.

A.  **The Court Has Jurisdiction To Consider The Parties' Cross-Motions For Summary Judgment, Notwithstanding The NLRA's Direct-Review Provision**

There is no question that federal courts are courts "of limited jurisdiction," and

thus any "inquiry must always begin by asking whether [the courts] have jurisdiction"

over the claim presented.  *Salazar ex rel. Salazar v. District of Columbia*, 671 F.3d

1258, 1261 (D.C. Cir. 2012).  The parties here disagree on whether district courts have

subject-matter jurisdiction to entertain any APA challenge to a rule promulgated by the

NLRB (*see* Def.'s Mot. to Transfer at 3; Pl.'s Opp'n to Transfer at 2), and this dispute

arises because section 160(f) of the NLRA provides, in relevant part, that

> [a]ny person aggrieved by a final order of the Board granting or
> denying in whole or in part the relief sought may obtain a review of
> such order in any United States court of appeals in the circuit wherein
> the unfair labor practice in question was alleged to have been engaged
> in or wherein such person resides or transacts business, or in the
> United States Court of Appeals for the District of Columbia[.]

29 U.S.C. § 160(f).  This Court easily concludes that the text, structure, and legislative

history of section 160(f) make it unambiguously clear that section 160(f) does not

channel to the courts of appeals direct-review jurisdiction over challenges to NLRB rules governing the election of union representatives for collective bargaining purposes, as explained below.

1.   Section 160(f) Pertains Solely To Claims That Relate To Agency Actions Concerning Unfair Labor Practices

Beginning, as this Court must, with the text of section 160(f), it is clear that this statutory provision is directed to "final order[s]" of the NLRB that "grant[] or deny[] in whole or in part the relief sought" in the context of the "unfair labor practice in question." 29 U.S.C. § 160(f). Thus, by its terms, the direct-review provision is quite specific and relatively narrow, insofar as it provides for direct judicial review in the court of appeals of only those "orders" of the NLRB that are "final," and such final orders must "grant[] or deny[]" some type of "relief" that has been "sought" by an entity that the NLRA governs. *Id.* Setting aside for the moment whether or not the "final order" requirement is broad enough to cover an NLRB "rule" like the one at issue here, there is no reasonable argument that credibly casts the 2019 Election Rule as an agency action that grants or denies any relief to a regulated party, and this problem alone is sufficient to cast doubt on the NLRB's contention that section 160(f) applies to the AFL-CIO's claims.[6] But what clinches the conclusion that section 160(f) does not

---

[6] The NLRB acknowledges that "no outside party specifically 'sought' relief in the form of a rulemaking petition," but it nonetheless asserts that "the Board itself sought—and granted—relief when it entered the Final Rule." (Def.'s Reply to Transfer at 7 n.3.) It further maintains that section 160(f) *must* be read to encompass instances in which the Board seeks relief from itself in this manner, because, otherwise, "[i]t would be hypertechnical and illogical to hold that rules issued by an agency on its own initiative must be challenged in district court, but rules issued in response to a petition must be challenged in circuit court." (*Id.*) Of course, this odd argument is a strawman, for it demands an entirely unnatural reading of what it means to seek relief from the NLRB, and simultaneously sidesteps the fact that, regardless of who initiates the rule, section 160(f) only conceivably applies to agency actions that pertain to unfair labor practices. *See infra* Section III.A.2.

divest the district court of the subject-matter jurisdiction that it would otherwise have to address the AFL-CIO's claims under 28 U.S.C. § 1331 is the very simple fact that what is being directed to the court of appeals for direct-review per the text of the statute is NLRB actions concerning the "unfair labor practice in question"—a textual reference that strongly suggests that the provision is only triggered when some kind of unfair labor practice is at issue.  *Cf. Am. Fed'n of Labor v. N.L.R.B.*, 308 U.S. 401, 409 (1940) (holding that section 160(f) authorizes judicial review of NLRA section 158 "unfair labor practice" orders, but it does not authorize judicial review of NLRA section 159 "representation" adjudications).

The structure of section 160 of the NLRA confirms that this interpretation is the only possible reading of this direct-review provision.  In this regard, as the Court previously explained, subsection (f) "appears as an integral part" of section 160, *id.* at 407—which is itself entitled "prevention of unfair labor practices[,]" 29 U.S.C. § 160— and "[a]ll the other subdivisions relate exclusively to proceedings for the prevention of unfair labor practices[,]" *Am. Fed'n of Labor*, 308 U.S. at 407.[7]  The NLRB provides no explanation for its suggestion that Congress intended to place section 160(f) in the heart of a section solely governing unfair labor practices, and yet somehow meant for this

---

[7] *See also* 29 U.S.C. § 160(a) (authorizing the Board "to prevent any person from engaging in any unfair labor practice . . . affecting commerce"); *id.* § 160(b) (setting out the Board's procedures "[w]henever it is charged that any person has engaged in or is engaging in any such unfair labor practice"); *id.* § 160(c) ("If upon the preponderance of the testimony taken the Board shall be of the opinion that any person named in the complaint has engaged in . . . any such unfair labor practice, then the Board shall state its findings of fact and shall issue . . . an order requiring such person to cease and desist from such unfair labor practice"); *id.* § 160(d) ("Until the record in a case shall have been filed in a court, as hereinafter provided, the Board may at any time upon reasonable notice and in such manner as it shall deem proper, modify or set aside, in whole or in part, any finding or order made or issued by it."); *id.* § 160(e) ("The Board shall have power to petition any court of appeals of the United States . . . for the enforcement of such order[.]").

particular provision alone to apply more broadly.  *Cf. Almendarez-Torres v. United States*, 523 U.S. 224, 234 (1998) (explaining that "the title of a statute and the heading of a section are tools available for the resolution of a doubt about the meaning of a statute" (internal quotation marks and citation omitted)).  And because the *entirety* of section 160 solely focuses on NLRB orders on unfair labor practice disputes, the only reasonable construction of subdivision (f) takes into account that it only concerns NLRB orders on unfair labor practice disputes as well.

The structure of the NLRA itself further solidifies this Court's view that section 160(f) mandates direct review of NLRB actions that pertain to unfair labor practices. *Cf. Massachusetts v. Morash*, 490 U.S. 107, 115 (1989) ("[I]n expounding a statute, we are not guided by a single sentence or member of a sentence, but look to the provisions of the whole law, and to its object and policy." (internal quotation marks, alterations, and citation omitted)).  As explained in Section I.A above, the NLRA draws a clear distinction between unfair labor practices and union elections in the collective bargaining context, and provides the NLRB with the power to adjudicate disputes and to promulgate rules with respect to both spheres of labor-related conduct.  "Separate and distinct" provisions of the NLRA "govern the procedure in unfair labor practice cases and in representation cases[,]" and "[t]he procedure to be followed in the unfair labor practice cases is outlined in some detail" in section 160, "which deal[s] with unfair labor practices only and do[es] not deal with the area of representation elections[,]" which are addressed in section 159 of the statute.  *Dep't & Specialty Store Emp. Union, Local 1265 v. Brown*, 284 F.2d 619, 626 (9th Cir. 1960); *see also Am. Fed'n of Labor*, 308 U.S. at 406 (noting that section 160, "which as its heading indicates relates to the

prevention of unfair labor practices[,]" includes no "mention of investigations or certifications authorized and defined by" section 159).

This Court's reading of section 160(f) is also consistent with the scant legislative history pertaining to this statutory provision. The House Report on the draft bill that became the NLRA clarifies that section 160 is intended to empower the NLRB "to prevent any person from engaging in any unfair labor practice[,]" and that it authorizes the federal courts to get involved in two circumstances. H.R. Rep. No. 74-969 at 21–22 (1935). The Report says, first, "[i]f the person complained of fails or neglects to obey the Board's order, it is provided that the Board shall be empowered to petition any appropriate Circuit Court of Appeals of the United States for the enforcement of such order." *Id.* at 22. And, second, "[a]ccording to a similar procedure, any person aggrieved by a final order of the Board granting or denying in whole or in part the relief sought may obtain a review of such order in the appropriate circuit court of appeals, or in the Court of Appeals of the District of Columbia." *Id.* This same source explains that the provision that allows an aggrieved person to solicit the intervention of the circuit court "is intended here to give the party aggrieved a full, expeditious, and exclusive method of review in one proceeding after a final order is made[,]" and "[u]ntil such final order is made the party is not injured, and cannot be heard to complain[.]" *Id*.

This all means that both Congress's own description of the intended purpose of section 160 and section 160(f), and also the text and structure of the statute that Congress crafted to convey that intent, leave no doubt as to the limited scope of the

direct review created by the NLRA: it concerns the enforcement and review of NLRB orders that pertain to unfair labor practice charges.

   2.   <u>That Ambiguous Direct-Review Provisions Pertaining To Agency "Orders" Presumptively Must Also Be Read To Include "Rules" Is Of No Moment</u>

The NLRB points out that the D.C. Circuit has long maintained, as a general matter, that where there is ambiguity with respect to the scope of a direct-review statute, the term "order" should be interpreted to include an agency "rule[.]"  *NYRSC*, 799 F.3d at 1131; *see also Inv. Co. Inst. v. Bd. of Governors of Fed. Reserve Sys.*, 551 F.2d 1270, 1273–78 (D.C. Cir. 1977) (interpreting Section 9 of the Bank Holding Act, which authorizes "[a]ny party aggrieved by an order of the Board under this chapter [to] obtain a review of such order . . . in the Court of Appeals in the District of Columbia[,]" and holding that "the purposes underlying Section 9 will best be served if 'order' is interpreted to mean *any* agency action capable of review on the basis of the administrative record," including agency regulations).  Given this binding authority, the Board here takes the unprecedent step of arguing that the text of section 160(f) must be read to mandate direct-review authority to the courts of appeals with respect to *both* any order of the NLRB *and* any rule that the NLRB promulgates (with the exception of orders certifying the election of union representatives), and as such, section 160(f) applies to divest this Court of jurisdiction over the AFL-CIO's claims.  (*See* Def.'s Mot. to Transfer at 3–5 (acknowledging that the Board never made this argument in prior challenges to its rules).)  But this entirely novel contention is also entirely unpersuasive, because section 160(f) is not at all ambiguous in scope, as demonstrated above—and, indeed, it makes crystal clear that the challenged agency action that is

subject to the courts of appeals' direct review must be one *that involves unfair labor practices*, while the elections rule at issue here indisputably concerns collective bargaining procedures.  *See Pub. Citizen, Inc. v. Nat'l Highway Traffic Safety Admin.*, 489 F.3d 1279, 1287 (D.C. Cir. 2007) (noting that, when interpreting a direct-review provision, the question is whether the provision is "ambiguous in any sense relevant").

Not to belabor the point, the Court merely reiterates that Congress intentionally designed subsection (f) of section 160 to provide "aggrieved parties" with the right to seek review of a "final order" of the NLRB pertaining to such an unfair labor practice in the court of appeals "in the circuit wherein the unfair labor practice in question was alleged to have been engaged in[,]" among other places, 29 U.S.C. § 160(f), in the same way that Board can seek court enforcement of any agency order concerning an alleged unfair labor practice pursuant to subsection (e), *see id.* § 160(e).  *See generally supra* Section III.A.1.  To be sure, subsection (f) is *also* in the nature of "a venue clause" (Def.'s Reply to Transfer at 8 (emphasis omitted)) insofar as it specifies *which* of the courts of appeals such aggrieved persons can petition to obtain judicial review.  But the text, structure, and legislative history of this direct-review provision unequivocally establishes that, at bottom, the *subject* of a petition for review that is filed with the court of appeals under section 160(f) must be an NLRB action that pertains to unfair labor practices as opposed to any other topic that the agency might have acted to address.

Thus, the NLRB's reliance on that the D.C. Circuit's holding that an "order" for direct-review-statute purposes presumptively includes "rules" (*see* Def.'s Mot. to Transfer at 3) is entirely beside the point.  That is, regardless of whether, "absent

contrary congressional intent," an ambiguous "statutory review provision creating a right of direct judicial review in the court of appeals of an administrative 'order' [also] authorizes such review of" any agency rule, *NYRSC*, 799 F.3d at 1131, Congress's intent with respect to section 160(f) is *not* absent; instead, Congress has unambiguously made it crystal clear that, to trigger the direct-review directive, any NLRB order (or, perhaps, any NLRB rule) must, as a threshold matter, relate to unfair labor practices.

This critical prerequisite manifestly distinguishes the instant direct-review provision from those in each of the cases that NLRB points to as precedents for the application of the presumption that "orders" includes "rules."  (*See* Def.'s Mot. to Transfer at 3–4; Def.'s Reply to Transfer at 12–13.)[8]  And the NLRB does not appear to dispute that the 2019 Election Rule concerns collective bargaining practices, *not* unfair labor practice determinations.  Therefore, it is clear to this Court that it retains jurisdiction over the instant challenge to the NLRB's rulemaking, not because the NLRB has promulgated a rule rather than issuing an order, but because the NLRB's action regulates representation rather than unfair labor practices, such that subsection (f)'s direct-review provision does not apply.[9]  Consequently, the Court will proceed to

---

[8] For example, in *Investment Co. Institute v. Board of Governors of Federal Reserve System*, 551 F.2d 1270, 1278 (D.C. Cir. 1977), the D.C. Circuit interpreted a direct-review provision that authorizes "[a]ny party aggrieved by an order of the Board under this chapter [to] obtain a review of such order . . . in the Court of Appeals in the District of Columbia[,]" *id.* at 1273 n.3, and held that "the purposes underlying [that provision] will best be served if 'order' is interpreted to mean any agency action capable of review on the basis of the administrative record," including agency regulations, *id.* at 1278. *See also, e.g., N.Y. Republican State Comm. v. S.E.C.*, 799 F.3d 1126, 1129–31 (D.C. Cir. 2015); *CTIA-Wireless Ass'n v. F.C.C.*, 466 F.3d 105, 108–12 (D.C. Cir. 2006).  Moreover, none of the cited authorities addresses a direct-review provision *that plainly* channels to the court of appeals direct-review authority only *with respect to a certain specified category of agency decisions*.  (*See* Hr'g Tr. at 30–31 (admitting that the provisions at issue in the cited cases are not as specific as section 160(f) in terms of applicability).)

[9] This Court expresses no view as to whether section 160(f)'s reference to "orders" in the context of unfair labor practice disputes should be interpreted to include "rules" that pertain to unfair labor

review the merits of the AFL-CIO's claims pursuant to the general subject-matter jurisdiction that Congress has conferred to it under 28 U.S.C. §1331.

**B.     The Board's 2019 Election Rule Required Notice-And-Comment Rulemaking Under The APA Because It Is Not A Procedural Rule**

The APA "separates legislative [or substantive] rules, which have the force and effect of law, from three types of rules that do not: interpretive rules, general statements of policy, and procedural rules[,]" *Planned Parenthood of Wisconsin, Inc. v. Azar*, 316 F. Supp. 3d 291, 304 (D.D.C. 2018), *vacated as moot*, 942 F.3d 512 (D.C. Cir. 2019) (internal quotation marks and citations omitted), and as relevant here, the APA also provides that interpretive rules, policy statements, and procedural rules are exempted from the statute's notice-and-comment requirement, *see* 5 U.S.C. § 553(b)(A).  The exception for "procedural rules" is "the hardest to define[,]" *Batterton v. Marshall*, 648 F.2d 694, 707 (D.C. Cir. 1980); however, the APA states that Congress intended to permit agencies to promulgate "rules of agency organization, procedure, or practice" without first submitting rules of that nature to public scrutiny, 5 U.S.C. § 553(b)(A). The nub of the instant dispute is the NLRB's valiant effort to shoehorn five parts of its 2019 Election Rule into this narrow classification.  But for the reasons explained below, this Court finds that the challenged provisions of the 2019 Election Rule are not procedural rules, and as a result, their promulgation violated the APA's otherwise mandatory notice-and-comment requirements.

---

practices, pursuant to "the presumption [] that statutory authorization of direct federal judicial review of agency 'order[s]' encompasses rules[.]"  *NYRSC*, 799 F.3d at 31.  The claims at issue here concern solely the NLRB's rulemaking practices on representation elections, therefore the applicability of the presumption to rules on unfair labor practices is not before this Court.

### 1. The Challenged Provisions Are Not Procedural Rules Because They Are Not Rules Of Agency Organization, Procedure, Or Practice

The first step in understanding this Court's evaluation of the instant dispute is to recognize that the parties have framed this issue as a quest to ascertain whether or not the 2019 Election Rule is a substantive rule for which notice-and-comment rulemaking is required—a subject upon which they vehemently disagree. (*Compare* Pl.'s Mot. for Summ. J. at 21 (arguing that the 2019 "amendments *are* substantive" (emphasis added)) *with* Def.'s Summ. J. Opp'n at 7 (contending that the challenged provisions are not substantive rules, because "none of the changes challenged by AFL-CIO in the 2019 [Election Rule] is so burdensome that they either foreclose fair consideration of the underlying controversy or have the intent or effect of changing the substantive outcome of the elections").) The parties appear to agree that the 2019 Election Rule is, in fact, a "rule" for the purpose of the APA, *see* 5 U.S.C. § 551(4); therefore, it is puzzling that the parties have framed the applicable legal standards in a manner that seems to lose track of the central question—*i.e.*, whether the 2019 Election Rule provisions are procedural rules and thus *exempt* from required notice-and-comment rulemaking—and have instead primarily engaged in a debate over whether the challenged parts of the 2019 Elections rule qualify as substantive and, as such, were entitled to notice-and-comment rulemaking in the first place.

The parties' struggle to keep their eyes on the ball is not surprising: the D.C. Circuit, too, "ha[s] struggled with the distinction between 'substantive' and 'procedural' rules[,]" *JEM Broad. Co. v. F.C.C.*, 22 F.3d 320, 326 (D.C. Cir. 1994), and has repeatedly suggested that "the distinction between substantive and procedural rules is one of degree[,]" rather than kind, *Elec. Privacy Info. Ctr. v. Dep't of Homeland Sec.*

*("EPIC")*, 653 F.3d 1, 5 (D.C. Cir. 2011). The Circuit has also indicated that the relevant analysis "is functional, not formal[,]" *Chamber of Commerce v. Dep't of Labor*, 174 F.3d 206, 212 (D.C. Cir. 1999), but it has not further expounded upon how one is expected to draw that line, as a practical matter, with respect to any particular rule formulation. *Cf. Nat'l Mining Ass'n v. McCarthy*, 758 F.3d 243, 251 (D.C. Cir. 2014) (noting that this "inquiry turns out to be quite difficult and confused").

Yet, the seemingly inscrutable task of discerning which agency rules function in a sufficiently substantive manner to qualify for notice-and-comment rulemaking is made substantially easier when one revisits the text of the APA, which helpfully establishes that an agency rule is essentially *presumed* to be substantive for the purpose of the notice-and-comment requirement, and that notice-and-comment rulemaking is thus generally required *unless* a rule satisfies one of the listed exceptions. *See* 5 U.S.C. § 553(b). Therefore, this Court has initially focused its attention on identifying the contours of the exception that the NLRB relies upon in this case rather than on defining the limits of the general rule, so as to determine whether the challenged parts of the 2019 Election Rule qualify as procedural rules. *Cf. Am. Hosp. Ass'n v. Bowen*, 834 F.2d 1037, 1044 (D.C. Cir. 1987) (warning of the risks of "allow[ing] the exceptions itemized in § 553 to swallow the APA's well-intentioned directive").

To be clear, attempting to ascertain the "procedural" nature of an agency rule by eliminating the possibility that the rule is "substantive" would be a rational approach if there were only those two options in the universe of possible rule classifications, and if each was equally likely to occur. However, as noted above, the APA carves out and exempts from notice-and-comment rulemaking three different kinds of agency rules—

not only "rules of agency organization, procedure, or practice," 5 U.S.C. § 553(b)(A),

but also "interpretive rules" and "general statements of policy," *id*.  And even more

importantly, notice-and-comment rulemaking is *the default* when an agency

promulgates a rule, while "the various exceptions" are to "be narrowly construed and

only reluctantly countenanced."  *N.J. Dep't of Envtl. Prot. v. E.P.A.*, 626 F.2d 1038,

1045 (D.C. Cir. 1980); *see also Mendoza*, 754 F.3d at 1023.  This means that, if the task

at hand is to determine when notice-and-comment is *not* required, than doing so is most

effectively and efficiently accomplished by demarcating the boundaries of the limited

exception at issue, and determining whether, in light of those parameters, the agency

has satisfied its burden of establishing that the rule it promulgated meets that mark.

Here, the NLRB argues that the challenged provisions of the 2019 Election Rule are

exempt from notice-and-comment rulemaking under the procedural-rule exception;

therefore, this Court has primarily undertaken to examine whether or not the provisions

at issue qualify as such.

Put another way, in order to prevent veering off course in this very murky area of

administrative law, this Court begins its analysis of the nature of the challenged

provisions of the 2019 Election Rule for APA purposes by establishing the scope of the

intended target: the procedural-rule exception.  In this regard, the D.C. Circuit has

instructed that the APA's procedural-rule exception exists "to ensure that agencies

retain latitude in organizing their internal operations," but it has also noted that "many

. . . internal agency practices affect parties outside the agency—often in significant

ways."  *Batterton*, 648 F.2d at 707.  The D.C. Circuit has provided few other insights

into the proper method for identifying procedural rules, but it is helpful to recall that

31

the term "procedural rule" is itself general nomenclature that is shorthand for the "rules
of agency organization, procedure, or practice" that are expressly exempted from the
notice-and-comment requirement under section 553(b) of the APA.

The Supreme Court has described the procedural rules provision as, essentially, a
"housekeeping statute," *Chrysler Corp. v. Brown*, 441 U.S. 281, 310 (1979), and the
D.C. Circuit has clarified Congress's intent with respect to this provision by explaining
that "Congress provided this exemption from the normal rulemaking procedures to
ensure that agencies retain latitude in organizing their *internal* operations[,]" *Mendoza*,
754 F.3d at 1023 (internal quotation marks and citation omitted) (emphasis added).
Thus, rules that are properly characterized as procedural in nature for APA purposes,
and are thus exempted from notice-and-comment rulemaking, are "primarily directed
toward improving the efficient and effective operations of an agency[,]" *Batterton*, 648
F.2d at 702 n.34; that is, they generally "relate to the method of operation of the
agency[,]" *id.* at 708 n.70 (citation omitted), although they can sometimes set
"timetable[s] for [regulated entities] asserting substantive rights[,]" *Lamoille Valley
R.R. Co. v. Interstate Commerce Comm'n*, 711 F.2d 295, 328 (D.C. Cir. 1983), or "alter
the manner in which the parties present themselves or their viewpoints to the agency[,]"
*Nat'l Mining Ass'n*, 758 F.3d at 250.  Importantly, the D.C. Circuit has also warned that
the procedural-rule exception "should not be deemed to include any action which goes
beyond formality[,]" *Pickus v. U.S. Bd. of Parole*, 507 F.2d 1107, 1113 (D.C. Cir.
1974), because procedural rules are intended simply to "deal[] with the method of
operation utilized by the [agency] in the dispatch of its business[,]" *Kessler v. F.C.C.*,
326 F.2d 673, 680 (D.C. Cir. 1963) (citation omitted).

It is instructive to consider a few examples of agency rules that the D.C. Circuit has found to be procedural in nature.  For example, the circuit has concluded that rules that create or modify deadlines for regulated entities to notify the agency of their choice to exercise certain substantive rights are procedural rules.  *See, e.g.*, *Lamoille Valley*, 711 F.2d at 328; *Ranger v. F.C.C.*, 294 F.2d 240, 244 (D.C. Cir. 1961).  Similarly, regulations regarding how the agency is going to receive petitions from regulated entities, or the internal steps that the agency will take to screen such applications, have been considered procedural.  *See, e.g.*, *Nat'l Mining Ass'n*, 758 F.3d at 250; *James V. Hurson Assocs., Inc. v. Glickman*, 229 F.3d 277, 282 (D.C. Cir. 2000).  The circuit has also concluded that regulations that govern an agency's internal procedures with respect to its processing of incomplete or objected-to petitions filed by regulated entities satisfy the procedural-rule exception.  *See, e.g.*, *JEM Broad. Co.*, 22 F.3d at 327–28; *Neighborhood TV Co. v. F.C.C.*, 742 F.2d 629, 637 (D.C. Cir. 1984).  And, lastly, procedural rules include agency regulations organizing the agency's internal procedures to meet its own legal duties.  *See, e.g.*, *Pub. Citizen v. Dep't of State*, 276 F.3d 634, 638 (D.C. Cir. 2002).

Thus, it is fair to say that D.C. Circuit's precedents, as well as its more general pronouncements regarding the scope and meaning of the procedural-rule exception, suggest that procedural rules primarily concern the agency's internal operations, even if such rules also occasionally create expectations for regulated entities with respect to the timeframe, means, and methods by which those entities assert their substantive rights vis-à-vis the agency.  Moreover, where (as here) a plaintiff challenges a rule provision that is plainly *not* directed to internal agency processes, the APA seemingly requires the

agency to demonstrate that its rulemaking action nevertheless relates to "agency organization, procedure, or practice[,]" 5 U.S.C. § 553(b)(A), to such a degree that it cannot be fairly characterized as having a substantive impact on the parties.  In other words, in this Court's view, if the agency cannot show that the default assumptions of the APA have been properly displaced because the rule at issue is, in fact, directed at the agency's internal processes despite the incidental effect on the parties, then the rule cannot be characterized as fitting within the APA's narrow procedural exemption, and notice-and-comment is required.  *Cf. EPIC*, 653 F.3d at 5–6 ("[T]he distinction between substantive and procedural rules is one of degree depending upon whether the substantive effect is sufficiently grave so that notice and comment are needed to safeguard the policies underlying the APA[,]" which include "serv[ing] the need for public participation in agency decisionmaking" and "ensur[ing] the agency has all pertinent information before it when making a decision[.]" (internal quotation marks and citations omitted)).

Applying these principles to the instant case, this Court concludes that each of the provisions of the 2019 Election Rule that the AFL-CIO challenges as a notice-and-comment violation reaches far outside the Board's internal operations, and the NLRB has failed to show that each provision nonetheless still fits within the narrow scope of the procedural-rule exception.  Take, for instance, the 2019 Election Rule's mandate that Regional Directors "will normally not schedule an election before the 20th business day after the date of the direction of election," 84 Fed. Reg. at 69,595, and also the rule's extension of the window of time within which employers must compile the list of eligible voters and disclose it to the Board and the employees, *see id.* at 69,531.  By

lengthening the timeframes wherein the agency (through its Regional Directors) and employers who presumably oppose unionization are supposed to undertake certain significant actions with respect to aspects of the representation-elections process, the NLRB is doing much more than merely and ministerially altering deadlines for parties to express their intentions *to the agency*. *See, e.g.*, *Lamoille Valley*, 711 F.2d at 328; *Ranger*, 294 F.2d at 244. Rather, the NLRB has delayed the timeframe within which duties *that are owed to the regulated entities* will be carried out. To be sure, these rules can be characterized as procedural at a certain level of abstraction, because they generally relate to the procedures that must be followed to conduct representation elections. But rule provisions that dictate when *the Regional Directors* will take certain necessary actions on behalf of the agency in response to employees' filings, or when *employers* must disclose certain information once the employees have already asserted their substantive rights, do not bear meaningfully on the agency's internal processes, yet they do have a significant impact on the employees' ability to mount a successful campaign for unionization, as is their right under the NLRA.

Likewise, when the 2019 Election Rule provides that "[d]isputes concerning unit scope, voter eligibility and supervisory status will normally be litigated and resolved by the [R]egional [D]irector *before* an election is directed[,]" 84 Fed. Reg. at 69,539; or requires the employees to choose as their election observer either "a current member of the voting unit" or "a current nonsupervisory employee[,]" *id.* at 69,597; or mandates that, "the certification [of the election results] will issue only after the Board's ruling on [any] request" for review, *id.* at 69,554, the Board is manifestly *outward* facing, and is unquestionably guiding the conduct of regulated entities in a manner that primarily

impacts matters outside its own internal operations.  To put a finer point on this particular assessment, by requiring pre-election litigation of potential voter eligibility problems, the NLRB is causing employees to wait for issues concerning the scope of the collective bargaining unit to be sorted out prior to an election, with the distinct possibility that such a delay will hinder the employees' prospects of mobilizing a sufficient number of peers to unionize the workplace, and with no apparent corresponding benefit with respect to the internal workings of the agency.  And the election-observer provision, which plainly directs whom the employees can choose to protect their interests while the election is underway, might well be a significant constraint for employees who are seeking to unionize, but appears to make not one whit of difference with respect to the agency's internal operations.  Finally, to the extent that the 2019 Election Rule delays certification, it likewise forestalls the benefits that employees are seeking when they campaign for unionization, *see, e.g.*, 29 U.S.C. § 158(b)(7) (allowing only "currently certified" labor organizations to picket for longer than 30 days an employer who refuses to "recognize or bargain with a labor organization as the representative of his employees"), while the beneficial effect of this prescribed delay on any internal practice or process of the NLRB has yet to be established.

The Board's response is that the challenged provisions of the 2019 Election Rule qualify as procedural rules regardless, because they only "govern[] the content and timing of case filings" (Def.'s Mot. for Summ. J. at 21 (quoting *Nat'l Whistleblower Ctr. v. Nuclear Regulatory Comm'n*, 208 F.3d 256, 262 (D.C. Cir. 2000))), and/or merely change "when [certain] issues are presented to, and decided by, the Board" (*id.*

at 17).  Boiled to bare essence, this contention suggests that the NLRB considers *any*
rule that merely *relates* to procedures as opposed to substantive rights as a procedural
rule for the purpose of the APA (*see* Hr'g Tr. at 58–59)—a misconception that appears
to be fueled, first and foremost, by a misunderstanding of the intended scope of the
APA's procedural-rule exception.  Indeed, as explained above, section 553(b)(A) of the
APA does not encompass any and all rules that relate to procedures that an agency says
a regulated entity must follow; instead, procedural rules are properly understood as
agency rules that relate primarily to "internal house-keeping measures organizing
agency activities[,]" *Batterton*, 648 F.2d at 702, which is precisely why they need not
be subjected to notice and public comment.

The NLRB also presents an "overly abstract account" of the challenged
provisions of the 2019 Election Rule—one that casts their implications at a high "level
of generality[,]" *EPIC*, 653 F.3d at 2–3, and thereby ignores the actual impact of the
challenged provisions of this rule on parties other than the agency itself.  The Board
may *say* that these provisions have only "an incidental effect on parties" (Def.'s Mot.
for Summ. J. at 20), but its own Federal Register notice belies its understanding that
these rule changes will significantly impact representation-election processes, which is
appears to be the very reason why the NLRB adopted these reforms.  *See, e.g.,* 84 Fed.
Reg. at 69,529 (stating, in reference to elections undertaken prior to the 2019 rule
changes, that "[t]he mere fact that elections are taking place quickly does not
necessarily mean that this speed is promoting finality or the most efficient *resolution* of
the question of representation").

Thus, it is clear to this Court that each of the challenged provisions of the 2019 Election Rule actually (and, apparently, intentionally) reaches beyond the agency's own "organization, procedure[s], or practice[s]" to direct regulated entities concerning how representation elections are to be conducted, 5 U.S.C. § 553(b)(A), in a manner that actually (and, apparently, intentionally) impacts the substantive rights of parties. Therefore, these provisions transcend the narrow scope of the procedural-rule exception.

2.  Even If Identifying Procedural Rules Requires Determining If A Rule Is "Not Substantive" In Nature, The Challenged Provisions Are Substantive And, Thus, Notice-And-Comment Rulemaking Was Required

Despite the fact that the text of the APA appears to require courts to determine whether an agency rule is procedural and therefore exempt from notice-and-comment rulemaking, the D.C. Circuit has, at times, suggested that in order to evaluate properly whether or not the APA requires notice-and-comment rulemaking, courts must ask whether the rule at issue is *not substantive*. *See, e.g.*, *Bowen*, 834 F.2d at 1045 (asserting that the reading "that seems most consonant with Congress' purposes in adopting the APA is to construe [the procedural-rule exception] as an attempt to preserve agency flexibility in dealing with limited situations where substantive rights are not at stake"). In the discussion that follows, this Court considers whether the challenged parts of the 2019 Election Rule are, or are not, substantive rules as the D.C. Circuit has defined them; it mirrors much of what has already been said, because, unfortunately for the NLRB, even under *that* framing of the relevant legal standards, the challenged provisions of the 2019 Election Rule are plainly substantive in nature, such that notice-and-comment rulemaking should have been implemented.

In *Batterton v. Marshall*—an oft-cited case concerning the distinction between substantive and procedural rules—the D.C. Circuit defines substantive rules as those that "effectuate statutory purposes[,]" and emphasizes that, "[i]n so doing, they grant rights, impose obligations, [] produce other significant effects on private interests[,] . . . narrowly constrict the discretion of agency officials by largely determining the issue addressed[,]" or otherwise "have substantive legal effect." *Batterton*, 648 F.2d at 701–02.  In other words, "where the agency action trenches on substantial private rights and interests[,]" *id.* at 708, or where the agency action "conclusively bind[s] the agency, the court, or affected private parties[,]" *id.* at 704, or where the agency is changing the applicable "substantive standards[,]" *Glickman*, 229 F.3d at 280, the exception for procedural rules cannot be applied to relieve the agency of its notice-and-comment rulemaking obligations.  In deciding whether or not a claimed procedural rule is actually substantive, the D.C. Circuit has "examine[d] how the rule affects not only the rights of aggrieved parties, but their interests as well." *Chamber of Commerce*, 174 F.3d at 212 (internal quotation marks and citation omitted).  The D.C. Circuit has also at times undertaken to identify a rule as substantive by seeking to determine whether or not the rule has "the force of law." *Id.  Cf. Chrysler Corp.*, 441 U.S. at 308 (explaining that an agency pronouncement that has "the force of law" is one that is "binding on the courts unless [it is] arbitrary or not promulgated pursuant to prescribed procedures").  A "force of law" finding "will not necessarily be controlling," but "whether a rule has the force of law often will bear upon its proper classification as substantive or procedural." *Chamber of Commerce*, 174 F.3d at 212. [10]

---

[10] Of course, part of the confusion in this area of the law is that it is exceedingly difficult to keep in mind that a rule's *failure* to meet any of these marks, much less the degree to which a rule falls short of

Applying this alternative framework to the provisions of the 2019 Election Rule that the AFL-CIO is challenging on notice-and-comment grounds, this Court concludes that the rules at issue are certainly more substantive than procedural, because they plainly impose obligations, alter substantive rights, and have substantive effects on private interests.  *See Batterton*, 648 F.2d at 701–02; *see also EPIC*, 653 F.3d at 5–6 (explaining that "the distinction between substantive and procedural rules is one of degree" (internal quotation marks omitted)).  For example, as the Court previously explained, the provision that requires Regional Directors to decline to certify the election results until any request for review has been decided by the Board, *see* 84 Fed. Reg. at 69,554, delays employees' procurement of significant statutory rights that depend on the NLRB's certification, *see, e.g.*, 29 U.S.C. § 158(b)(7); *see also EPIC*, 653 F.3d at 6 (suggesting that, where a policy change "substantively affects the public to a degree sufficient to implicate the policy interests animating notice-and-comment rulemaking[,]" the new rule qualifies as "substantive").  While perhaps less directly impactful, the imposition of restrictions regarding whom the employees can choose as their election observer, *see* 84 Fed. Reg. at 69,587, not only alters the employees right to choose their own observer, but it also plainly appears to have the force of law, because it "forecloses alternate courses of action" and "conclusively binds the . . . affected private parties[,]" *Batterton*, 648 F.2d at 702.

The other challenged provisions of the 2019 Election Rule—*i.e.*, the increase in the number of challenges that can be raised and must be resolved before the election,

---

these specific targets, is not, in itself, the hallmark of a procedural rule, as the APA defines that exception.  To think otherwise is, effectively, to make no-notice-and-comment (procedural-rule status) the default rule, rather than a narrow exception, as suggested *supra*, in Section III.B.1.

*see* 84 Fed. Reg. at 69,539; the mandatory delay of the election date, *see id.* at 69,595; and the extention of time for releasing the eligible voters' list, *see id.* at 69,531—may, or may not, have a *substantial* impact on a particular unionization effort (one could imagine that the degree of impact each of these provisions has might vary widely, depending on the circumstances presented); however, each of these rules "grant[s] rights" and "impose[s] obligations[,]" and *could* conceivably produce "significant effects on private interests[,]" *Batterton*, 648 F.2d at 701–02.  Thus, each of those provisions too, qualify as substantive for the purpose of the APA's notice-and-comment prescriptions.

In this regard, and in conclusion, this Court has found it helpful to consider the relatively recent pronouncements of the D.C. Circuit in two cases in which the court of appeals found that agencies had sidestepped their duties to undertake notice-and-comment rulemaking with respect to substantive rules, and had thus committed an APA violation.  In *Electronic Privacy Information Center v. Department of Homeland Security*, the D.C. Circuit reviewed a Transportation Security Administration ("TSA") decision to screen airline passengers using advanced imaging technology rather than magnetometers, which the agency itself described as a change in its *own* procedures to process passengers through the checkpoint.  *See* 653 F.3d at 2–3, 5.  The D.C. Circuit noted that the TSA's view was an "overly abstract account of the change in procedure at the checkpoint[,] elid[ing] the privacy interests at the heart of the petitioners' concern[,]" *id.* at 6, because the change "substantively affects the public to a degree sufficient to implicate the policy interests animating notice-and-comment rulemaking[,]" *id.*

Similarly, in *Mendoza v. Perez*, the D.C. Circuit considered two Department of Labor guidance letters concerning applications for temporary work visas for immigrants employed in the herding industry.  754 F.3d at 1003.  The circuit found that, if "stated at a high enough level of generality," those letters might *seem* procedural—indeed, they set forth the agency's enforcement plan for determining employer compliance with the applicable immigration laws, and described how employers seeking a certification that the requirements to petition for such work visas were met should present themselves to the agency—"[b]ut a more practical account of the rules makes it clear the [letters] create substantive requirements by, *inter alia*, setting the minimum wage an employer must offer American workers before it can obtain [the work visa] certification" and by "set[ting] the bar for what employers must do to obtain approval."  *Id.* at 1024.

So it is here.  The NLRB apparently conceives of its 2019 Election Rule at a level of abstraction that qualifies it as a "procedural" rule insofar as it generally pertains the steps that must be followed to conduct a representation election, and the agency argues that the rule is not substantive insofar as it does not bar, or otherwise substantially impede, the conduct of that election.  (*See* Def.'s Mot. for Summ. J. at 22.)  But none of the challenged provisions is actually addressed to "internal house-keeping measures organizing agency activities[,]" *Batterton*, 648 F.2d at 702, nor do these provisions merely set "timetable[s] for asserting substantive rights," *Lamoille Valley*, 711 F.2d at 328, or "alter the manner in which the parties present themselves or their viewpoints to the agency[,]" *Nat'l Mining Ass'n*, 758 F.3d at 250.  Instead, the challenged provisions carry many of the indicia of substantive rules—*i.e.*, they grant rights and impose obligations; they produce "significant effects on private interests";

and they "foreclose alternate courses of action" or "conclusively bind the . . . affected private parties." *Batterton*, 648 F.2d at 701–02, 704.  Therefore, this Court finds that the NLRB's promulgation of these particular rules without engaging in notice-and-comment rulemaking violated the APA

### C.     The Court Will Vacate The Challenged Provisions Of The 2019 Election Rule And Remand This Matter To The Board

Finally, the Court will briefly address next steps, including the appropriate scope of the remedy, given its conclusion that some of the 2019 Election Rule's provisions have been unlawfully promulgated.  The ALF-CIO asserted in its briefing and during the motions hearing that, if the Court concludes that the provisions of the 2019 Election Rule that are challenged on notice-and-comment grounds have to be set aside as unlawful, then the Court should end its analysis there and not proceed to consider the other legal claims in the complaint.  (*See* Pl.'s Mot. for Summ. J. at 4 ("If the Court agrees with Plaintiff's primary claim that the NLRB promulgated the 2019 election rule in violation of the APA's notice-and-comment requirement, the Court may grant summary judgment and remand the rule to the Board without reaching Plaintiff's alternative grounds for invalidating the rule."); *see also* Hr'g Tr. at 38–39.)  Notably, the AFL-CIO maintains that the *entire* 2019 Election Rule should be vacated and sent back to the agency if based on a finding that *some* of the rule provisions were improperly adopted because, according to the AFL-CIO, "the [challenged provisions of the 2019 Election Rule] are not discrete and it would be illogical to adopt some reforms without regard to whether others are adopted."  (Pl.'s Mot. for Summ. J. at 35.)  The NLRB strongly objects to the AFL-CIO's severability argument (*see* Def.'s Mot. for Summ. J. at 50–53); in this regard, the Board points to the text of 2019 Election Rule

(*id.* at 50–51), which specifically states that the NLRB "would adopt each of these amendments individually, or in any combination, regardless of whether any of the other amendments were made[,]" and that, "[f]or this reason, the amendments are severable[,]" 84 Fed. Reg. at 69,525 n.5.

This Court is of the view that the standard severability analysis is not warranted in a case such as this one—*i.e.*, where the plaintiff specifically challenges only certain parts of a regulation on the grounds that the defendant has violated the APA's procedural requirements—because the APA plainly authorizes this Court to vacate unlawful *parts* of a rule, and the agency itself will have ample opportunity to decide how to treat the remainder of its policy prescription when the Court remands the matter back for reconsideration in light of the Court's opinion.  To the extent that this Court must nevertheless consider severability in the instant circumstances as a matter of law, it finds, in the alternative, that the provisions of the 2019 Election Rule that the AFL-CIO has challenged on notice-and-comment grounds can, and should be, severed from the rest of the rule.

    1.    <u>Severability Analysis Is Neither Warranted Nor Clearly Authorized Under The Circumstances Presented In This Case</u>

In the ordinary case, it would make eminent sense to inquire whether or not the whole of a congressional enactment that carries the force of law must be invalidated if one or more of its provisions are struck down by the courts, especially if the law itself is silent as to the effect of such partial invalidation.  *Cf. Alaska Airlines, Inc. v. Brock*, 480 U.S. 678, 684 (1987) (reasoning that "the invalid part [of a statute] may be dropped" and the rest of the law allowed to take effect "if what is left is fully operative as a law" "[u]nless it is evident that the Legislature would not have enacted those

[remaining] provisions[,] which are within its power, independently of that which is not" (quotation marks and citation omitted)).  Indeed, in some circumstances, it might even be *necessary* to address whether the remaining parts of a partially invalidate law can be allowed to stand in order to avoid further violations of the rights of the regulated parties.  *See* Michael D. Shumsky, *Severability, Inseverability, and the Rule of Law*, 41 Harv. J. on Legis. 227, 256 (2004) (observing that "the [severability] standard seems to recognize something *constitutionally* troubling about a residual statutory scheme that cannot function" (emphasis in original)).

In this Court's view, however, the conceptual question of the legal status of a partly invalidated law seldom arises in the context of a challenge to an agency's rulemaking, for the APA itself provides the answer to what happens after a regulation is found to be unlawful: courts "hold unlawful and set aside [such] agency action[,]" 5 U.S.C. § 706(2), and the "agency action" that the court sets aside may be either "the whole *or a part* of an agency rule [or] order[,]" *id.* § 551(13) (emphasis added).  Moreover, once an unlawful agency rule is set aside in whole or in part, the court remands the matter to the agency so that the agency can reconsider the rule in light of the court's ruling.  *See, e.g.*, *Envtl. Def. Fund v. Reilly*, 909 F.2d 1497, 1506 (D.C. Cir. 1990) (explaining that, "should a district court on APA review find agency action defective, either substantively or procedurally, it ordinarily must remand to the agency for further proceedings").

This means that APA clearly contemplates a circumstance in which a court will find that part of an agency rule is unlawful, and nothing in the text of the APA suggests that a court *has* to proceed to invalidate the *entire* rule on the basis of the unlawfulness

of any of its parts; indeed, the court's "scope of review" under the APA is plainly limited to the "agency action" that is challenged as, and found to be, in violation of the statute.  5 U.S.C. § 706(2).  Binding precedents have also clearly established that *the agency* decides what happens next when all or part of a challenged action has been invalidated.  *See Cont'l Air Lines, Inc. v. Dep't of Transp*., 843 F.2d 1444, 1451 (D.C. Cir. 1988) ("[I]f one thing should be clear, it is that courts are not to engage (at least in the arena of judicial review of agency action) in substantive policymaking.").  Thus, for a court to proceed to speculate as to how the agency *might* have responded to the court's partial vacatur, *if* it had known that a certain part of its rule would be vacated, seems both unnecessary and imprudent.

What is more, because an agency in the NLRB's position gets to decide what happens next in any event, it is unlikely this Court's effort to engage in the sometimes tricky exercise of analyzing severability will make any practical difference.  To understand why this is so, imagine that the Court determines that the 2019 Election Rule is severable and vacates only the challenged provisions before remanding the matter back to the agency.  Upon receipt, the agency will *still* have to determine whether or not, as a policy matter, it intends to enforce the parts of the rule that have not been invalidated, and, presumably, the agency is free to make that non-justiciable determination either immediately or after curing the notice-and-comment defect (or appealing this Court's order).[11]  The same result appears to follow if the Court were to

---

[11] This Court is not aware of any legal standard that would permit it to review an agency's discretionary determination regarding whether or not to proceed to enforce a rule that it has previously promulgated and that has not been deemed unlawful, no matter how swiftly the agency undertakes to make that decision.  *Cf. Ctr. for Biological Diversity v. Zinke*, 260 F. Supp. 3d 11, 29 (D.D.C. 2017) ("[C]ourts do not, and cannot, police agency deliberations as a general matter; indeed, it is only when the agency actually takes some final action that review under the APA is appropriate.").  Thus, the AFL-CIO's

find that the remaining parts of the rule are so intertwined with the unlawful provisions

that the entire rule must be vacated.  Nothing prevents the agency from issuing a *new*

rule concerning the subject of the vacated regulation, and presumably that new rule

could reiterate the policies that were not previously found to be violative of the APA in

and of themselves, and it could do so immediately, or wait to cure the established

notice-and comment defect (or appeal the district court's ruling).[12]

Thus, it is hard for this Court to appreciate why there is any *need* to speculate as

to what the NLRB *would have* wanted in terms of the remainder of the 2019 Election

Rule, when the NLRB *will* decide how to move forward regardless.  *Cf. S.E.C. v.

Chenery Corp.*, 332 U.S. 194, 196–97 (1947) ("It will not do for a court to be

compelled to guess at the theory underlying the agency's action.").  And simply

remanding to the agency for reconsideration in light of the Court's opinion (without

commenting on what should happen with respect to the remainder of the rule) not only

faithfully recognizes the district court's limited authority under both the APA and the

Constitution, but it also underscores the fact that agencies, not courts, determine the

---

recent motion suggesting that the NLRB has not afforded sufficient deliberation to the decision of
whether or not to enforce parts of the 2019 Election Rule that are not addressed in this Court's order
(*see* Pl.'s Mot. for Clarification, ECF No. 35, at 3–6) raises an issue that is plainly non-justiciable.

[12] The argument that the agency could not immediately re-promulgate the unchallenged rule provisions
(*cf.* Pl.'s Mot. for Clarification at 5–6) seems dubious, because the Court would not have made any
determination that the remaining portions of the rule are themselves unlawful absent the severability
finding.  To be sure, severability analysis nevertheless permits a court to strike otherwise lawful rule
provisions on the grounds that they are too integral to the unlawful parts to be allowed to stand, but,
again, unless there are clear constitutional implications, the logic of enforcing the residual parts of a
partially invalidated rule is the kind of policy judgment call that courts have consistently said belongs
to the agency.  Thus, no matter how illogical it might seem to this Court for the NLRB to proceed to
enforce the remaining portions of the 2019 Election Rule, it is up to the agency to determine which
otherwise lawful policy prescriptions it wishes to adopt and enforce, and a simple remand of the matter
gives the agency the best opportunity to make that determination in the first instance.

logic of their own duly enacted policies, so long as their rulemaking is otherwise consistent with the law.  This Court also fails to discern any prejudice to plaintiffs, for non-severability is not the *only* means of securing vacatur of an entire agency rule, and plaintiffs are always free to press an *independent* basis for setting aside the remainder of the rule and to ask the court to do so despite any finding that a part of the rule is unlawful.[13]

The bottom line is this: at this point, the AFL-CIO has only successfully established that certain parts of the 2019 Election Rule should be struck down as unlawful on notice-and-comment grounds, and, ultimately, it will be up to the agency to decide whether and to what extent "the remainder of the regulation could function sensibly without the stricken provision."  (Pl.'s Mot. for Summ. J. at 35 (quoting *MD/DC/DE Broadcasters Ass'n v. F.C.C.*, 236 F.3d 13, 22 (D.C. Cir. 2001)).)  Thus, the most prudent course of action is for the Court to follow the remedial path that hews most closely to the well-accepted and limited role of the federal courts with respect to actions of regulatory authorities, by merely holding unlawful and setting aside those parts of the rule that cannot be maintained due to the established APA violation.

---

[13] In the instant case, the AFL-CIO might well have argued that, even if this Court agreed that the challenged provisions of the 2019 Election Rule are unlawful on notice-and-comment grounds, the Court should nonetheless proceed to reach the merits of its alternative claims that the 2019 Election Rule must be vacated in its entirety because it is arbitrary and capricious or violates the NLRA.  (*See* Compl. ¶¶ 51–81.)  But, for whatever reason, the AFL-CIO maintained that this Court need not reach its other claims, apparently assuming that the Court would agree with its severability analysis.  (*See* Pl.'s Mot. for Summ. J. at 4; Hr'g Tr. at 38–39.)

2.      In Any Event, The Parts Of The 2019 Election Rule That The AFL-
        CIO Has Successfully Challenged On Notice-And-Comment
        Grounds Are Severable

That all said, to the extent that binding precedent suggests that a standard

severability analysis *must* be undertaken in the context of APA challenges with respect

to partially invalidated rules, *see, e.g., Carlson v. Postal Regulatory Comm'n*, 938 F.3d

337, 351 (D.C. Cir. 2019) (asking "whether" a challenged provision could be severed

from the remainder of an agency rule, based on a finding that (1) "the agency would

have adopted the same disposition regarding the unchallenged portion of the regulation

if the challenged portion were subtracted" and (2) the parts of the regulation that remain

can "function sensibly without the stricken provision" (internal quotation marks,

citations, and alternation omitted)), this Court will merely add that it has no doubt that

the challenged provisions of the 2019 Election Rule are severable, for the following

reasons.

First, this Court is "without any substantial doubt that the agency would have

adopted the severed portion on its own." *ACA Int'l v. F.C.C.*, 885 F.3d 687, 708 (D.C.

Cir. 2018) (quotation marks and citation omitted). As repeatedly referenced above, the

2019 Election Rule contains an express severability provision, *see* 84 Fed. Reg. at

69,525 n.5, which plainly demonstrates the agency's actual intent regarding partial

invalidation. *Cf. Alaska Airlines*, 480 U.S. at 686 (noting that a severability clause

creates a rebuttable "presumption that Congress did not intend the validity of the statute

in question to depend on the validity of the constitutionally offensive provision."). *See*

*also Am. Petroleum Inst. v. E.P.A.*, 862 F.3d 50, 71–72 (D.C. Cir. 2017) (explaining

that the court could not find that two provisions were "wholly independent" because

"[a]t no point in the record does EPA propose keeping the [one provision] and repealing [the other]").  Furthermore, even if the NLRB's severability rule statement is "contradicted by other statements in the preamble[,]" as the AFL-CIO claims (Pl.'s Mot. for Summ. J. at 35), the AFL-CIO's memoranda do not explain the conflict, and regardless, the Court concludes that the NLRB has made it unmistakably clear that the Board made an intentional determination that nearly all of the rule's provisions, including the parts that the AFL-CIO challenges as notice-and-comment violations, should be treated as severable.  *See* 84 Fed. Reg. at 69,533 n.40 (expressly asserting that certain other provisions of the 2019 Election Rule are *not* to be deemed severable); *see also MD/DC/DE*, 236 F.3d at 22 (explaining that, where the agency "clearly intends that the regulation be treated as severable, to the extent possible, for it said so in adopting the regulation[,]" the only "question for the court, then, is whether the balance of the rule can function independently if shorn of its [unlawful] aspects").

Second, and for what it's worth, the remaining provisions of 2019 Election Rule—*i.e.*, those that this Court has not yet addressed, much less determined to be unlawful—can most likely "function sensibly without the stricken provision[s]." *Sorenson Commc'ns, Inc. v. F.C.C.*, 755 F.3d 702, 710 (D.C. Cir. 2014).  Under standard severability analysis, an "entire rule must be vacated" *only* if severing the unlawful aspects "would severely distort the [agency's] program and produce a rule strikingly different from any the [agency] has ever considered or promulgated in the lengthy course of these proceedings." *MD/DC/DE*, 236 F.3d at 23.  And this Court perceives little risk of such severe distortion here.  While some of the residual does relate back to the unlawfully promulgated provisions that expand the issues that must be

litigated at the pre-election hearing, including the extension of the delay between the announcement of a pre-election hearing and the actual hearing (*see* Pl.'s Summ. J. Opp'n at 16), the Court is persuaded that the remaining provisions can still "function sensibly without the [underlying and now] stricken provision[,]" *Sorenson*, 755 F.3d at 710, especially given that the Board's overarching purpose for many of these rule changes is to "permit parties to more easily manage the obligations imposed on them by the filing of a petition and to better prepare for the hearing, thus promoting orderly litigation[,]" 84 Fed. Reg. at 69,525, and both the stricken provisions and the residual parts reflect various means of achieving the same goals.

In sum, it is clear beyond cavil that, when remedying an APA violation, courts should ordinarily "limit the solution to the problem[.]" *Nat. Res. Def. Council v. Wheeler*, 955 F.3d 68, 82 (D.C. Cir. 2020) (quoting *Ayotte v. Planned Parenthood of N. New England*, 546 U.S. 320, 328–29 (2006)).  Here, the AFL-CIO has chosen to press its notice-and-comment challenge with respect to only certain provisions of the 2019 Election Rule, and it has also requested that the Court *not* proceed to adjudicate its other claims with respect the remainder of the rule.  (*See* Pl.'s Mot. for Summ. J. at 4; Hr'g Tr. at 38–39.)  Thus, this Court has only assessed the alleged procedural propriety of the five rule provisions that the AFL-CIO has successfully challenged as a violation of the APA's notice-and-comment requirement, and it is only those provisions that this Court is plainly authorized to hold unlawful and set aside.  Consistent with this Court's view that courts should not substitute their own judgment about the logic of an otherwise lawful policy prescription for that of the agency, the Court will not vacate the entire 2019 Election Rule; it opts instead to remand this matter back to the Board for

consideration of how to proceed with respect to both the invalidated and as-yet unchallenged parts of rule in light of this Court's ruling.

## IV.    CONCLUSION

Section 160(f) of the NLRA is a direct-review provision that plainly governs only NLRB actions that pertain to unfair labor practice disputes; therefore, this Court retains subject-matter jurisdiction to entertain the challenges to the NLRB's 2019 Elections Rule that the AFL-CIO has brought under the APA.  Moreover, having exercised its jurisdiction to address whether or not certain portions of the 2019 Elections Rule violate the APA because they required notice-and-comment rulemaking, this Court has concluded that the challenged portions of the 2019 Elections Rule are not procedural rules that are exempt from that rulemaking requirement, and thus those provisions must be held unlawful and set aside.  At the AFL-CIO's request, the Court has not proceeded further to consider the AFL-CIO's remaining substantive APA challenges.  Instead, as set forth in the Order dated May 30, 2020, the Court has **DENIED** both the Board's motion to transfer the case to the D.C. Circuit and its motion for summary judgment, and has **GRANTED** the AFL-CIO's motion for summary judgment with respect to Count One of the Complaint.  The provisions of the rule that are challenged in Count One have now been deemed invalid, and this matter is remanded to the Board for consideration in light of this Court's Memorandum Opinion and Order.

DATE:  June 7, 2020                                  *Ketanji Brown Jackson*
                                                     KETANJI BROWN JACKSON
                                                     United States District Judge