## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| AMERICAN FEDERATION OF LABOR AND CONGRESS OF INDUSTRIAL ORGANIZATIONS, | ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Civ. No. 20-cv-0675 (KBJ) |
| NATIONAL LABOR RELATIONS BOARD, | ) ) ) | |
| Defendant. | ) ) ) | |

## MEMORANDUM OPINION AND ORDER

On March 6, 2020, the American Federation of Labor and Congress of Industrial Organizations ("AFL-CIO" or "Plaintiff") filed a complaint in this Court to challenge a rule that the National Labor Relations Board ("NLRB") recently promulgated in order to regulate union-representation elections.  (*See* Compl., ECF No. 1.)  The complaint invokes the Administrative Procedure Act ("APA"), Pub. L. 79-404, 60 Stat. 237 (1946) (codified as amended at 5 U.S.C. §§ 551–559, 701–706), and claims that the NLRB's 2019 Election Rule is unlawful in several respects.  (*See* Compl. ¶¶ 43–50 (Count One) (arguing that the NLRB wrongly eschewed the required notice-and-comment process); ¶¶ 51–59 (Count Two) (claiming that the rule is arbitrary and capricious as a whole); *id*. ¶¶ 60–69 (Count Three) (asserting that several rule provisions, including the new impoundment requirement, are arbitrary and capricious); *id*. ¶¶ 70–81 (Count Four) (maintaining that the impoundment provision, among others, violates section 153(b) of the National Labor Relations Act ("NLRA").)  This Court has already issued an order

that grants summary judgment in favor of the AFL-CIO with respect to the complaint's *first* claim; i.e., the Court has held that certain provisions of the 2019 Election Rule are unlawful because the NLRB did not engage in the notice-and-comment rulemaking process that the APA requires.  (*See* Order of May 30, 2020, ECF No. 34, at 1–2; *see also* Compl. ¶ 48.)  And based solely upon that conclusion—which, again, pertains only to Count One of the AFL-CIO's complaint—the Court has invalidated the five rule provisions that the complaint identifies as procedurally improper on notice-and-comment grounds, and it has remanded the entire matter back to the NLRB for reconsideration, *without* proceeding to consider the remaining claims in the AFL-CIO's complaint.  (*See* Mem. Opinion of June 7, 2020, ECF No. 36, at 47–48 (rejecting the AFL-CIO's argument that the rule should be vacated in its entirety on non-severability grounds, and sending the matter back to the NLRB based in part on the AFL-CIO's assertion that the Court need not consider the complaint's remaining claims if summary judgment is entered in Plaintiff's favor with respect to Count One).)[1]

After this Court issued the Memorandum Opinion that explained its Order of May 30, 2020, *see generally AFL-CIO v. N.L.R.B. ("AFL-CIO I")*, No. 20-cv-0675, 2020 WL 3041384 (D.D.C. June 7, 2020), the AFL-CIO filed a motion for reconsideration under Federal Rules of Civil Procedure 59(e) and 60(b), asking the Court to revisit its decision not to reach Plaintiff's remaining claims concerning the 2019 Election Rule.  (*See* Pl.'s Mot. for Reconsideration, ECF No. 37, at 1–2.)  That motion, which the NLRB opposes (*see* Def.'s Mem. in Opp'n to Pl.'s Mot. for

---

[1] Page-number citations to the documents that the parties and the Court have filed refer to the page numbers that the Court's Electronic Filing System ("ECF") automatically assigns.

Reconsideration ("Def.'s Opp'n to Reconsideration"), ECF No. 39), is before this Court at present.  The AFL-CIO contends that the Court misinterpreted its "suggestion that the Court did not need to proceed to Counts Two to Four" if the Court agreed that certain provisions of the 2019 Election Rule violated the APA's notice-and-comment requirement, because the remand request "was always premised on the Court's agreement with the AFL-CIO's argument that [those] provisions of the NLRB's rule were non-severable, and therefore, the entire rule was invalid on notice and comment grounds."  (Pl.'s Mot. for Reconsideration at 2.)  In essence, the AFL-CIO now seeks rescission of the part of the Court's Order that remands this matter to the agency, insofar as the AFL-CIO's motion for reconsideration asks the Court to "proceed to rule on Counts Two, Three, and Four" of the complaint.  (*Id*. at 8)

This Court has the discretion to revise its prior interlocutory order under Federal Rule of Civil Procedure 54(b) and, for the reasons explained fully below, this Court is persuaded that its prior Order was based upon a significant misunderstanding: the Court understood the AFL-CIO to be calling for an unqualified return of the matter to the NLRB if the Court ruled in the AFL-CIO's favor on Count One, when the AFL-CIO actually intended for its remand request to be contingent upon this Court's agreement that the invalidated provisions of the 2019 Election Rule were not severable. Therefore, the AFL-CIO's motion for reconsideration will be **GRANTED**, and the Court's Order of May 30, 2020, will be **AMENDED** to rescind the Court's remand of this matter to the agency, in order to facilitate the Court's consideration of the AFL-CIO's remaining claims.

In light of its ruling on the motion for reconsideration, this Court has also

proceeded to consider the parties' summary judgment arguments concerning the remaining counts in the complaint, as the AFL-CIO has requested. As explained herein (*see infra* Section I.B), the Court concludes that the NLRB is entitled to summary judgment on Counts Two, Three, and Four of the AFL-CIO's complaint. In particular, the Court finds that the NLRB's decisionmaking process with respect to its promulgation of the 2019 Election Rule as whole—and also with respect to the provision that provides for the automatic impoundment of election ballots pending NLRB review—was sufficiently reasoned to clear the APA's arbitrary-and-capricious policymaking hurdle. And the Court has also determined that the impoundment provision does not violate the NLRA, because that statute is silent regarding the issue, and the NLRB advanced a reasonable interpretation of the NLRA's limits when it adopted the impoundment policy.

Consequently, the Court's May 30th Order will be further amended to reflect the Court's conclusion that, ultimately, both parties' cross-motions for summary judgment must be granted in part and denied in part. (*See* Amend. Order, ECF No. 41.) The AFL-CIO's motion for summary judgment will be granted with respect to Count One (for the reasons set forth in the Memorandum Opinion issued on June 7, 2020) and denied with respect to Counts Two, Three, and Four, for the reasons explained below. And the NLRB's cross-motion for summary judgment is denied with respect to Count One (as set forth in the Court's prior Memorandum Opinion) and granted with respect to the remaining counts in the complaint, as discussed in Section I.B of the instant Memorandum Opinion and Order.

I.   **DISCUSSION**

   A.   **The AFL-CIO's Motion For Reconsideration, Properly Construed As A Motion To Revise This Court's Prior Interlocutory Judgment Pursuant To Federal Rule Of Civil Procedure 54(b), Will Be Granted**

      1.   <u>The AFL-CIO Is Seeking Reconsideration Of An Interlocutory Order, Not A Final Judgment</u>

The Federal Rules of Civil Procedure provide three avenues for a party to seek reconsideration of a court's ruling: "Rule 54 governs reconsideration of interlocutory orders," while "Rules 59(e) and 60(b) dictate when a party may obtain reconsideration of a final judgment." *Ali v. Carnegie Inst. of Washington*, 309 F.R.D. 77, 80 (D.D.C. 2015); *see also Murphy v. Exec. Office of Office for U.S. Attorneys*, 11 F. Supp. 3d 7, 8 (D.D.C. 2014), *aff'd*, 789 F.3d 204 (D.C. Cir. 2015).  Indeed, while a motion brought under Rule 59(e) seeks "to alter or amend a judgment," Fed. R. Civ. P. 59(e), and a Rule 60(b) motion requests relief "from a final judgment, order, or proceeding," Fed. R. Civ. P. 60(b)—and thus these two rules indisputably pertain to the court's reconsideration of *final* judgments, *see West v. Holder*, 309 F.R.D. 54, 55 (D.D.C. 2015)—Rule 54(b) permits a court to revise or reconsider any order "that adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties[,]" Fed. R. Civ. P. 54(b).  To this end, Rule 54(b) plainly provides that, unless the court says otherwise, "any order or other decision, however designated, that adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties does not end the action as to any of the claims or parties and may be revised at any time before the entry of a judgment adjudicating all the claims and all the parties' rights and liabilities." *Id*.

So it is here.  The AFL-CIO filed a complaint that made four separate claims

with respect to the alleged unlawfulness of the NLRB's 2019 Election Rule, and in its Order of May 30, 2020, this Court did not purport to resolve the entire case; instead, it granted summary judgment only with respect to one of the AFL-CIO's four claims. (*See* Order at 2 (ordering that "judgment is entered in Plaintiff's favor with respect to Count One of the Complaint").)  The interlocutory nature of the Court's review was entirely transparent; in fact, the Court *expressly* declined to reach the other APA claims that appear in the AFL-CIO's complaint.  *See AFL-CIO I*, 2020 WL 3041384 at *19. And the AFL-CIO's own motion tacitly concedes that the Court has not yet entered a final judgment in this case, for the union's basic ask is that the Court "proceed to rule on Counts Two, Three, and Four."  (Pl.'s Mot. for Reconsideration at 8.)

"The district court ordinarily enters a final judgment only after it has disposed of *all* claims against all parties[,]" *Capitol Sprinkler Inspection, Inc. v. Guest Servs., Inc*., 630 F.3d 217, 221 (D.C. Cir. 2011) (emphasis added), and until then, a request to reconsider any of its "order[s] or other decision[s]" is governed by Rule 54(b), Fed. R. Civ. P. 54(b).  *Cf.* 47 Am. Jur. 2d Judgments § 638 (2020) ("In general, a partial summary judgment is merely an interlocutory judgment which can be added to, amended, or set aside by the court at any time prior to final judgment.").  Therefore, the AFL-CIO's instant motion to reconsider this Court's Order of May 30, 2020, is properly construed as a motion to revise that interlocutory judgment pursuant to Rule 54(b), and a request that the Court proceed to render a final judgment in this case—*i.e.*, one that addresses all of the AFL-CIO's claims.  *See, e.g., Ofisi v. BNP Paribas, S.A*., 285 F. Supp. 3d 240, 243 (D.D.C. 2018) (construing a motion for reconsideration, which invoked Rule 60(b), as a Rule 54(b) motion to revise an interlocutory judgment).

2.      In Its Discretion, This Court Will Grant The AFL-CIO's Motion
And Proceed To Review The Remainder Of Its Claims

"Motions for reconsideration of interlocutory orders are within the discretion of

the trial court[,]" *Jordan v. Dep't of Labor*, 308 F. Supp. 3d 24, 35 (D.D.C. 2018),

*aff'd*, 2018 WL 5819393 (D.C. Cir. Oct. 19, 2018), and "[t]he Court may reconsider and

revise its interlocutory orders as justice requires[,]" *id*.  And it is clear beyond cavil that

justice requires reconsideration when, among other things, a court has "patently

misunderstood a party" or "has made an error not of reasoning but of apprehension[.]"

*Singh v. George Washington Univ*., 383 F. Supp. 2d 99, 101 (D.D.C. 2005).

In the instant case, the AFL-CIO has made a persuasive argument that this Court

misunderstood Plaintiff's statements concerning whether or not the Court should

proceed to consider the remaining claims in the AFL-CIO's complaint in the event that

the Court agreed with the AFL-CIO's notice-and-comment challenge.  (*See, e.g.*, Pl.'s

Mem. in Supp. of Mot. for Summ. J. ("Pl.'s Mot. for Summ. J."), ECF No. 23-1, at 10

("If the Court agrees with Plaintiff's primary claim that the NLRB promulgated the

2019 election rule in violation of the APA's notice-and-comment requirement, the

Court may grant summary judgment and remand the rule to the Board without reaching

Plaintiff's alternative grounds for invalidating the rule."); Hr'g Tr., ECF No. 38, at 36

("MR. GINSBURG: [W]e do not believe you need to reach that [arbitrary-and-

capricious] argument if you agree that these are substantive changes that should have

gone through notice and comment in the first instance."); *see also id.* at 31, 66.)

Specifically, the AFL-CIO has now clarified that its repeated calls for remanding the

matter to the agency based solely upon the Court's Count One ruling were intended to

suggest that this Court should skip consideration of the AFL-CIO's remaining claims

*only* "if the court agreed that the rule is substantive in its entirety because the procedural elements are not severable[.]"  (Pl.'s Mot. for Reconsideration at 7.)

Moreover, the NLRB has done little to convince the Court that it should *not* reconsider its remand and should not proceed to review the other claims that the AFL-CIO has unquestionably asserted.  Indeed, the agency's opposition appears to be based almost entirely on the stringent nature of an inapplicable legal standard.  (*See* Def.'s Opp'n to Reconsideration at 2 (observing that "successful requests for reconsideration under Rule 60(b)(1) are rare" (internal quotation marks and citation omitted).)  What is more, the agency has apparently proceeded apace to enforce the remainder of the 2019 Election Rule in the wake of this Court's Order granting the AFL-CIO summary judgment solely with respect to Count One, notwithstanding the pendency of other legal claims that assail the 2019 Election Rule in its entirety.  (*Cf.* Pl.'s Mot. for Reconsideration at 4 (explaining how the NLRB's actions suggest that it has interpreted this Court's May 30th Order "as having agreed with the NLRB on severability and *granted* the NLRB's cross-motion for summary judgment as to Plaintiff's Counts Two, Three, and Four rather than as having denied the motion as to those counts" (emphasis in original) (internal citation omitted)).  Thus, the Board is hard pressed to complain about the AFL-CIO's attempt to ensure that the rest of its claims are considered.

In short, this Court misapprehended Plaintiff's requested remedy for the first APA violation that it successfully identified—which qualifies as a clear error, *see Singh*, 383 F. Supp. 2d at 101—and, as such, justice requires revision of the Court's prior order, *id.*  Therefore, the AFL-CIO's motion for reconsideration will be granted and the Court will proceed to consider Plaintiff's additional claims, such that the Order

of May 30, 2020, will ultimately be amended to reflect the conclusions that Court has now reached concerning the remaining claims, which are discussed below.

### B.     The NLRB Is Entitled To Summary Judgment With Respect To Counts Two, Three, And Four Of The AFL-CIO's Complaint

On June 7, 2020, this Court issued a lengthy Memorandum Opinion that describes in detail the relevant background for the instant dispute between the AFL-CIO and the NLRB concerning the validity of the 2019 Election Rule.  *See AFL-CIO I*, 2020 WL 3041384, at *2–7.  Those background facts are incorporated into this Memorandum Opinion and Order by reference, and thus the Court assumes familiarity with those facts.  As relevant here, it suffices to repeat merely that the NLRB's 2019 Election Rule prescribes certain procedures that govern representation elections for collective bargaining purposes.  *See id.* at *6–7.  The reader is also reminded that, at this point in the litigation, the Court has set aside five provisions of the 2019 Election Rule that the AFL-CIO has successfully challenged as violations of the APA's notice-and-comment rulemaking requirement.  *See id.* at *13.  The Court now turns to the AFL-CIO's three remaining contentions: (1) that the 2019 Election Rule as a whole is arbitrary and capricious, and must be set aside on that basis (*see* Compl. ¶¶ 51–59 (Count Two)); (2) that the provision of the 2019 Election Rule that requires the automatic impoundment of election ballots under certain circumstances is arbitrary and capricious (*see id*. ¶¶ 60–69 (Count Three)); and (3) that the impoundment provision also violates section 153(b) of the NLRA (*see id*. ¶¶ 70–81 (Count Four)).[2]

---

[2] Counts Three and Four of the AFL-CIO's complaint also challenge other parts of the 2019 Election Rule, beyond the impoundment provision (*see* Compl. ¶¶ 62–66, 72, 74); however, this Court has already held unlawful and set aside those other rule provisions on notice-and-comment grounds, *see AFL-CIO I*, 2020 WL 3041384, at *13.  Consequently, the other challenges contained in Counts Three and Four are now moot.

In its motion for summary judgment, the AFL-CIO argues that the NLRB's "promulgation of the [2019 Election Rule] was arbitrary and capricious as a whole because the Board completely ignored available evidence that contradicts the rationale for the rule." (Pl.'s Mot. for Summ. J. at 37.)  The AFL-CIO further contends that the impoundment provision is either arbitrary and capricious, because it "forces the Board to decide issues that in many cases will become moot once the ballots are opened" and raises "uncertainty to an entirely different level" for employers (*id.* at 47–48), or violates section 153(b) of the NLRA, since that statutory provision "preclude[s] automatic, categorical stays" of regional-director duties, such as the one the impoundment provision triggers (Pl.'s Mem. in Opp'n to Def.'s Mot. for Summ. J. ("Pl.'s Summ. J. Opp'n"), ECF No. 29, at 28).

In response, the NLRB maintains that the 2019 Election Rule is not arbitrary and capricious in its entirety, given that the Board "considered many of the same policy considerations as those examined by the 2014 Board majority[,]" such as "efficiency, fair and accurate voting, transparency and uniformity, changed technology, and timeliness," and concluded that "important interests, such as fairness, voting accuracy, and finality, had been sacrificed and would be better served by allowing more time for the electoral process." (Def.'s Mem. in Supp. of NLRB's Mot. for Summ. J., ECF No. 22-1, at 28.)  The NLRB similarly argues that the Board intentionally and rationally determined that "automatic impoundment in these narrow circumstances will promote transparency" (*id.* at 39), and that its decision to adopt an impoundment policy does not violate the NLRA, because that statute "is either silent or ambiguous" on the automatic impoundment issue, and the Board's interpretation is "based on a permissible

construction of the statute" (*id.* at 47).

As explained below, this Court concludes that the NLRB has the better of this argument, in light of well-established and, indeed, foundational principles of administrative law.  Therefore, summary judgment must be entered in the NLRB's favor with respect to Counts Two through Four of the AFL-CIO's complaint.

1.   The APA Requires Agencies To Engage In Reasoned Decisionmaking, But This Limitation Is A Relatively Narrow Constraint On An Agency's Policymaking Authority

The Administrative Procedure Act of 1946 codified established common law principles by specifying "the procedures by which federal agencies are accountable to the public and their actions subject to review by the courts[.]"  *Franklin v. Massachusetts*, 505 U.S. 788, 796 (1992).  For example, it was well established, long before 1946, that "arbitrary power resides nowhere in our system of government," *United States ex rel. Champion Lumber Co. v. Fisher*, 227 U.S. 445, 448–49 (1913); thus, in the APA, Congress fashioned a statutory cause of action, and a remedy, for the longstanding legal claim that the agency-defendant had unlawfully made the challenged policy determination in an "arbitrary [or] capricious" fashion.  5 U.S.C. § 706(2)(A). This principle—*i.e.*, judicial review of agency actions that are procedurally arbitrary or capricious—is fundamental to our democratic system of government.  *See* Raoul Berger, *Administrative Arbitrariness: A Synthesis*, 78 Yale L.J. 965, 966 (1969) ("For more than 125 years before the passage of the APA the Supreme Court declared again and again that there is no room for arbitrary action in our system, that power to act arbitrarily is not delegated."); *see also, e.g.*, *United States ex rel. Champion Lumber Co. v. Fisher*, 39 App. D.C. 158, 161 (D.C. Cir. 1912).  And it appears, unsurprisingly, that courts' firm rejection of arbitrary action by government officials finds its origin in

the Due Process Clause of the U.S. Constitution.  *See People of State of New York ex rel. N.Y. & Queens Gas Co. v. McCall*, 245 U.S. 345, 348–49 (1917); *see also Goldsmith v. Clabaugh*, 6 F.2d 94, 96 (D.C. Cir. 1925) (explaining that "a board composed of public officials" may not make discretionary decisions in an "arbitrary or capricious" way or "for undisclosed reasons," for doing so "violate[s] the fundamental principles of justice and due process of law").[3]

At bottom, the APA "requires agencies to engage in reasoned decisionmaking, and directs that agency actions be set aside if they are arbitrary or capricious[.]"  *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, No. 18-587, 2020 WL 3271746, at *7 (U.S. June 18, 2020) (internal quotation marks and citation omitted); *see also Michigan v. E.P.A.*, 135 S. Ct. 2699, 2706 (2015) (explaining that the APA's no-arbitrariness command means that agencies must engage in "reasoned decisionmaking" with respect to their policy prescriptions (internal quotation marks and citation omitted)).  However, and significantly for present purposes, the "scope of review under the arbitrary and capricious standard is narrow and a court is not to substitute its judgment for that of the agency[.]"  *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (internal quotation marks omitted).  That is, "if one thing should

---

[3] In other words, the common law prohibition against arbitrary decisionmaking is a well-established background requirement of discretionary administrative action that the APA codifies and that courts have traditionally enforced.  Thus, with respect to a statute that confers discretion to an agency, section 706(2) of the APA presumptively applies, and Congress is ordinarily *explicit* in its intention to displace APA review.  *Cf. F.C.C. v. Schreiber*, 381 U.S. 279, 292 (1965) (noting, in the context of a statutory grant of policymaking authority to an agency, that "[t]he delegated power, of course, may not be exercised arbitrarily"); *see also, e.g.*, *Mittleman v. Postal Regulatory Comm'n*, 757 F.3d 300, 305 (D.C. Cir. 2014) (holding that APA review is not available because the statute specifically provides that "no Federal law dealing with public or Federal contracts, property, works, officers . . . *including the provisions of chapters 5 and 7 of title 5*, shall apply to the exercise of the powers of the Postal Service" (emphasis added)).

be clear, it is that courts are not to engage (at least in the arena of judicial review of agency action) in substantive policymaking." *Cont'l Air Lines, Inc. v. Dep't of Transp.*, 843 F.2d 1444, 1451 (D.C. Cir. 1988). And this is so despite the fact that "courts [do] retain a role, and an important one, in ensuring that agencies have engaged in reasoned decisionmaking[.]" *Judulang v. Holder*, 565 U.S. 42, 53 (2011). Simply stated, a court's non-policymaking duty under the APA is merely to ensure that the agency has "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action including a rational connection between the facts found and the choice made[.]" *State Farm*, 463 U.S. at 43 (internal quotation marks and citation omitted); *see also Physicians for Soc. Responsibility v. Wheeler*, 956 F.3d 634, 646 (D.C. Cir. 2020) (noting that an agency has the "obligation 'to enable' a reviewing court to conclude that the agency's action 'was the product of reasoned decisionmaking'" (quoting *State Farm*, 463 U.S. at 52)).

It is important to note that a court's examination for the APA's limited purposes can reveal violations of the arbitrary-and-capricious mandate that can take various forms. For example, if the agency fails to "provide any explanation whatsoever" for a challenged action, *Swedish Am. Hosp. v. Sebelius*, 773 F. Supp. 2d 1, 14 (D.D.C. 2011), then it has violated the APA's arbitrariness prohibition by not providing a factual basis upon which a court may conclude that the agency has actually engaged in reasoned decisionmaking, *see A.L. Pharma, Inc. v. Shalala*, 62 F.3d 1484, 1491 (D.C. Cir. 1995) (noting that the requirement that an agency explain its decision enables courts to fulfill their duty of ensuring non-arbitrary decisionmaking under the APA). An agency that, instead, transparently engages in policymaking, but arrives at its discretionary decision

"by Ouija board or dart board, rock/paper/scissors, or even the Magic 8 Ball[,]" has acted in an arbitrary-and-capricious manner for APA purposes because its policy determination is not a *reasoned* one.  *Make the Rd. N.Y. v. McAleenan ("MTRNY")*, 405 F. Supp. 3d 1, 47 (D.D.C. 2019), *rev'd on other grounds sub nom.*, *Make the Rd. N.Y. v. Wolf*, No. 19-5298, 2020 WL 3421904 (D.C. Cir. June 23, 2020).  An agency similarly transgresses the APA's arbitrariness restriction if it "entirely fail[s] to consider an important aspect of the problem," or if its decision "runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise[,]" *State Farm*, 463 U.S. at 43; *see also Regents*, 2020 WL 3271746, at *14.  Under any of these circumstances, it is the court's obligation to declare that the challenged rule is procedurally unlawful, and to vacate the agency's action under section 706(2)(A) of the APA.  *See Regents*, 2020 WL 3271746, at *7.

Moreover, the "foundational precept of administrative law" that prohibits arbitrary-and-capricious policymaking in any of these forms "is especially important where, as here, an agency changes course."  *Wheeler*, 956 F.3d at 644.  If an agency has chosen *to depart* from its prior position, it "must show that there are good reasons for the new policy[,]" and when fashioning those "good reasons," the agency cannot simply "disregard[] facts and circumstances that underlay or were engendered by the prior policy" without offering "a reasoned explanation" for the decision to disregard those considerations at present.  *F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 515–16 (2009) (emphasis added); *see also United Steel v. Mine Safety & Health Admin.*, 925 F.3d 1279, 1284 (D.C. Cir. 2019) (explaining that an agency acts arbitrarily if it provides "no explanation for the change" in its policies or "completely ignores its

previous finding[s]").  Furthermore, if the agency's reasoning fails to display "awareness that it *is* changing position[,]" *Fox Television*, 556 U.S. at 515 (emphasis in original), including an explanation for why the agency is departing from its prior policy where that "new policy rests upon factual findings that contradict those which underlay its prior policy" or where "its prior policy has engendered serious reliance interests that must be taken into account[,]" *id.,* then the agency has not "provide[d] a reasoned explanation for the change[,]" as the APA's arbitrary-and-capricious mandate requires, *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2125 (2016).

Be that as it may, when an agency opts to depart from prior practice, it need "not demonstrate to a court's satisfaction that the reasons for the new policy are *better* than the reasons for the old one[.]"  *Fox Television*, 556 U.S. at 515 (emphasis in original). Instead, "it suffices that the new policy is permissible under the statute, that there are good reasons for it, and that the agency *believes* it to be better, which the conscious change of course adequately indicates."  *Id.* (emphasis in original).  In other words, if the agency is "not writing on a blank slate," the APA merely requires it "to assess whether there were reliance interests, determine whether they were significant, and weigh any such interests against competing policy concerns."  *Regents*, 2020 WL 3271746, at *15 (internal quotation marks and citation omitted).  Ans this is so precisely because making the "difficult decision" of whether "other interests and policy concerns outweigh any reliance interests" is "the *agency's* job," not the court's.  *Id.* (emphasis added); *see also MTRNY*, 405 F. Supp. 3d at 57  ("Congress intentionally delegated the designation authority to the expert agency that it likely believed was best equipped to make rational decisions about who should be exposed to the significant and

consequential risks it was creating.").

      2.    <u>The NLRB Engaged In Reasoned Decisionmaking With Respect To The 2019 Election Rule As A Whole</u>

In the instant case, the Court is persuaded that the NLRB's policymaking process with respect to promulgation of the 2019 Election Rule as whole was sufficient to satisfy the APA's reasoned-decisionmaking requirement.  To start, the record plainly establishes that the NLRB fully recognized that it was *changing* the existing policy concerning the practices that pertain to representation elections.  In fact, the agency commenced its decisionmaking process by intentionally gathering information about how the 2014 rule was working, *see Representation—Case Procedures*, 82 Fed. Reg. 58,783 (Dec. 14, 2017) ("Request for Information"), and having done so, the agency was fully aware of the interests at stake with respect to any changes it was contemplating, including the impact of any such change on those who had adjusted to, and were relying on, the prior system.

What is more, the text of the 2019 Election Rule demonstrates the NLRB's awareness of the values upon which the prior rule was based, *see* 84 Fed. Reg. at 69,528 (recognizing that the 2014 Election Rule "serve[d] and balance[d] many different interests[,]" and that "speed in the electoral process was a very important consideration"), and the Board articulated its reasons for deciding to change course: that, in addition to "efficiency[,]" the Board now also values "certainty and finality, uniformity and transparency, [and] fair and accurate voting" when it comes to election determinations, *id.* at 69,539.  This policy decision was entirely the NLRB's to make, and the record establishes that the Board exercised its discretion with relevant information in hand and with eyes wide open concerning the impact of the significant

changes that it was adopting.  *See Am. Hosp. Ass'n v. N.L.R.B.*, 499 U.S. 606, 618–19 (1991) ("The question whether the Board has changed its view about certain issues . . . does not undermine the validity of a rule that is based on substantial evidence and supported by a reasoned analysis." (internal quotation marks and citation omitted)).

As a result, this Court cannot accept the AFL-CIO's argument that the NLRB acted arbitrarily and capriciously in violation of the APA because it "plowed ahead without conducting [certain relevant statistical] analyses" on the effectiveness of the 2014 Election Rule that the responses to the NLRB's Request for Information identified.  (Pl.'s Mot. for Summ. J. at 39.)  To do so would be essentially to mandate that an agency must explore "every alternative device and thought conceivable by the mind of man[,]" *Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc.*, 435 U. S. 519, 551 (1978), despite the fact that the Supreme Court has long rejected such an expansive view of the requirements of non-arbitrary policymaking.  (*See supra* Section I.B.1.)  Nor was the NLRB required to engage in the particular kinds of statistical analyses that the AFL-CIO would have preferred.  To the contrary, the Board's choice "not to do an empirical study does not make [the agency's action] an *unreasoned* decision" for APA purposes, *Chamber of Commerce of U.S. v. S.E.C.*, 412 F.3d 133, 142 (D.C. Cir. 2005) (emphasis added), and this is especially so given that the NLRB specifically explained that its "reasons for revising or rescinding some of the 2014 amendments are . . . based on non-statistical policy choices[,]" 84 Fed. Reg. at 69,557.

It is also evident on the face of the 2019 Election Rule that the Board described adequately its decisionmaking process with respect to the procedures that the agency

was mandating concerning certification of a representation election.  The NLRB was

plainly making policy judgments, and its value-driven choices did not primarily rely on

either statistical data or particular facts about the operation of the prior regime.  *Cf.*

*Olivares v. Transportation Sec. Admin.*, 819 F.3d 454, 466 (D.C. Cir. 2016) (noting that

sometimes, with respect to agency policymaking, "facts alone do not provide the

answer" (internal quotation marks and citation omitted)).  Indeed, far from "fail[ing] to

consider available evidence" (Pl.'s Mot. for Summ. J. at 42), the NLRB appears to have

looked at the existing relevant information about the operation of the prior rule, and

identified "the considerations *it* found persuasive" from within that corpus of

information, *Olivares*, 819 F.3d at 466 (internal quotation marks and citation omitted)

(emphasis added), which is really all that the APA's reasoned-decisionmaking

requirement demands.

For example, in the text of the 2019 Election Rule, the NLRB expressly

acknowledges that "the Board's statistics demonstrate that the median time between the

filing of a petition and the election has been significantly reduced since the 2014

amendments became effective[.]"  84 Fed. Reg. at 69,528–29.  But the agency also

expresses its renewed interest in considering whether those "gains in speed have come

at the expense of other relevant interests," including "certainty and finality[.]"  *Id*.

And, ultimately, the Board preferenced the latter, by observing that the 2014 rule's

efficiency gains also permitted "issues of unit scope and employee eligibility" to

"linger on after the election for weeks, months, or even years before being resolved[,]"

and thereby created a "barrier" to reaching "certainty and finality" of election results.

*Id.*

This Court also has little doubt that the NLRB employed *reasoning* when it decided to value the kind of finality that requires all disputes about the outcome of an election to be resolved prior to certification, and it must reject the AFL-CIO's efforts to persuade the Court that the 2014 Election Rule also tended to yield final results.  (*See* Pl.'s Summ. J. Opp'n at 17–18 (complaining that the Board "just repeats over and over that 'finality' had 'been sacrificed' by the 2014 rule," when an academic report "demonstrate[s] conclusively that the 2014 rule did not simply reduce the time between petition and election but also *significantly* reduced the time between petition and case closing, *i.e.*, finality" (emphases in original)).)  In this regard, the AFL-CIO's arbitrariness argument just serves to underscore its own disagreement with the NLRB's judgment regarding which *kind* of finality is more important: finality in terms of efficient election results that facilitate relatively rapid certification, or finality in terms of definitiveness.

But, again, the APA leaves it up to the Board to decide which form of finality is "better[.]"  *Fox Television*, 556 U.S. at 515 (emphasis omitted).  And as long as the NLRB "remains within the bounds" of the APA's procedural obligations, "[a] change in administration brought about by the people casting their votes is a perfectly reasonable basis for [the agency's] reappraisal of the costs and benefits of its programs and regulations[.]"  *Nat'l Ass'n of Home Builders v. E.P.A.*, 682 F.3d 1032, 1043 (D.C. Cir. 2012) (internal quotation marks and citation omitted).  Therefore, this Court concludes that the NLRB is entitled to summary judgment with respect to Count Two of the AFL-CIO's complaint.

3.     The Impoundment Provision Of The 2019 Election Rule Is Not
Arbitrary And Capricious, Nor Does It Violate The NLRA

The AFL-CIO's contention that the NLRB acted arbitrarily and capriciously
and/or in violation of the NLRA when it promulgated the specific provision of the 2019
Election Rule that automatically impounds election ballots pending NLRB review (*see*
Compl. ¶¶ 60–69 (Count Three) (arbitrary and capricious); *id*. ¶¶ 70–81 (Count Four)
(violation of the NLRA)) fare no better.

The impoundment provision of the 2019 Election Rule states that, "[w]here a
request for review of a direction of election is filed within 10 business days of that
direction" and "the Board has not ruled on the request . . . before the conclusion of the
election," any "ballots whose validity might be affected by the Board's ruling on the
request or decision on review will be segregated and all ballots will be impounded and
remain unopened pending such ruling or decision."  84 Fed. Reg. at 69,526.[4]  The AFL-
CIO contends that this impoundment-of-ballots requirement—which effectively stalls
ballot counting and election certification until these challenges are reviewed and ruled
upon—is not the product of reasoned decisionmaking, because it "forces the Board to
decide issues that in many cases will become moot once the ballots are opened."  (Pl.'s
Mot. for Summ. J. at 47–48.)  The AFL-CIO further argues that impounding the ballots
raises the employers' "uncertainty to an entirely different level" because it prevents
employers from determining "whether employees voted for representation in the first
instance[,]" which is significant because employers are barred "from unilaterally

---

[4] Section 153 of the NLRA authorizes the NLRB to delegate to its regional directors various powers of
the Board, including the authority "to direct an election or take a secret ballot . . . and certify the
results thereof."  29 U.S.C. § 153(b).  This statutory provision also authorizes the Board to "review"
any decision that its regional directors may make pursuant to the NLRB's delegation of authority.  *Id.*

changing terms and conditions of employment starting on the date of the election if [and only if] the union is ultimately certified."  (*Id.* at 48.)  Alternatively, the ALF-CIO asserts that this impoundment policy violates the APA because it breaches section 153(b) of the NLRA, which states that a request for Board review of "any action of a regional director delegated to him" shall not, "unless specifically ordered by the Board, operate as a stay of any action taken by the regional director."  (*Id.* at 49 (quoting 29 U.S.C. § 153(b)).)  As fully explained below, this Court concludes that neither APA claim is availing.

The Court's prior discussion concerning the extent, and limits, of the APA's arbitrary-and-capricious requirement and the Court's role in enforcing it (*see supra* Section I.B.1) is sufficient to permit expeditious dispatch of the AFL-CIO's first contention.  Nothing in the Federal Register notice or the administrative record hints at arbitrary action in any of the forms described above; instead, the 2019 Election Rule plainly articulates the NLRB's policy-driven view that the impoundment provision will enhance "finality and certainty, fair and accurate voting, transparency and uniformity, ballot secrecy, and even (in certain respects) efficiency[,]" 84 Fed. Reg. at 69,548.  As a result, the AFL-CIO's counterargument—*i.e.*, that the provision does not, in fact, "promote[] transparency" because it "forces the Board to decide issues that in many cases will become moot once the ballots are opened" (Pl.'s Mot. for Summ. J at 47) and raises "uncertainty to an entirely different level" for employers (*id.* at 48)—is largely beside the point.  The NLRB apparently *believes* that an impoundment practice best furthers the objectives of transparency, mootness, and certainty, which is not an entirely irrational or unreasonable view, all things considered, and as explained above, it is *the*

*agency's* prerogative to weigh the downsides of the proposed policy change (such as the ones that the AFL-CIO now perceives) against the beneficial outcomes that the agency is seeking.  *See Fox Television*, 556 U.S. at 515.  All that the APA's no-arbitrariness mandate requires, and thus all that this Court is permitted to compel, is the agency's transparent consideration of the relevant facts and factors when it weighs the costs of the new policy against the benefits that it believes the change will yield.  And, here, the NLRB has clearly done so.  *See, e.g.,* 84 Fed. Reg. at 69,548 (explaining that, "although it is possible that the results of an election will render issues moot, there is no way to know in advance if this will be the case, and where the issues are not mooted by the election results, the parties will have greater finality and certainty if these matters are resolved prior to the vote count"); *see also id.* (positing that "impoundment of the ballots will reduce the possibility of confusion where results are announced prior to the Board's ruling on a pending request for review, but then the Board's subsequent ruling nullifies or alters the results").  Thus, this Court cannot find that the NLRB's impoundment provision is arbitrary and capricious in violation of section 706(2)(A) of the APA.

The Court is also unable to conclude that that the new impoundment provision violates section 153(b) of the NLRA, as the AFL-CIO claims.  (*See* Pl.'s Mot. for Summ. J. at 49.)  As previously noted, section 153(b) of the NLRA authorizes the NLRB to delegate the Board's own authority in representation cases to its regional directors, 29 U.S.C. § 153(b), and also establishes that, "upon the filing of a request . . . by any interested person, the Board may review any action of a regional director delegated to him[,]" *id.*  The statute further provides that "such a review shall not,

unless specifically ordered by the Board, operate as *a stay of any action taken by the regional director*[.]" *Id.* (emphasis added).  And the AFL-CIO maintains that this statutory bar on stays of actions the regional director has taken forecloses a stay on a regional director's *future* acts, such that the impoundment provision in the 2019 Election Rule is "unambiguously" unlawful.  (*See* Pl.'s Summ. J. Opp'n at 27.)

    To understand why the Court disagrees with the AFL-CIO's characterization of the rule's impoundment policy, it is crucial to recognize that the particular action of the regional director that is under review at the time of impoundment is the regional director's "decision and direction of election[,]" 29 C.F.R. § 102.67(c) (2020), which is but one of the regional director's delegated duties.  In the absence of the impoundment provision and in the ordinary course of affairs, the regional director calls for an election, the election then occurs, and once the election has been conducted, the regional director will count the ballots that were cast and will certify the election results.  29 C.F.R. § 102.69 (2019).  The impoundment provision has no bearing on whether the election that a regional director has called proceeds, *i.e.*, it does not impact the act of the regional director that has already been taken.  Rather, if a request for Board review is filed "within 10 business days" of the regional director's call for an election, and if such request "has not been ruled upon or has been granted before the election is conducted," 29 C.F.R. § 102.67(c) (2020), then the impoundment rule operates to stymie certain actions that the regional director *intends* to take, but has not yet taken (*i.e.*, counting the ballots and certifying the election).

    In this Court's view, section 153(b)'s stay prohibition plainly speaks solely to actions that have been "taken" by regional directors, 29 U.S.C. § 153(b), and says

nothing about whether actions that regional directors *have not yet taken* (but *will take*) can be stayed or postponed.  "Congress' use of a verb tense is significant in construing statutes."  *United States v. Wilson*, 503 U.S. 329, 333 (1992).  Moreover, "Congress' choice of words is presumed to be deliberate[.]"  *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 353 (2013).  As relevant here, the word "taken" in section 153(b) of the NLRA appears to identify, and prevent the postponement of, a subset of the decisions that the NLRB has "delegated" to regional directors: those that have *already* been made.  29 U.S.C. § 153(b).  And because section 153(b) is "silent or [at best] ambiguous[,]" *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 843 (1984), about the prospective-action issue that the 2019 Election Rule raises—*i.e.*, whether the NLRA prohibits the agency from *preventing* the regional director from making a future decision—the only question for the court is whether the agency's rule "is based on a permissible construction of the statute[,]" *id*.

In this regard, the AFL-CIO appears to suggest that the NLRB's promulgation of the impoundment rule is an unreasonable interpretation of the NLRA's stay provision, because "prospectively preventing [regional directors] from taking certain categories of action without a specific order in a particular case" has the effect of "wholly undermin[ing] the clear purpose[s]" of section 153(b), which the AFL-CIO identifies as "preclud[ing] automatic, categorical stays" (Pl.'s Summ. J. Opp'n at 28) and "speed[ing] the work of the Board" (Pl.'s Mot. for Summ. J. at 49 (internal quotation marks and citation omitted)).  But there is no indication in the legislative history or elsewhere that Congress intended to prohibit *all* stays of any action the Board delegates to its regional directors, retrospective and prospective; thus, it is not unreasonable for

the NLRB to conclude that the postponement of future actions of a regional director is permissible.  It is also clear to this Court that impoundment provision comports with the stated purposes of the NLRA's stay prohibition at a certain level of abstraction, because it appears that section 153(b) was simply intended to "expedite final disposition of cases by the Board, by turning over part of its caseload to its regional directors for final determination[,]" 105 Cong. Rec. 19,770 (daily ed. Sept. 14, 1959) (statement of Sen. Goldwater), and one of the many stated reasons why the NLRB is requiring impoundment is to avoid "situations where the Board's ruling on the request for review requires a rerun election because challenged ballots were opened and commingled with the valid ballots[,]" 84 Fed. Reg. at 69,548—*i.e.*, to expedite final disposition of such cases.

In short, the NLRB "has a wide degree of discretion in establishing the procedure and safeguards necessary to insure the fair and free choice of bargaining representatives by employees[,]" *Sitka Sound Seafoods, Inc. v. N.L.R.B*., 206 F.3d 1175, 1178 (D.C. Cir. 2000) (internal quotation marks and citation omitted), and the NLRA does not appear to address whether an election-related action that an agent of the Board is slated to take may be prospectively stayed, through rulemaking by the NLRB or in any other fashion.  Therefore, this Court cannot find that the NLRB's exercise of its authority to promulgate the impoundment rule contravenes section 153(b)'s stay prohibition, or is an otherwise unreasonable interpretation of that statutory provision.

## II.   ORDER

For the foregoing reasons, it is hereby

**ORDERED** that the AFL-CIO's Motion for Reconsideration (ECF No. 37) is **GRANTED**, and the Court's Order of May 30, 2020, will be **AMENDED** to rescind the

Court's remand of this matter to the agency and to reflect the Court's conclusions with respect to the parties' cross-motions for summary judgment concerning Counts Two, Three, and Four of the AFL-CIO's complaint.  Specifically, as discussed herein and as reflected in the accompanying Amended Order (*see* ECF No. 41), the Court has concluded that both parties' cross-motions for summary judgment (*see* ECF Nos. 22, 23) must be granted in part and denied in part.  The AFL-CIO is entitled to summary judgment with respect to Court One of complaint, while the NLRB is entitled to summary judgment with respect to the complaint's remaining counts.

DATE:  July 1, 2020

*Ketanji Brown Jackson*
KETANJI BROWN JACKSON
United States District Judge